1    trial that came up about your other association

2    with prostitutes and some of the information

3    that was, I'm sure you're familiar with, from

4    the probation officer's report that he quote

5    from the District Attorney.  Were you leading

6    kind of a double life at that time?

7        INMATE BYRDE:  I was going through a period

8    of -- I like to think of it as a very isolated

9    period of extreme stress.  Actually, in that

10    information that you have, I didn't intend to

11    submit that, but there was some recent

12    information that one of the doctors gave me that

13    said people with MS suddenly do this, they go

14    off the deep end for unexplained reasons from

15    time to time.  But I had a -- I was in charge of

16    lending, as I stated.  My boss at the time,

17    although I didn't know it then, was a crook.  I

18    would turn down major multi-million dollar

19    loans, and he would approve them over my head

20    and tell me I didn't know what I was doing.

21    Turned out -- subsequently I found out a couple

22    years later he was in bed with these developers.

23    He ended up going to prison for it.  He ended up

24    doing federal time for it, but at the time I had

25    no idea.  I just knew I was being criticized in

26    my job.  I had my first major attack of MS,

27    which at that time affected one of my hands, and

Exhibit #2 Page 22

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 2 of 91
Case 4:07-cv-06375-SBA    Document 2-2    Filed 12/17/2007    Page 24 of 38

21

1   I was basically in fear of my job and in fear of

2   what was going to happen, in fear of this, what

3   you see now.  That's not an excuse, but I was

4   under a lot of pressure and a lot of stress, and

5   I didn't handle it appropriately.  I handled it

6   by, basically driving around trying to escape my

7   reality, and I got involved in these activities.

8       PRESIDING COMMISSIONER DAVIS:  And so your

9   activity with prostitutes was something that was

10  done after your diagnosis?  Is that what you're

11  saying?

12      INMATE BYRDE:  Yes, after I had my first

13  attack.

14      PRESIDING COMMISSIONER DAVIS:  So you did

15  nothing prior to that?

16      INMATE BYRDE:  No, I had no prior

17  involvement.  I think the first prostitute I

18  ever encountered in my life was around maybe

19  December of '84, somewhere in there.  It was a

20  short period of maybe five or six months.

21      PRESIDING COMMISSIONER DAVIS:  The

22  information is described again on -- I

23  referenced -- included my reference in the year

24  -- I don't think I included page seven by

25  reference, actually, but on page seven of the

26  probation officer's report really describes some

27  rather graphic fantasies that apparently you

Exhibit #2 Page 23

1   admitted to at this time.  Was this you think

2   all part of your MS as well?

3   **INMATE BYRDE:**  No, I can't blame it on the

4   MS.  I think I blame it on just trying to escape

5   my own reality.  The world of -- the first

6   prostitute I ever met or had a relationship with

7   was something that was alien to me.  You

8   discussed my past activity and all the civic

9   stuff and all this.  It was just something that

10  was completely alien, and I spent most of the

11  time asking questions about what your life like

12  and they would describe to me.  I said what's

13  the craziest thing you ever heard, and they

14  would describe wild and crazy things.  You know,

15  it was just something completely different.  It

16  allowed me to escape my own reality and to say

17  wow, you know, and get into that, but it wasn't

18  -- it wasn't any kind of longstanding fantasy I

19  had or anything like that.  In fact, a lot of

20  times one person would tell me one thing, and I

21  would pass it on to the next one just to see for

22  reaction and all this stuff.  It's basically

23  escapism.  I was trying the get away from my own

24  reality into another reality.

25  **PRESIDING COMMISSIONER DAVIS:**  Well, you

26  have to admit sitting on this side that's quite

27  a quantum leap for someone who's involved in Red

Exhibit #2 Page 24

1  Cross and Kiwanis and so forth to be involved in

2  these kinds of activities that are described in

3  here?

4      **INMATE BYRDE:**  I don't know what activities

5  are described.  I probably dated about half a

6  dozen prostitutes.  There's no excuse for it.  I

7  mean, I can't justify it.  I wouldn't attempt

8  to.  It's so alien to my own upbringing and my

9  own experience.  If you go back 20 years ago or

10  so, I guarantee anybody looking at me would say

11  I'm at least conservative as either one of you

12  two gentleman, you know, just as you've pointed

13  out.

14      **PRESIDING COMMISSIONER DAVIS:**  Okay.

15  Anyway, also included in my earlier

16  incorporation by reference to include that page

17  seven into the record as well.  Commissioner, do

18  you have any questions?

19      **DEPUTY COMMISSIONER ARMENTA:**  Yes, I do.

20  Prior to that incident, had you hurt any of the

21  other ladies?

22      **INMATE BYRDE:**  No.

23      **DEPUTY COMMISSIONER ARMENTA:**  No?

24      **INMATE BYRDE:**  No.

25      **DEPUTY COMMISSIONER ARMENTA:**  Did you have

26  any disagreements with them?

27      **INMATE BYRDE:**  Disagreements, no.

Exhibit #2 Page 25

1    **DEPUTY COMMISSIONER ARMENTA:**

2    Disagreements?

3    **INMATE BYRDE:** Not that I'm aware of.

4    **DEPUTY COMMISSIONER ARMENTA:** No?

5    **INMATE BYRDE:** That I can recall.

6    **DEPUTY COMMISSIONER ARMENTA:** So why would

7    you have it here?

8    **INMATE BYRDE:** The only --

9    **DEPUTY COMMISSIONER ARMENTA:** This

10    incident?

11    **INMATE BYRDE:** The only reason in my mind

12    that anything happened was the fact that Ms.

13    Engstrom panicked in the situation and started

14    screaming, and I freaked out because I was

15    afraid that my neighbors were going to hear the

16    screaming and yelling.

17    **DEPUTY COMMISSIONER ARMENTA:** Did you live

18    in a house?

19    **INMATE BYRDE:** Yes, sir, right next door --

20    **DEPUTY COMMISSIONER ARMENTA:** In an

21    apartment?

22    **INMATE BYRDE:** No, a house.

23    **DEPUTY COMMISSIONER ARMENTA:** A house?

24    **INMATE BYRDE:** But it's maybe ten or 12

25    feet to the next house. They're close together.

26    **DEPUTY COMMISSIONER ARMENTA:** What time was

27    it?

Exhibit #2 Page 26

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 6 of 91
Case 4:07-cv-06375-SBA    Document 2-2    Filed 12/17/2007    Page 28 of 38

25

1    **INMATE BYRDE:**  It was 10:00 o'clock at

2    night maybe.

3    **DEPUTY COMMISSIONER ARMENTA:**  At night?

4    **INMATE BYRDE:**  Maybe 10:30, yeah.

5    **DEPUTY COMMISSIONER ARMENTA:**  During the

6    week or weekend or what?

7    **INMATE BYRDE:**  You know, I can't recall.

8    It may of been a Sunday night, Monday night.

9    **DEPUTY COMMISSIONER ARMENTA:**  Where was

10    your wife?

11    **INMATE BYRDE:**  She was at a Girl Scout camp

12    with my two daughters.

13    **DEPUTY COMMISSIONER ARMENTA:**  And you say

14    that you can't remember what happened.  Were you

15    under drugs?

16    **INMATE BYRDE:**  No, sir, I've never used

17    drugs.

18    **DEPUTY COMMISSIONER ARMENTA:**  No, alcohol?

19    **INMATE BYRDE:**  No, I'm a very light

20    drinker.

21    **DEPUTY COMMISSIONER ARMENTA:**  And the only

22    thing you recollect is that you did hold her

23    down?

24    **INMATE BYRDE:**  Oh, no, I hit her -- held

25    her down, and I probably hit her too or fighting

26    with her as she was struggling and yelling.  I

27    wanted her to be quiet, and she didn't want to

Exhibit #2 Page 27

1    be quiet.

2        **DEPUTY COMMISSIONER ARMENTA:**  Did you hit

3    her, or are you still saying probably?  Did you

4    hit her?

5        **INMATE BYRDE:**  I'm sure I did.  I mean, I

6    don't have a memory of hitting her.

7        **DEPUTY COMMISSIONER ARMENTA:**  Okay.

8        **INMATE BYRDE:**  But just from looking at the

9    bruises, I can't account for them any other way.

10   I must have hit her.

11       **DEPUTY COMMISSIONER ARMENTA:**  And why do

12   you think you can't remember?

13       **INMATE BYRDE:**  Well, because I was think I

14   was not intending to strike her as much as I was

15   trying to shove her down and keep her quiet.  I

16   was actually quite panicked because of the

17   window right above my right ear was wide open,

18   and I was afraid that the neighbors were going

19   hear, and I wanted to jump up and close the

20   window.

21       **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

22       **INMATE BYRDE:**  That was the biggest thing -

23   -

24       **DEPUTY COMMISSIONER ARMENTA:**  How long did

25   you hold her down?

26       **INMATE BYRDE:**  It seemed like a few

27   seconds.

Exhibit #2 Page 28

1      **DEPUTY COMMISSIONER ARMENTA:**  A few

2   seconds?

3      **INMATE BYRDE:**  It seemed like to me.

4      **DEPUTY COMMISSIONER ARMENTA:**  Did you ask

5   her to be quiet?

6      **INMATE BYRDE:**  Yes, of course.

7      **DEPUTY COMMISSIONER ARMENTA:**  And she would

8   not?

9      **INMATE BYRDE:**  No, I think she was choking

10  or had water or something, like I said, and she

11  was yelling and struggling, and we both

12  panicked.

13     **DEPUTY COMMISSIONER ARMENTA:**  Okay.  So you

14  -- so she's at fault too?

15     **INMATE BYRDE:**  No, not at all.

16     **DEPUTY COMMISSIONER ARMENTA:**  Because she

17  panicked?

18     **INMATE BYRDE:**  That's obviously my fault.

19     **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

20     **INMATE BYRDE:**  She was in a helpless

21  situation.

22     **DEPUTY COMMISSIONER ARMENTA:**  Okay.  I

23  don't have any other questions.

24     **PRESIDING COMMISSIONER DAVIS:**  All right.

25  Mr. Byrde, is there anything that I haven't

26  asked you about your prior history, about your

27  social history, your -- obviously, you don't

Exhibit #2 Page 29

28

1  have an arrest record, so we don't have anything

2  to cover there, about the crime itself that you

3  believe is important for this Panel to

4  understand this afternoon that we haven't

5  already gone over?

6      **INMATE BYRDE:** No, sir, not really because

7  to me -- I mean, like I said, I probably was

8  more conservative than either one of you

9  gentleman, and to me whether I meant to do this

10  or didn't mean to do that, it's been all along

11  irrelevant to me.  I'm responsible.  Whatever

12  happened, I did it.  I'm responsible and I

13  understand that to be the case and I accept that

14  responsibility.  So the details of it are -- are

15  not as relevant to me as they might be to

16  someone else.  I've carried an awful lot of

17  guilt about this for a very long time.

18      **PRESIDING COMMISSIONER DAVIS:**  All right.

19  I'll ask you to turn your attention please to

20  Commissioner Armenta.

21      **DEPUTY COMMISSIONER ARMENTA:**  Let's go over

22  several things.  Let's go over the letters, and

23  we do have a number of letters.  We have a total

24  of 31 letters of opposition to you being getting

25  a date.  With that, I mean 37 letters from

26  different people, members of the family, as well

27  as friends and neighbors.  We also -- we did

Exhibit #2 Page 30

1    receive a letter -- we did send out some

2    notices.  We got a letter from the Marin County

3    Sheriff's Office, the last letter being dated

4    May 10th, 2005, and they oppose your release, as

5    well as from the courts.  The judge sent a

6    letter, and as well as the office from the DA

7    office.  However, we have a member of the DA's

8    office in the hearing, and we'll be hearing from

9    that individual.  We have letters from the

10   father of the victim, Mr. William Engstrom, and

11   he's here.  Right, you're here, sir?

12       MR. WILLIAM ENGSTROM:  Yes, sir.

13       DEPUTY COMMISSIONER ARMENTA:  Okay.  I want

14   to ask you, do you want me to read the letter,

15   or when it comes to your time do you want me to

16   -- do you want to read it yourself or what?

17       MR. WILLIAM ENGSTROM:  I would like to have

18   you read my wife's letter.

19       DEPUTY COMMISSIONER ARMENTA:  That is --

20       MR. WILLIAM ENGSTROM:  Linda.

21       DEPUTY COMMISSIONER ARMENTA:  Okay.  I'll

22   do that.

23       MRS. ENGSTROM:  Is that the one from 2006,

24   this year?

25       DEPUTY COMMISSIONER ARMENTA:  We'll look

26   for it.

27       MRS. ENGSTROM:  I think Katherine has --

Exhibit #2 Page 31

Case 3:08-cv-00651-JM-AJB     Document 1-2     Filed 04/09/2008     Page 11 of 91
Case 4:07-cv-06375-SBA     Document 2-2     Filed 12/17/2007     Page 33 of 38

30

1       **DEPUTY COMMISSIONER ARMENTA:**  Okay.  Yeah,

2   it's right here.

3       **MRS. ENGSTROM:**  Okay.

4       **DEPUTY COMMISSIONER ARMENTA:**  June 13,

5   2006?

6       **MRS. ENGSTROM:**  Yes.

7       **DEPUTY COMMISSIONER ARMENTA:**

8           Members of the Board, Cynthia Lynn

9           Engstrom is my daughter and murder

10          victim of Leslie Arthur Byrde,

11          convicted of second-degree murder,

12          sentenced 15 years to life in prison.

13          I am writing to you with the hope that

14          you will not release Leslie Arthur

15          Byrde from prison for the murder of my

16          daughter Cynthia Lynn Engstrom.  Leslie

17          Arthur Byrde committed a heinous crime.

18          He so cold heartedly ended Cindy's

19          life.  The pain that he has caused to

20          our family is unimaginable.  Cindy

21          would be 40 years old now.  She would

22          be a aunt, a sister-in-law, a loving

23          sister, and a precious daughter.  It is

24          my belief that sexual predators and

25          violent murderers are beyond

26          redemption.  It is shown that the

27          recidivism rate is greatly in excess of

Exhibit #2 Page 32

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 12 of 91
Case 4:07-cv-06375-SBA    Document 2-2    Filed 12/17/2007    Page 34 of 38

31

1           50 percent.  We can never bring Cindy

2           back to us, but it is my belief that

3           society would be protected from this

4           cold hearted -- should be protected

5           from this cold hearted murderer.  I

6           urge the Board please deny parole to

7           Leslie Arthur Byrde.

8       Signed Linda J. Engstrom, mother.  We also

9   have a letter dated June 13, 2006, from Sylvia

10  Ann Engstrom.  Is she a sister?

11      **MR. SCOTT ENGSTROM:**  It's my wife.

12      **DEPUTY COMMISSIONER ARMENTA:**  Sister-in-

13  law?

14      **MR. SCOTT ENGSTROM:**  Correct.

15      **DEPUTY COMMISSIONER ARMENTA:**  Okay.  And

16  June 13th, 2006, from the father.  I did mention

17  that letter already.  We got a letter on June

18  11, 2006, from Walter Gene (indiscernible).

19      **DEPUTY DISTRICT ATTORNEY MITCHELL:**

20  Something like that.  it's a Japanese name.

21      **DEPUTY COMMISSIONER ARMENTA:**  Northridge,

22  California, and it's basically a letter in

23  support of the pleas made by the family and asks

24  that you not be given a date.  June 7th, 2006,

25  letter from sandy Nelson.  And that's the --

26      **MR. WILLIAM ENGSTROM:**  Sister.

27      **DEPUTY COMMISSIONER ARMENTA:**  That's the

Exhibit #2 Page 33

1    sister?

2        **MR. WILLIAM ENGSTROM:**  Yes.

3        **DEPUTY COMMISSIONER ARMENTA:**  And letter

4    from June 6, 2006, from Roy O'Sherum (phonetic),

5    June 5th, 2006, letter from Robert Whitaker

6    (phonetic), Northridge, California.  June 5th,

7    2006, letter from Kelly Clark.  Is she a friend

8    of the family?

9        **MR. WILLIAM ENGSTROM:**  I'm sorry, from a

10    coworker.

11        **DEPUTY COMMISSIONER ARMENTA:**  Okay.  June

12    4th, 2006, letter from Chris Berry (phonetic).

13    June 2nd, 2006, letter from Fred Pruvica

14    (phonetic).

15        **DEPUTY DISTRICT ATTORNEY MITCHELL:**

16    Pruvechey (phonetic).

17        **DEPUTY COMMISSIONER ARMENTA:**  Pruvechey?

18        **DEPUTY DISTRICT ATTORNEY MITCHELL:**  Yeah.

19        **DEPUTY COMMISSIONER ARMENTA:**  Okay.  June

20    2nd, 2006, letter from Jim Thomas (phonetic),

21    Huntington Beach, also they urge that you be

22    kept.  June 1st, 2006, letter from Stephanie

23    Nguyen.  And a letter June 1st, 2006, from a

24    Michael Williams.  He opposes your release.

25    Also, a letter from Jay Thobe, T-H-O-B-E.

26    Letter dated June 1st, 2006, from a Marvin

27    Gibler (phonetic), lives in Lake Forest.  Letter

Exhibit #2 Page 34

1   dated May thirty-first, 2006, also from a Tracy

2   Tobin (phonetic) writing as a concerned citizen

3   and also believes that you should not be

4   released.  May 31st, 2006, letter from Shanelle

5   Branenburg (phonetic), also opposes your

6   release.  May 31st, 2006, letter from William

7   and Deborah Whitaker.  And another letter from

8   Richard and Cheryl Pyle (phonetic), dated May

9   30th, 2006.  David Karl also wrote a letter

10  dated 5/30/2006.  His letter is very brief and

11  to the point, and he says, "I believe that

12  people can change and do deserve a second

13  chance; however, the despicable crime that this

14  inmate committed is one of the few crimes that I

15  feel do not deserve any leniency.  I also have a

16  letter with no date from Lynn Moss, and Jason

17  Shsu S-H-S-U, also wrote a letter and no date,

18  but also he opposes your parole.  And Joshua

19  Emmons (phonetic) wrote a letter and also

20  opposes.  Dena Dernick (phonetic) also wrote us

21  a letter and she opposes.  And Yun Hutchinson

22  (phonetic), Robby Reese (phonetic), Mark Schultz

23  (phonetic) also wrote a letter.  Most of these

24  letters don't have a date, but they did sign the

25  letters.  Letter from Jorge Norvada (phonetic)

26  and opposes.  Again, a letter from the DA's

27  office May 26th, 2006, from the Chief Deputy

Exhibit #2 Page 35

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 15 of 91
Case 4:07-cv-06375-SBA    Document 2-2    Filed 12/17/2007    Page 37 of 38

34

1   District Attorney Mitchell, and we have that

2   person present.  And I'm sorry there is a more

3   current letter from the sheriff's office.  That

4   is May 25th, 2006.  That one I will read into

5   the record.

6            In June, 1985, I was the chief

7            investigator into the murder of Cynthia

8            Engstrom.  Ms. Engstrom was murdered a

9            the hands of Leslie Arthur Byrde, a

10           vice president of a local bank.  Leslie

11           Arthur Byrde offered Cynthia Engstrom a

12           ride.  Byrde took Engstrom to his home

13           that day.  Byrde's wife and two

14           children were out of town attending a

15           church camp.  Once at the residence,

16           Mr. Byrde fulfilled a fantasy that he

17           had and engaged Cynthia in a sexual act

18           with him while in a bathtub.  During

19           this act Leslie Arthur Byrde watched as

20           the water rose over Cynthia's face.

21           During my extensive interview with him,

22           I asked Byrde what he had planned to do

23           with her body after she was dead.

24           Leslie Arthur Byrde replied, 'I was

25           planning to prop her up on a park

26           bench.'  What did he do with her --

27           what he did with her body was dump her

Exhibit #2 Page 36

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 16 of 91
Case 4:07-cv-06375-SBA    Document 2-2    Filed 12/17/2007    Page 38 of 38

35

```
 1              on a rural dirt driveway, a driveway
 2              that belonged to a rancher who was
 3              defaulting on a loan from the very bank
 4              that Mr. Byrde was employed.  This was
 5              a callous self gratifying murder.  An
 6              educated man, married, gainfully
 7              employed, Mr. Byrde acted as if nothing
 8              had happened and displayed a total lack
 9              of remorse.  I urge the parole Board to
10              deny parole to Leslie Arthur Byrde.
11      Signed Richard A. Keaton (phonetic),
12 retired sergeant, Marin County Sheriff's Office.
13 Also I'll read the letter from the courts dated
14 May 23rd, 2005.
15              On May 20th, 1986, I sentenced Leslie
16              Arthur Byrde to serve 15 years to life
17              with the second-degree murder of
18              teenage girl Cynthia Engstrom.  Mr.
19              Byrde was first eligible for parole in
20              1993.  At that time I wrote a letter
21              objecting to a early parole for him.  I
22              have attached a copy of my letter dated
23              November 12th, 1993, for use of
24              reference as well as the incorporation
25              of this letter.  I believed then, I
26              still believe today, that Mr. Byrde is
27              too dangerous to release into society.
```

Exhibit #2 Page 37

1          Once again I urge you to deny him

2          parole.

3     And that's retired Judge Beverly Savitt, S-

4  A-V-I-T-T.  In fact, as I recall reading that

5  letter and talking that she stated in that

6  letter that if she was able to give you more

7  time at that time that you would of gotten more

8  time.  I'm going to ask the next of kin, is

9  there anything other than the letters that I

10 mentioned that you would like me to read into

11 the record or would you just -- when it comes to

12 your time, you just going to take care of it?

13    **DEPUTY DISTRICT ATTORNEY MITCHELL:**  I think

14 we've read enough letters.  I think -- maybe,

15 did you want to say something?

16    **DEPUTY COMMISSIONER ARMENTA:**  No, not yet.

17    **DEPUTY DISTRICT ATTORNEY MITCHELL:**  Right.

18 Right.

19    **DEPUTY COMMISSIONER ARMENTA:**  Okay.  Let's

20 keep on going then.  Okay.  We did cover the

21 letters, and I said there's a letter from the

22 Deputy DA, but she is here.  We covered the

23 letter from the Court and the Sheriff.  And we

24 have letters from your family.  We have a letter

25 from a Carol Sullivan and dated February 21st,

26 2006.  Also a May 6th, 2006, letter from your

27 brother?

Exhibit #2 Page 38

1    **INMATE BYRDE:**  I don't have a brother.

2    **DEPUTY COMMISSIONER ARMENTA:**  He says, "I'm

3    writing on behalf of my brother Arthur Byrde."

4    **INMATE BYRDE:**  Who signed it?

5    **DEPUTY COMMISSIONER ARMENTA:**  That's a she?

6    **INMATE BYRDE:**  That's a she.

7    **DEPUTY COMMISSIONER ARMENTA:**  I'm sorry.

8    **INMATE BYRDE:**  Okay.

9    **DEPUTY COMMISSIONER ARMENTA:**  I need

10   glasses.

11   **INMATE BYRDE:**  You scared me with that one

12   there.

13   **DEPUTY COMMISSIONER ARMENTA:**  I'm sorry, I

14   apologize.  And there's a letter from Samantha

15   Byrde.

16   **INMATE BYRDE:**  One of my daughters.

17   **DEPUTY COMMISSIONER ARMENTA:**  Okay.  And

18   Nancy?

19   **INMATE BYRDE:**  That's my wife.

20   **DEPUTY COMMISSIONER ARMENTA:**  The wife.

21   Want me to read that letter?

22   **INMATE BYRDE:**  Sure.

23   **DEPUTY COMMISSIONER ARMENTA:**  Okay.  March

24   18th, 2006, Tucson.

25           My husband of 38 years, Leslie Arthur

26           Byrde, has spent the majority of our

27           married years in prison.  I've missed

Exhibit #2 Page 39

38

1    him greatly, and after the shock of

2    having him gone and losing his support,

3    the support of my best friend, I

4    continue to love the man he was and the

5    man he is today.  Art has missed his

6    two daughters grow up.  When he was

7    sent to prison our youngest daughter

8    was third grade and our oldest in

9    fifth.  Now, they are living their own

10   lives and -- but he has missed out on

11   so much.  He has been gone for dance

12   recitals, (indiscernible), graduations

13   and weddings.  He has missed out on the

14   good night kisses, checking out prom

15   nights, and walking down the wedding

16   aisles.  His daughters have been

17   without fatherly advise, monetary

18   backing, vacations together and so much

19   more.  Beyond the fact that we have

20   suffered without him, is the fact that

21   he caused the death of a fellow human

22   being.  He deeply regrets this.  We'll

23   probably never forgive or understand

24   his doing this.  Arthur is and always

25   was a person who respected life.  One

26   of my fondest memories was with when we

27   were at Sea World looking at the tidal

Exhibit #2 Page 40

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 20 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 4 of 64

39

```
1          pools.  A small child was being

2          careless with a sea --

3     And what -- that is anatomy?

4     INMATE BYRDE:  Anatomy?

5     DEPUTY COMMISSIONER ARMENTA:  Yeah.

6          And Art took the time to tell the boy

7          and our daughters that this was a

8          living creature and needed to be

9          treated with respect.  In prison Art

10         has tried not to waste his mind and

11         talents.  He took classes in computers

12         when they were available.  He's always

13         enjoyed working as a clerk, and has

14         been a respected helper in Hands on

15         Peace.  I am proud of him for his

16         efforts.  Art's health has become much

17         worse the last 21 years.  He was

18         diagnosed with MS 32 years ago and has

19         had flare ups on and off since that

20         time.  It was shortly after a

21         particularly bad flare up that he went

22         to prison.  Now, without the steady use

23         of his legs, he is unable to walk.  At

24         60 he is slower to recover from

25         setbacks and needs to be home where he

26         can get the care he needs.  I feel my

27         husband has served his time in
```

Exhibit #2 Page 41

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 21 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 5 of 64

40

1          punishment.  Although nothing can truly
2          make up for his crime, he can be better
3          service to his family and humanity at
4          home.  I am a teacher, fully vested in
5          requirement who can support him if he
6          needs to be.  I love him and want to
7          spend my remaining years with him.
8          Please grant him a parole date.  Nancy
9          G. Byrde.
10   That's your wife?
11   **INMATE BYRDE:**  Yes, sir.
12   **DEPUTY COMMISSIONER ARMENTA:**  Do you have a
13   letter of where you're going to live in
14   California?
15   **INMATE BYRDE:**  Well, I wanted to speak with
16   you gentlemen about that because that's an issue
17   that needs to be addressed because of my
18   disability.  If we're at that point in time --
19   **DEPUTY COMMISSIONER ARMENTA:**  Well, that's
20   something that we're doing right now.
21   **INMATE BYRDE:**  Okay.
22   **DEPUTY COMMISSIONER ARMENTA:**  Because one
23   of the questions that I would have is where do
24   you plan to live?
25   **INMATE BYRDE:**  Okay.  Obviously, I know
26   that the law is that you should attempt to
27   parole to your county of commitment.  I can do

Exhibit #2 Page 42

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 22 of 91
Case 4:07-cv-06375-SBA      Document 2-3      Filed 12/17/2007    Page 6 of 64

41

1    that.  I have financial resources to do that,

2    but I would prefer if you would allow me to

3    parole -- if you were to grant parole to my

4    sister's house, for example, in Orange County.

5    She's a licensed social worker and has plenty of

6    room for me.  Obviously, ultimately, I want to

7    try to transfer my parole to Arizona and live

8    with my wife, as she indicates in the letter.  I

9    realize that takes a little bit of time to do.

10   But that's -- I don't plan to live in California

11   any longer than I have to.  I can parole to my

12   sister's house.  I have a daughter who's an

13   architect who lives in San Diego.  I can parole

14   to my daughter's house, whatever the Board feels

15   appropriate.  If I'm required to go to Marin

16   County, I can afford to do that, but I don't

17   think the people in Marin County -- in fact, Ms.

18   Mitchell said in one of the previous hearings

19   people in Marin County don't want me back, and I

20   understand that.

21        **DEPUTY COMMISSIONER ARMENTA:**  Do you want

22   to talk about that or --

23        **INMATE BYRDE:**  That's --

24        **ATTORNEY CORYN:**  Go ahead.  You can address

25   that.

26        **DEPUTY COMMISSIONER ARMENTA:**  Okay.  I

27   don't believe you would be -- I'm sorry, I don't

Exhibit #2 Page 43

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 23 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 7 of 64

42

1   believe you would be or could be required to go

2   back to the county of commitment.  I believe the

3   law in that area has been changed.

4        INMATE BYRDE:  Right.

5        DEPUTY COMMISSIONER ARMENTA:  I think we

6   would be looking at, as a parole Board, is for

7   an area in California --

8        INMATE BYRDE:  Right.

9        DEPUTY COMMISSIONER ARMENTA:  -- where you

10  would have the less -- the best chance to

11  succeed.

12       INMATE BYRDE:  Right.

13       DEPUTY COMMISSIONER ARMENTA:  It doesn't

14  necessarily have to be wherever the commitment

15  offense did occur.

16       INMATE BYRDE:  Right.  That's what I wanted

17  to hear because the reality of it is I'm

18  disabled.  It's not like I'm going to be out on

19  the streets looking for a job.  I'll basically

20  be confined to a house, wherever it is, and so I

21  would prefer to parole to my sister's house who

22  is the social worker who has --

23       DEPUTY COMMISSIONER ARMENTA:  Do we have a

24  letter from her?

25       INMATE BYRDE:  There's a letter from her.

26  It doesn't specifically to my living because I

27  didn't know what you would actually want.

Exhibit #2 Page 44

1    **DEPUTY COMMISSIONER ARMENTA:**  Well, I'll

2    tell you in the future, if you don't get a date

3    today, and you feel that you can live with her

4    and she wants you to live with her.  Be certain

5    that a letter does say that.

6        **INMATE BYRDE:**  I'll do that, sir.

7        **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

8        **PRESIDING COMMISSIONER DAVIS:**  Other

9    options include, and I don't know if Arizona is

10   a signer to the interstate compact or not, but

11   would be to have your incarceration; should you

12   not get a date today, and we're certainly a long

13   away from making that decision; however, if you

14   don't get a date today, work on getting your

15   incarceration transferred to the state of

16   Arizona, if they're signed to the compact.  I

17   don't know if they are.

18       **INMATE BYRDE:**  I don't believe that they

19   are, sir.

20       **PRESIDING COMMISSIONER DAVIS:**  That's

21   something you should investigate with your

22   counselor.

23       **INMATE BYRDE:**  Yeah.

24       **MS. DIAZ:**  Actually, may I say something?

25   Arizona is part of it.

26       **INMATE BYRDE:**  Arizona is?

27       **PRESIDING COMMISSIONER DAVIS:**  Arizona is.

Exhibit #2 Page 45

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 25 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 9 of 64

44

1    **INMATE BYRDE:**  Okay.

2    **MS. DIAZ:**  Yes, I've processed inmates

3  before.

4    **INMATE BYRDE:**  Oh, good.  Okay.

5    **PRESIDING COMMISSIONER DAVIS:**  So that's

6  something you should investigate.  All right?

7    **DEPUTY COMMISSIONER ARMENTA:**  Okay.  All

8  right.  Let's get into what you've been doing

9  since your last hearing.  Mr. Byrde, your last

10  hearing was on 1/22 -- January 22nd, 2002.  At

11  that time you were denied for three years.  You

12  came in last May 31st, 2005.  At that time you

13  signed a one-year stip for a psych report?

14    **INMATE BYRDE:**  Yes, sir.  I was told it was

15  out of date.

16    **DEPUTY COMMISSIONER ARMENTA:**  Yeah, I think

17  it was six years old.

18    **INMATE BYRDE:**  It was only three years old.

19    **DEPUTY COMMISSIONER ARMENTA:**  Was it only

20  three?

21    **INMATE BYRDE:**  It was slightly over three

22  years old, and they said it had to be within

23  three years.

24    **DEPUTY COMMISSIONER ARMENTA:**  Okay.  And

25  even that's changed now with the rules on that,

26  but that was then.  Now is now.  Okay.  Now, you

27  got a five-year denial -- was that in 1996?

Exhibit #2 Page 46

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 26 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 10 of 64

45

1        **INMATE BYRDE:**  Sounds right.

2        **DEPUTY COMMISSIONER ARMENTA:**  9/24, and

3   prior to that on 12/93 you did a two-year stip?

4        **INMATE BYRDE:**  Right.

5        **DEPUTY COMMISSIONER ARMENTA:**  Okay.  And I

6   did go over your C file and went over the

7   reports prepared by Correctional Counselor York,

8   prepared what is known as the life prisoner's

9   report, and also the post-conviction progress

10  report, which covers the period from your last

11  hearing to the present time.  I can also report

12  that at this time your points, your scores are

13  at 28, which is the least you can be at.

14       **INMATE BYRDE:**  Yeah.

15       **DEPUTY COMMISSIONER ARMENTA:**  Minimum that

16  you can be at, which is 28.  And -- let me turn

17  it around.

18                    **R E C E S S**

19       **DEPUTY COMMISSIONER ARMENTA:**  Okay.  We are

20  on side two of the tape in the hearing of Leslie

21  Byrde, CDC number D-30420.  Okay.  And as far as

22  any problems in the prison, you have none.

23  Those are what are known as 115s.  No

24  disciplinaries.  You do have a 128, which is a

25  counseling chrono, only one.  That's dated

26  November 14th, 1991, supposedly for quarters,

27  whatever that is.

                                        Exhibit #2 Page 47

1    **INMATE BYRDE:**  I had a vent cover that we

2  forgot to take down during inspection.

3    **DEPUTY COMMISSIONER ARMENTA:**  Okay.  Let me

4  ask you, how is it that you've been able to

5  function all these years inside the prison

6  without one 115?

7    **INMATE BYRDE:**  That's a hard question --

8    **DEPUTY COMMISSIONER ARMENTA:**  I mean,

9  that's not easy.

10   **INMATE BYRDE:**  Yeah, that's a hard question

11  to answer.  I mean, I'm not involved in the

12  activities that people are normally are in

13  prison that tend to get them 115s.  I don't make

14  Pruno.  I don't gamble.  I'm not gang

15  affiliated.  I don't try to use any other

16  inmates that I don't, you know, I spend most of

17  my time in my cell studying and reading and --

18  or involved in activities in the chapel or self-

19  help groups or whatever.  So I've try to do keep

20  myself as far away as I can from the problems

21  that would lead to 115s.

22   **DEPUTY COMMISSIONER ARMENTA:**  Have you ever

23  been -- while in prison, have you ever been

24  pressured to take part?

25   **INMATE BYRDE:**  Well, I got beat up about a

26  year and a half ago and went to the hole because

27  I refused to lose some disciplinary

Exhibit #2 Page 48

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 28 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 12 of 64

47

1    documentation for some gangsters who thought I

2    should.

3         DEPUTY COMMISSIONER ARMENTA:  Okay.

4         INMATE BYRDE:  I said I don't do that, and

5    I got assaulted and was in the hole for a week

6    and a half until that all got sorted out, and it

7    was explained to them that they shouldn't do

8    that.

9         DEPUTY COMMISSIONER ARMENTA:  Okay.  Now,

10   we did get from you a lot of your certificates,

11   and I'm going to go over the information that I

12   found in the C file.  If there's something that

13   I miss, go ahead just let me know, okay.  I did

14   find that you have been a participant of Hands

15   of Peace.  Is that correct?

16        INMATE BYRDE:  A participant, and also I'm

17   actually the --

18        DEPUTY COMMISSIONER ARMENTA:  Facilitator?

19        INMATE BYRDE:  Facilitator, and I teach the

20   other facilitators now.  Actually, I have people

21   coming in from the street and I teach them how

22   to do it.

23        DEPUTY COMMISSIONER ARMENTA:  Why don't you

24   tell us about it.

25        INMATE BYRDE:  About Hands of Peace?

26        DEPUTY COMMISSIONER ARMENTA:  Uh-huh.

27        INMATE BYRDE:  Hands of Peace is an

Exhibit #2 Page 49

1  alternatives to violence program, which focuses

2  basically on effective communications and

3  listening techniques and violence avoidance

4  techniques.  We train people to basically

5  utilize these techniques to avoid conflict

6  situations.  We used to be called Creative

7  Conflict Resolution.

8      **DEPUTY COMMISSIONER ARMENTA:**  What have you

9  learned about yourself since taking part in

10  this?

11      **INMATE BYRDE:**  Every time I go one of these

12  things you learn something because they're

13  always different, you know.  We all think that

14  we're great listeners or great communicators or

15  whatever, but everybody in there can teach you

16  something about, you know, how you can become

17  better, what it is to avoid conflict, to avoid

18  violence, to avoid all of that stuff.

19      **DEPUTY COMMISSIONER ARMENTA:**  So what did

20  you learn about yourself?

21      **INMATE BYRDE:**  I learned that I was not

22  nearly as smart as I thought I was.  I tended to

23  be from my job, for lack of a better

24  description, arrogant.  I thought I was a real

25  hot shot kind of guy and that people maybe had

26  less education than me, you know, were not quite

27  as sharp, and I found out that's not the case,

Exhibit #2 Page 50

1   you know.  Intelligence hasn't really got

2   anything to do with education, and there's some

3   really smart and valuable people out there, you

4   know.  We see people come into the alternatives

5   to violence things, and a lot of then are just

6   there for the chrono or whatever, but a lot of

7   them are there because they really want to

8   change, you know, and you can learn a lot from

9   them, and they learn a lot from us we think.

10        **DEPUTY COMMISSIONER ARMENTA:**  You also took

11   part in a program called Views (phonetic)?

12        **INMATE BYRDE:**  That's at the --

13        **DEPUTY COMMISSIONER ARMENTA:**  Victims?

14        **INMATE BYRDE:**  Yes.  That was way, way --

15        **DEPUTY COMMISSIONER ARMENTA:**  In the '90s?

16        **INMATE BYRDE:**  Way back, yeah.

17        **DEPUTY COMMISSIONER ARMENTA:**  Like, well,

18   you know what I do, sir, I go over your whole C

19   file.

20        **INMATE BYRDE:**  I forgotten all about that.

21        **DEPUTY COMMISSIONER ARMENTA:**  Yeah, I know.

22   I go over the whole thing.  We're kind of told

23   just cover the period from your last hearing.

24        **INMATE BYRDE:**  Right.

25        **DEPUTY COMMISSIONER ARMENTA:**  And we do,

26   but in all fairness, but we also like to go back

27   --

Exhibit #2 Page 51

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 31 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 15 of 64

50

1       **INMATE BYRDE:**  I appreciate it.  That's
2   right.
3       **DEPUTY COMMISSIONER ARMENTA:**  Like when you
4   first came in you were, I think I believe you
5   were -- you went to Mule Creek, and immediately
6   they made you a clerk?
7       **INMATE BYRDE:**  Well, actually, I had been
8   at Folsom for awhile before there.  I didn't
9   immediately go to Mule Creek.
10      **DEPUTY COMMISSIONER ARMENTA:**  Oh, you
11  didn't, okay.
12      **INMATE BYRDE:**  I was at Folsom for about a
13  year and a half before I went to Mule Creek.
14      **DEPUTY COMMISSIONER ARMENTA:**  Well, when
15  you get a term like you did, a year and a half
16  is not that long.
17      **INMATE BYRDE:**  Yeah, I was lucky.
18      **DEPUTY COMMISSIONER ARMENTA:**  So that's
19  almost immediately.
20      **INMATE BYRDE:**  Yeah, okay.
21      **DEPUTY COMMISSIONER ARMENTA:**  Anyway,
22  that's where you went, and the point is that
23  you've been a clerk for many years, and your
24  ratings have been exceptional for all your
25  efforts.  And you also have been a housing clerk
26  and been very involved in -- like I said, you've
27  been a facilitator.  Now, you also teach them?

Exhibit #2 Page 52

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 32 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 16 of 64

51

1    **INMATE BYRDE:**  Yes, sir.

2    **DEPUTY COMMISSIONER ARMENTA:**  The Creative

3    Conflict Resolution.  You've got certificates of

4    completion.  You also participated in a

5    Vocational Computer Tech?

6    **INMATE BYRDE:**  Yes.

7    **DEPUTY COMMISSIONER ARMENTA:**  Did you ever

8    complete that?

9    **INMATE BYRDE:**  Well --

10    **DEPUTY COMMISSIONER ARMENTA:**  I know you

11    were close?

12    **INMATE BYRDE:**  Well, the guys that were in

13    the course deliberately never completed it

14    because if you actually got the final

15    certificate they kicked you out of the class.

16    And with computer technical and computer

17    programming, once you're away from it for a

18    couple of years, you're dead in the water.  I

19    mean, it's been 11 and a half years since I was

20    in it, and even though I was pretty qualified

21    computer programmer 11 and a half years ago,

22    today probably the average ten year-old could

23    run rings around me.  The technology goes so

24    fast, so we would deliberately -- we would learn

25    one language, become very competent in it, and

26    then we would learn another language, and then

27    another language.  So we have stage

Exhibit #2 Page 53

1  certificates, and I think the certificates in

2  that say job ready and eligible and all of that

3  sort of thing, but we very deliberately tried

4  not to graduate because once we did we'd be out

5  of it and we couldn't ever -- we'd lose our

6  vocation immediately.

7    **DEPUTY COMMISSIONER ARMENTA:** Okay. We

8  have your certificates here, most recently 2006

9  from Hands of Peace Alternatives to Violence

10  Project. Workshop for training in nonviolent

11  conflict resolution, and it says you

12  satisfactorily completed 22 hours training for

13  facilitator's course?

14    **INMATE BYRDE:** Right, I was a training

15  facilitator.

16    **DEPUTY COMMISSIONER ARMENTA:** Again,

17  another one 2004 for Conflict Resolutions,

18  Friends Outside?

19    **INMATE BYRDE:** Right.

20    **DEPUTY COMMISSIONER ARMENTA:** And

21  certificate in 2003, and then another one for

22  serving in the facilitator team. That seems to

23  be what your -- your main --

24    **INMATE BYRDE:** Yes, sir, it is.

25    **DEPUTY COMMISSIONER ARMENTA:** -- function

26  is at this point?

27    **INMATE BYRDE:** Right.

Exhibit #2 Page 54

1      DEPUTY COMMISSIONER ARMENTA:  Well, your

2  main project?

3      INMATE BYRDE:  It is.  Yeah, I'm very

4  involved in that project and have been for the

5  last ten years or more.

6      DEPUTY COMMISSIONER ARMENTA:  Yeah, there's

7  a lot of --

8      INMATE BYRDE:  I think there's like 16 of

9  them, in fact.

10     DEPUTY COMMISSIONER ARMENTA:   --

11  certificates.

12     INMATE BYRDE:  There's a lot more that we

13  didn't get certificates for.  It seems sort of

14  overkill after a certain point.

15     DEPUTY COMMISSIONER ARMENTA:  Well, if you

16  earn them, you should get them.  You also have a

17  certificate for Breaking Barriers?

18     INMATE BYRDE:  Yes, sir.

19     DEPUTY COMMISSIONER ARMENTA:  1996, and for

20  Karos (phonetic).

21     INMATE BYRDE:  Kiros (phonetic).

22     DEPUTY COMMISSIONER ARMENTA:  Kiros?

23     INMATE BYRDE:  Right.

24     DEPUTY COMMISSIONER ARMENTA:  Okay.  And

25  you also completed a morals and values course.

26  Is that correct?

27     INMATE BYRDE:  Yes, sir.

Exhibit #2 Page 55

Case 3:08-cv-00651-JM-AJB   Document 1-2   Filed 04/09/2008   Page 35 of 91
Case 4:07-cv-06375-SBA   Document 2-3   Filed 12/17/2007   Page 19 of 64

54

1    **DEPUTY COMMISSIONER ARMENTA:**  What did you

2    learn the there?

3    **INMATE BYRDE:**  It was taught by a an old

4    rabbi from New York.  Basically, his number one

5    moral and number one value amounted to the same

6    thing, which was that life was devoted to work.

7    I've always been kind of a work alcoholic

8    anyway, so I'm not sure I learned anything new,

9    but he was a very interesting guy, and it was

10   that people needed to be busy and needed to be

11   working.  You didn't need to be watching

12   television and playing pinochle out in the day

13   room.  You needed to be actually doing something

14   positive with your life, and I agreed with him

15   completely.

16   **DEPUTY COMMISSIONER ARMENTA:**  We got a

17   number of chronos, most of them have to do with

18   your participation in Hands of Peace.  We also

19   got a positive chrono from J.W. Dresbach.

20   **INMATE BYRDE:**  Yes, sir.  He's a captain.

21   **DEPUTY COMMISSIONER ARMENTA:**  D-R-E-S-B-A-

22   C-H, facility captain, facility one.  And it

23   talks very highly of you and your work.  And he

24   himself has been with the department for 31

25   years.  And he says, "I do not feel that inmate

26   Byrde would reoffend if released from prison.

27   This is not a statement I make lightly.  Inmate

Exhibit #2 Page 56

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 36 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 20 of 64

55

1  Byrde is only the second inmate for which I have

2  made such evaluation.  I am aware of the inmate

3  Byrde's commitment offense, but based on my day-

4  to-day observations with him and his

5  interactions with staff, I feel comfortable with

6  my evaluation.  My opinion is further supported

7  by inmate Byrde's deteriorating physical

8  condition.  The increasing cost of maintaining

9  inmate Byrde in prison represents, in my

10  opinion, both an unwarranted and unnecessary

11  cost to the state.  I mentioned letters from

12  Carol, but here's a letter from a Dr. Rod Stern

13  (phonetic)?

14       INMATE BYRDE:  Yes.

15       DEPUTY COMMISSIONER ARMENTA:  Is he is --

16       INMATE BYRDE:  He's a friend.

17       DEPUTY COMMISSIONER ARMENTA:  Oh, a friend,

18  but he's also been in prison?

19       INMATE BYRDE:  He was.  He was in prison

20  here.  He's been out for a number of years, and

21  he's been very successful in business, and he

22  just keeps in touch with some of us that's still

23  here in prison.

24       DEPUTY COMMISSIONER ARMENTA:  It's a letter

25  of support.

26       INMATE BYRDE:  Right.

27       DEPUTY COMMISSIONER ARMENTA:  Dated

Exhibit #2 Page 57

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 37 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 21 of 64

56

1   February 25th, 2006.  As I mentioned letters

2   from Sherry, your sister?

3        **INMATE BYRDE:**  One of my sisters.

4        **DEPUTY COMMISSIONER ARMENTA:**  Okay.  We

5   read your wife's letter, and also a letter here

6   from your daughter?

7        **INMATE BYRDE:**  Which?

8        **DEPUTY COMMISSIONER ARMENTA:**  Is that your

9   daughter?

10       **INMATE BYRDE:**  Which one?

11       **DEPUTY COMMISSIONER ARMENTA:**  Samantha?

12       **INMATE BYRDE:**  Samantha is one of my

13  daughters, yes.

14       **DEPUTY COMMISSIONER ARMENTA:**  Okay.

15            My father Leslie Arthur has been a

16            prisoner in the California Department

17            of Corrections for 28 years.  During

18            the time he has missed seeing my sister

19            and me grow up.  We've been punished

20            for not having him near us in these

21            years.  I've missed him greatly, and

22            due to the location of my job, have not

23            been able to ever even visit him on a

24            regular basis.  I feel that he has

25            served his punishment.  I would

26            respectfully request his release from

27            prison in the near future.  He is

Exhibit #2 Page 58

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 38 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 22 of 64

57

1          needed at home and in our lives, and we

2          want him back.

3      And it's signed Samantha Byrde in Chicago,

4  dated March 17th, 2006.  Okay.  Let's go into

5  one more area, which is the psychological.

6  There was a report that was prepared for this

7  hearing by Dr. Louisa Fijman, F-I-J-M-A-N.

8  She's a staff psychiatrist.  I'll cover a couple

9  of areas.  Under diagnosis -- or diagnostic

10  impression, Axis I:  There's No Diagnosis.  Axis

11  II:  There's No Diagnosis.  Under Axis III:  It

12  says you have Multiple Sclerosis and cataracts.

13      **INMATE BYRDE:**  Cataracts.

14      **DEPUTY COMMISSIONER ARMENTA:**  As well as

15  asthma.  Under Axis IV:  Which is the area of

16  your stress, it says consists of Legal Issues,

17  Incarceration, Deterioration of Health and

18  Separation from your Family Members is what is

19  causing you your stress, and gives you a

20  functional score between 75 to 80.  In the area

21  of whether she considers you a threat to the

22  community, I will read this into the record.

23  "Mr. Byrde's violence potential outside a

24  controlled setting in the past was considered to

25  have been less than average, and at the present

26  it is estimated to be reduced from that level.

27  If released to the community, he in all

Exhibit #2 Page 59

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 39 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 23 of 64

58

1  probability be likely to continue improvement

2  given his defined set of expectations and goals,

3  along with family support.  He further appears

4  to have internal resources necessary, along with

5  the motivation, to be productive and contribute

6  to helping others."  Basically, one other area

7  that I should point out in the psychological

8  report, she writes on section six, it says no

9  one in the family, with the exception of his

10 wife, knew about his illness for the previous

11 ten years.  Multiple sclerosis is known to be

12 aggravated by any type of stress.  Mr. Byrde was

13 at that time experiencing a great deal of stress

14 produced by conflicts of work, (indiscernible)

15 or being overruled by his superiors and that

16 were questioning his judgment.  A combination of

17 his declining health, his conflicts at work, and

18 his personal approach to dealing with stress

19 produced some type of emotional (indiscernible).

20 She basically felt that you were leaving your

21 office to unwind, trying to unwind.  It was at

22 this time that he became engaged in soliciting

23 prostitutes.  The contacts occurred for

24 approximately six or seven months.  It was a

25 period where several banks merged, and he was

26 part of the design team in charge of

27 reorganizing the work force.  This involved

Exhibit #2 Page 60

1   letting go of a number of people, which created

2   enumerable conflicts and lawsuits.  He remembers

3   working seven days a week for a period of five

4   months.  Now, that's what you told her?

5        INMATE BYRDE:  Yes, largely.  I guess she

6   got some of that from reading my file, but

7   mostly.

8        DEPUTY COMMISSIONER ARMENTA:  All right.

9        INMATE BYRDE:  She asked me questions about

10  it.

11       DEPUTY COMMISSIONER ARMENTA:  Okay.  All

12  right.  Is there anything that I haven't

13  covered?

14       INMATE BYRDE:  No, sir.  I guess not.

15       DEPUTY COMMISSIONER ARMENTA:  Okay.  I'll

16  turn it over for questions.

17       PRESIDING COMMISSIONER DAVIS:  Did we talk

18  about what you're going to do for a living when

19  you're released?

20       INMATE BYRDE:  We haven't specifically.

21       DEPUTY COMMISSIONER ARMENTA:  Tell me.

22       INMATE BYRDE:  A lot of it is going to

23  depend on my physical condition.  I'm totally

24  disabled.  We can talk about, you know, my

25  finances or where I'm going get money, but I

26  have sufficient resources outside to -- that I

27  wouldn't be a burden to the state.  I have been

Exhibit #2 Page 61

1    offered in the past -- I have members of my

2    family that are in the computer business and

3    it's possible that I could be able to work from

4    the home.

5        **DEPUTY COMMISSIONER ARMENTA:**  Okay.

6        **INMATE BYRDE:**  To do some work from there,

7    but it's very unlikely that I'll ever be able to

8    go to an office.  I'll never be able to drive a

9    car, for example, or anything like that.  It's

10   just too far gone.  So unless I can find a job

11   that I can actually do out of the house, I'm

12   going to have to be retired.  I have a pension

13   from the Arizona Bank that you talked about.

14   I'll eligible -- I'm fully paid up in Social

15   Security.  I paid the maximum benefit for a lot

16   of years.  My wife, of course, has indicated

17   that her retirement -- we own a home in Arizona,

18   and I have other letters of support from people

19   that has offered money, so it's not a question

20   of having enough money to live on.  I want to

21   work.  I'm kind a work alcoholic, as I've said,

22   but whether I'm going to be able to find gainful

23   employment that's meaningful is open to question

24   depending on exactly where I parole and when I

25   parole.  I actually foresee -- I have in the

26   back of my mind an idea to spend my time

27   actually trying to help, hate to say it, ex-

Exhibit #2 Page 62

1   convicts, in gaining approval and setting small

2   business loans and doing the planning and the

3   research and doing the submissions for banks.

4   I'm an expert in that field, and I can actually

5   get loans for people to help them stay out of

6   prison, stay on the street, and just do that on

7   a volunteer basis and support myself kind of

8   putting loan package together.  I know what

9   questions the banks are going to ask, and I can

10  do the projections.  I can help people get

11  loans.  I've actually done that already a couple

12  times for people, but that's not gainful

13  employment, but it is how I plan to spend my

14  life.

15          **PRESIDING COMMISSIONER DAVIS:**  Do you have

16  questions, Commissioner?

17          **DEPUTY COMMISSIONER ARMENTA:**  I was going

18  to tell you that even that area has changed a

19  lot, the last 15, 20 years.

20          **INMATE BYRDE:**  Yeah, I know it's --

21          **DEPUTY COMMISSIONER ARMENTA:**  Okay.  Now,

22  you can go on line and you get loans.

23          **INMATE BYRDE:**  In fact, one of my nephews -

24  - if you ever got a credit card, he is probably

25  the one that processed it.

26          **PRESIDING COMMISSIONER DAVIS:**  Nice.

27          **INMATE BYRDE:**  Yes.

Exhibit #2 Page 63

1    **PRESIDING COMMISSIONER DAVIS:** Okay. When

2    you were with the Red Cross.

3    **INMATE BYRDE:** Sir.

4    **PRESIDING COMMISSIONER DAVIS:** So you were

5    a treasurer for them for a year?

6    **INMATE BYRDE:** No, sir. I was the -- I was

7    treasurer with cystic fibrosis. I was the

8    regional board member with the Red Cross.

9    **PRESIDING COMMISSIONER DAVIS:** All right.

10   How did you become associated with the Red

11   Cross?

12   **INMATE BYRDE:** It wasn't through any greet

13   goodness of my own. I was with the Arizona Bank

14   in Tucson. All of the major banks participate

15   in assigning some of their more senior officers

16   to serve on the Board of the charities just so

17   that we'd be representing for a public

18   relations.

19   **PRESIDING COMMISSIONER DAVIS:** Were you

20   active with them at all?

21   **INMATE BYRDE:** Oh, yeah, we went to

22   meetings, and what we would do is I would be

23   assigned to -- for example, when we had our

24   fundraising things, I would be the one that

25   would be raising the money from all the various

26   banks from the state.

27   **PRESIDING COMMISSIONER DAVIS:** Did you gain

Exhibit #2 Page 64

1   any practical knowledge from your association

2   with the American Red Cross?

3       INMATE BYRDE:   In what --

4       PRESIDING COMMISSIONER DAVIS:   Did you ever

5   learn first aid, those kinds of basic sorts of

6   things that the Red Cross tends to want to make

7   sure all their people know?

8       INMATE BYRDE:   I didn't learn first aid

9   from Red Cross.   I was a certified life guard

10  from a previous experience, but --

11      PRESIDING COMMISSIONER DAVIS:   When were

12  you a certified life guard?

13      INMATE BYRDE:   I grew up in Hawaii, and

14  everybody out there swims like a fish, and I

15  took the Red Cross life guard training.

16      PRESIDING COMMISSIONER DAVIS:   So was CPR a

17  part of your training?

18      INMATE BYRDE:   The old way.

19      PRESIDING COMMISSIONER DAVIS:   What's the

20  old way?

21      INMATE BYRDE:   We're talking 1950s, was the

22  on the back and pull the arm.   With the person

23  on their stomach you're pulling up on their arm

24  and you're pushing down on their back.   It's

25  completely different than what they teach today.

26      PRESIDING COMMISSIONER DAVIS:   Right.   So

27  you're familiar with what they were at the time

Exhibit #2 Page 65

1    of the crime.  Were you familiar with what

2    they're currently teaching?

3        INMATE BYRDE:  I had a vague idea, and in

4    fact, I think I mentioned to one of the

5    investigating officers that I tried to revive

6    the victim, which I did unsuccessfully.

7        PRESIDING COMMISSIONER DAVIS:  All right.

8    Do you have any other questions, Commissioner?

9        DEPUTY COMMISSIONER ARMENTA:  No.

10        PRESIDING COMMISSIONER DAVIS:  All right.

11    Ms. Mitchell?

12        DEPUTY DISTRICT ATTORNEY MITCHELL:  May I

13    address some questions to him through the Board?

14        PRESIDING COMMISSIONER DAVIS:  Yes.

15        DEPUTY DISTRICT ATTORNEY MITCHELL:  If you

16    could ask Mr. Byrde if he remembers the first

17    version of the events of the murder that he told

18    to Sergeant Keaton as to statements from the

19    second version of events?

20        PRESIDING COMMISSIONER DAVIS:  Do you

21    remember, sir?

22        INMATE BYRDE:  Yes, I do, and would you

23    like me to address that?

24        PRESIDING COMMISSIONER DAVIS:  Certainly.

25    I assume that would be your next question?

26        DEPUTY DISTRICT ATTORNEY MITCHELL:  Yes, if

27    he could tell the Board what his first version

Exhibit #2 Page 66

Case 3:08-cv-00651-JM-AJB     Document 1-2     Filed 04/09/2008     Page 46 of 91
Case 4:07-cv-06375-SBA       Document 2-3      Filed 12/17/2007     Page 30 of 64

65

1    of events.

2          **PRESIDING COMMISSIONER DAVIS:**  All right.

3          **INMATE BYRDE:**  Yes, when I was first

4    interviewed by the -- Sergeant Keaton, I had no

5    memory of committing this crime, and what I mean

6    is, I mean, I knew that the victim was did, that

7    I knew that I disposed of the body, but I

8    believed in my heart that she must of died as a

9    drug overdose or something that was unrelated to

10   me.  I just didn't have the memory of holding

11   her under water or pushing her or hitting her or

12   anything long enough that would of caused

13   anyone's death.  I remember jumping up and going

14   downstairs, turning off water, closing windows,

15   and coming back up and finding her to my

16   surprise.  I really think that I blanked or did

17   something and disassociated, and maybe I

18   couldn't believe what I'd did.  But when I first

19   interviewed with the police, I was adamant that

20   I had not done this, that I was not responsible,

21   that something else must have happened to her.

22         **PRESIDING COMMISSIONER DAVIS:**  Okay.

23         **DEPUTY DISTRICT ATTORNEY MITCHELL:**  If you

24   could ask Mr. Byrde, how many months after the

25   murder of Cindy Engstrom was it that he suddenly

26   remembered this second version of events?

27         **PRESIDING COMMISSIONER DAVIS:**  Do you

Exhibit #2 Page 67

1    understand the question, sir?

2         INMATE BYRDE:  Yes.

3         PRESIDING COMMISSIONER DAVIS:  Okay.

4         INMATE BYRDE:  I was -- I'm not sure of the

5    exact number of months.  It was probably about,

6    I'm guessing, three or four.  I was under the

7    care -- I had been seeing a psychiatrist who had

8    been talking to me about what had gone on, and

9    through seeing that psychiatrist, I was brought

10   to understand what had happened, and at that

11   point told my attorney what I remembered.  And

12   I'm not sure what he said to the District

13   Attorney or anyone else, but in terms of my own

14   attorney when I found out.

15        DEPUTY DISTRICT ATTORNEY MITCHELL:  If you

16   could ask Mr. Byrde if that psychiatrist was not

17   a psychiatrist that had been retained by his

18   attorney?

19        INMATE BYRDE:  He was retained by my

20   attorney, yes.

21        PRESIDING COMMISSIONER DAVIS:  Okay.

22        DEPUTY DISTRICT ATTORNEY MITCHELL:  And if

23   could you ask Mr. Byrde if it wasn't when he was

24   in jail and they were preparing for the trial of

25   this case that he suddenly remembered the second

26   version of events?

27        INMATE BYRDE:  I was in jail.  It was many

Exhibit #2 Page 68

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 48 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 32 of 64

67

1   months before the trial, but I was in jail, yes.

2        **DEPUTY DISTRICT ATTORNEY MITCHELL:**  Okay.

3   If you could ask Mr. Byrde why he placed Cindy

4   Engstrom's body where he placed it.

5        **INMATE BYRDE:**  I was driving out in the

6   remote areas of Marin County.  It was a turn in,

7   and I just -- it seems like a good spot.  I know

8   there was a lot made of the fact that apparently

9   the person that owned that ranch was a doctor,

10  if I recall, that owed the bank some money and

11  was in default.  I would like to point out that

12  if you know anything about banking, his loan was

13  completely stock secured, and I'd never met the

14  man.  I mean, his -- the loan officer's boss's

15  boss's boss would of been me.  I mean, it was

16  irrelevant to me.  I had no idea where I was at,

17  but I was out driving around in the countryside,

18  and I left it, and I did -- go ahead.

19       **PRESIDING COMMISSIONER DAVIS:**  No, finish

20  your statement.

21       **INMATE BYRDE:**  No, and I did somewhat had

22  made an earlier statement to Sergeant Keaton who

23  -- Sergeant Keaton is a very honest individual I

24  had found when I was dealing with him.  I did

25  originally think -- because I thought that I was

26  wasn't responsible for the death, I did

27  originally have the idea of well maybe I'll just

Exhibit #2 Page 69

Case 3:08-cv-00651-JM-AJB   Document 1-2   Filed 04/09/2008   Page 49 of 91
Case 4:07-cv-06375-SBA   Document 2-3   Filed 12/17/2007   Page 33 of 64

68

1  leave Ms. Engstrom in park or somewhere like

2  that.  She'll be found.  They'll figure out it

3  wasn't me.  It was -- whatever it was, drugs,

4  heart attack, whatever it was, I didn't know,

5  and that way people won't be looking for me.

6  And that was the genesis of that remark to him.

7  Once I realized later on what I had done, it

8  became kind of silly, so I think that's why I

9  said that to him in the first place.

10      **PRESIDING COMMISSIONER DAVIS:**  Okay.

11      **DEPUTY DISTRICT ATTORNEY MITCHELL:**  If you

12  could ask Mr. Byrde sometime after he was

13  convicted and sentenced to prison, did he

14  discuss this case with a reporter and talk about

15  why he placed the body where he did, if he

16  remember that conversation.

17      **INMATE BYRDE:**  A reporter.  I'm not sure

18  what -- I don't remember the conversation

19  specifically, no.

20      **PRESIDING COMMISSIONER DAVIS:**  Would it be

21  with someone other than a reporter?  We don't

22  have to focus on whether it was specifically a

23  reporter or not.  Did you discuss with someone a

24  different version of perhaps why you left the

25  body where you did?

26      **INMATE BYRDE:**  I don't remember discussing

27  anything different from what I've said to you.

Exhibit #2 Page 70

1 I was interviewed by a reporter while I was at
2 Folsom that was allegedly at that time going to
3 possibly write a book or something, but I don't
4 have any specific memories. It's been a long
5 time. It's been 20 years. I don't know exactly
6 what I might of said to her.

7     **DEPUTY DISTRICT ATTORNEY MITCHELL:** Okay.
8 If you can ask Mr. Byrde why he bought the
9 boning knife, the knife that Cindy was murdered?

10     **INMATE BYRDE:** I bought the knife the day
11 before I think, but maybe it was -- I'm not
12 sure. A boning knife is a knife with a blade
13 about that long. I bought it because I was knew
14 -- we were going to use the tape that I
15 discovered -- the tape when it's wet -- I knew
16 from -- I use the tape on my ankles all the
17 time, and it's hard to get off, and I was going
18 to cut the tape off of with it. I might point
19 out too there were no knife wounds or anything
20 like that on Ms. Engstrom.

21     **DEPUTY DISTRICT ATTORNEY MITCHELL:** I don't
22 have any other questions.

23     **PRESIDING COMMISSIONER DAVIS:** All right.
24 Counsel?

25     **ATTORNEY CORYN:** I have none.

26     **PRESIDING COMMISSIONER DAVIS:** All right.

27 Closing?

Exhibit #2 Page 71

1    **DEPUTY DISTRICT ATTORNEY MITCHELL:**  Yes.

2    I'd like to thank the Commissioners for giving

3    me the opportunity to correct the record, which

4    I know always happens in these lifer hearings

5    because many years ago something will get put

6    into the record from some correctional counselor

7    or psychologist or something, and then it

8    becomes part of the record.  Even though it's

9    wrong, it just kept -- gets repeated over and

10   over again.  For example, the report of the

11   correctional counselor that appears at the top

12   of your lifer packet where the summary of the

13   crime is a restatement of a summary that was

14   made many years earlier, and it just gets

15   repeated and repeated.  And then the prisoner's

16   version, which was given years ago, gets

17   repeated verbatim, and all kinds of

18   misinformation then just gets repeated over the

19   years, and I would like to correct that with you

20   gentlemen.  The first paragraph, the summary of

21   the crime where it talks about the body being

22   placed at the location of discovery, and this

23   one sentence, "The body showed signs of

24   violence."  Now, that is the most sanitized

25   misrepresentation of the condition of Cindy

26   Engstrom's body.  As Commissioner Davis has

27   noted, in the probation officer's report that

Exhibit #2 Page 72

1    was prepared at the time that Mr. Byrde was

2    sentenced, Cindy Engstrom was battered and

3    bruised.  The photographs of her body were

4    appalling.  She was bruised all over her body,

5    her face, her head, her hands, her arms.  It was

6    very clear from the photographs and the

7    coroner's report that Cindy Engstrom did not die

8    an immediate death, that there was a violent

9    struggle, and that this young woman had to try

10   to fight for her life unsuccessfully.  The

11   coroner, as you have noted, determined that the

12   cause of death was asphyxiation, although the

13   actual mechanism of the asphyxiation could not

14   be determined by the coroner.  However, there

15   was evidence of trauma to her neck, evidence

16   that she had been strangled.  There was damage

17   to the hyoid bone.  There was petechial

18   hemorrhaging, which would be evidence of

19   strangulation, but also the coroner was not able

20   to say whether she died as a result of the

21   manual strangulation or the drowning or a

22   combination of both, but signs of violence

23   indeed.  The prisoner's version of events, which

24   I would like to point out is the second version

25   of events that, as Mr. Byrde has stated,

26   suddenly came to him some months after the crime

27   while he was sitting in jail and he was in

Exhibit #2 Page 73

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 53 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 37 of 64

72

1   consultation with a defense retained

2   psychiatrist, and that is the version that you

3   have heard today, which is that they were having

4   bondage sex, Cindy became panicked, he panicked,

5   and then there was this violent struggle, but

6   then he still doesn't really know what happened,

7   and he must of hit her.  This is sort of his, I

8   guess, I'm guilty.  I'm sort of guilty, but I

9   wasn't -- I don't remember being as bad as it

10  clearly was.  The original version of events

11  that he told Sergeant Keaton just a couple of

12  days after the murder was that they were having

13  consensual bondage sex.  They had sex.  He got

14  up to go down and feed the cat.  He was gone

15  about ten or 15 minutes and when he came back,

16  sure enough here was this young woman dead in

17  his bathtub, making it appear that her death was

18  accidental.  You know, she's a prostitute, so

19  there was probably some untoward drug abuse

20  going on in her life or some unknown medical

21  condition, and this was the -- his original

22  version of events.  Then, of course, came the

23  coroner's report, and the photographs that were

24  developed from the crime scene and the autopsy,

25  which of course, gave lie to the whole it was

26  just an apparent accidental event that occurred

27  while I was out feeding the cat.  What really

Exhibit #2 Page 74

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 54 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 38 of 64

73

1   happened here was that Cindy Engstrom's death

2   was the culmination of Mr. Byrde's homicidal

3   hateful fantasies involving women, fantasies

4   that he discussed over several months with some

5   of the various prostitutes that he retained,

6   that he spoke to freely, as he would in the

7   belief that their conversations were private.

8   These fantasies included mutilation, scavenger

9   hunts where women's breasts were going to be

10  some of the objects of the scavenger hunts,

11  raping his co-workers, killing them, his female

12  co-workers, by blowing them up, their cars up.

13  But the most graphic fantasy that he shared with

14  one of his actual favorite prostitutes was this

15  fantasy of watching a woman drown and seeing the

16  fear in her eyes as the water rose up over her

17  face, and sure enough, this is how Cindy

18  Engstrom met her death at the hands of the

19  defendant, Mr. Byrde.  The absence of my

20  reference to all of these fantasies, which are

21  articulated very thoroughly in the probation

22  report, and also discussed by Judge Savitt in

23  her sentencing of Mr. Byrde, are for some reason

24  completely ignored by the psychiatrist who did

25  this, what I consider to be a very worthless

26  report for the Board.  I'm sorry to say that the

27  only thing that the psychiatrist seems to

Exhibit #2 Page 75

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 55 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 39 of 64

74

1   properly link together with Mr. Byrde is it's

2   clear that he really hates and hated his mother.

3   She was a missing in action mother.  She was a

4   hopeless alcoholic, and there is probably -- and

5   you probably don't need to be a psychiatrist to

6   understand that there's probably a link between

7   his attitude towards his mother and his

8   attitudes towards women that he voiced to the

9   psychiatrist, which also explains also some of

10  the things that were going on at the bank.  The

11  doctor, the psychiatrist, seems to relate the

12  events of this crime just to the stress that he

13  was having at his place of work, in that the

14  only way he could relieve the stress was through

15  "sexual release."  Now, sexual release is one

16  thing, carving up women, fantasizing about

17  blowing them up and drowning them, cutting off

18  their breasts, that I -- it's pretty hard to

19  really lump that into your garden variety sexual

20  release.  And the stress that was going on with

21  Mr. Byrde at the bank had to do with his

22  harassment of his women, co-employees and

23  subordinates, that led apparently in the fall of

24  1984 to a sexual harassment suit being filed

25  against him --

26      **ATTORNEY CORYN:**  I object.  We're getting

27  off the topic of suitability for the instant

Exhibit #2 Page 76

1   hearing.

2       **PRESIDING COMMISSIONER DAVIS:**   I think what

3   the District Attorney is trying to describe now

4   is the nature of the crime itself, and certainly

5   in closing there is a latitude in terms of that,

6   so I'll allow her to continue.   Please do.

7       **DEPUTY DISTRICT ATTORNEY MITCHELL:**   Thank

8   you.   The women employees at the bank got very

9   tired of his obscene comments, the sexual toys

10  placed in their desks, cartoons involving rape

11  and murder that would show up in a top drawer of

12  their desk.   That was the stress that was going

13  on at the bank.   It had to do with his

14  disgusting behavior toward his women co-

15  employees.   It didn't have anything to do with

16  the number one man at the bank Mr. Mayno

17  (phonetic), who was one of his supporters.   His

18  statement is included in the probation report

19  when Mr. Mayno said what a wonderful employee

20  Mr. Byrde was at the bank.   Well, of course, Mr.

21  Mayno himself a few years later went off to

22  Federal prison for his misdeeds, but what you

23  had here was a man who is living a secret life.

24  All of this, these letters that have been

25  directed his way by people who are going to be

26  his support on the outside, Mr. Byrde had a

27  tremendous support system going on at the time

Exhibit #2 Page 77

1    he was leading this horrible, ugly double life.

2    He had a wife who stuck by him through thick and

3    thin, who was at church camp with his two young

4    daughters while he was going back and forth on

5    multiple trips to San Francisco to pick up

6    prostitutes to bring them back to his house in

7    her absence to engage in bondage sex and to

8    share his thoughts of these sadistic practices.

9    He had an excellent job at the bank.  It was

10   very curious that the place where he placed

11   Cindy Engstrom's body on her back totally naked

12   in a spread eagle position was the driveway of a

13   client of the bank who was in default on his

14   loan.  Cindy Engstrom was not placed somewhere

15   with a blanket over her, even though he brought

16   her out of his house and put her in a blanket in

17   the trunk of his car.  He placed her body on the

18   driveway, nude, spread eagle, bruised, battered,

19   as it was, and then took her meager little

20   positions, drove many miles away on the rural

21   roads of West Marin to a location where there is

22   a bridge that is over a creek, had to get out of

23   his vehicle to throw her meager positions and

24   the boning knife that he had purchased into the

25   creek bed, and as it just so happens, that's the

26   creek where a fisherman happened to be.  Well,

27   the good news was that that fisherman was also a

Exhibit #2 Page 78

1    police officer and realized immediately that

2    women's undergarments, a boning knife and a

3    purse, that's a crime scene.  And so it was

4    through fortuitous circumstances that Cindy

5    Engstrom was identified.  That led to the police

6    to the Tenderloin area of San Francisco and all

7    the prostitutes with whom Mr. Byrde was

8    fraternizing over these many months and led to

9    his eventually being contacted by the police

10   when he made his initial statement that would

11   seem to suggest that Cindy Engstrom had just

12   accidentally died after bondage sex, and there

13   was nothing violent about it on his part, which

14   of course, was totally a lie and untrue.  On his

15   parole plans, the fact of the matter is Mr.

16   Byrde detests his wife.  This unfortunate woman

17   who sat by his -- behind him through the course

18   of the trial was the object of some of his

19   homicidal fantasies that he shared apparently

20   with some of his women co-employees that got

21   communicated apparently to his -- the

22   psychiatrist that was working with him on his

23   criminal defense, and that came out at the trial

24   to the shock of everybody.  But his thoughts

25   about his wife was that he hated her and wanted

26   to blow her up in her car, as he did with some

27   of his other co-employees, so the idea of -- he

Exhibit #2 Page 79

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 59 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 43 of 64

78

1    had a support system, and yet it didn't prevent

2    him from committing this horrible crime.

3    Running off to his wife is not the answer

4    because the fact of the matter is, his true

5    thoughts about his wife are extremely hateful

6    and violent.  That came out at the trial.  The -

7    - I do want to say one thing about Cindy

8    Engstrom.  She was 19 years old.  Somehow or

9    other within the months prior to this she had

10   gotten involved in prostitution.  She was very

11   naive.  She was from a very loving family who --

12   her parents and her siblings attended her trial.

13   Her parents were present every day throughout

14   the course of the trial.  They have vowed to

15   attend every lifer hearing that they have to to

16   make sure that Mr. Byrde stays in custody so

17   that this never happens to anybody else's child.

18   And as Judge Savitt pointed out so insightfully

19   at the time he was sentenced and in her previous

20   letter, this is a very dangerous man.  The

21   psychiatrist who examined him -- it's such a

22   superficial shallow report with such lack of

23   insight, whereas Judge Savitt who sat through

24   this lengthy trial, heard everything, has

25   basically said he is and always will be

26   dangerous to women.  He's broken and can't be

27   fixed.  She points out that his apparent show of

Exhibit #2 Page 80

79

1   remorse at trial with tears were ingenuine.

2   Basically, he wasn't crying for the life that he

3   took, Cindy Engstrom, who never got to

4   participate in all of life's joys that when

5   you're 19, if you're 41, all those wonderful

6   things that happened during those 20 years, that

7   Mr. Byrde wasn't weeping for her, he was weeping

8   for himself because even though he's a very

9   intelligent man, whatever is wrong with him got

10  the better of him, and unfortunately Cindy

11  Engstrom was his victim and had to pay the price

12  for whatever it is that's wrong with Mr. Byrde,

13  and it can't be fixed.  And I would like to

14  thank you for your attention.

15      **PRESIDING COMMISSIONER DAVIS:**  All right,

16  thank you.  Counsel?

17      **ATTORNEY CORYN:**  Yes.  I also thank you for

18  listening to Mr. Byrde today.  As far as the

19  commitment offense, according to the Code of

20  Regulations, the statutory basis for parole

21  suitability should be noted for the record that

22  Mr. Byrde accepts full responsibility.  He does

23  not minimize his conduct, which is consistent

24  with the version that he gave to the Board and

25  that he answered in Ms. Mitchell's questions,

26  and the version that's the same as the one

27  submitted to the probation officer.  He was

Exhibit #2 Page 81

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 61 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 45 of 64

80

1    convicted of second-degree murder.  This crime

2    was not premeditated and deliberate, and the

3    jury found it second degree.  By way of

4    mitigation, Mr. Byrde had no prior criminal

5    record and no arrests prior to the commitment

6    offense.  He had a stable background and a

7    stable social history.  He was -- had a

8    bachelor's degree and a graduate degree in

9    banking.  He had a solid banking employment

10   history and had involved himself in Red Cross

11   and the Kiwanis Group.  This is really an

12   aberrational conduct.  You can talk about led a

13   double life, yes, and as Mr. Byrde explained,

14   this is seemingly out of character with his

15   previous background.  He was not young when he

16   committed the offense.  He was out and had

17   stability, and then he had the attack of -- and

18   the pressures of MS, but he realizes and he

19   articulated today that it's no excuse for what

20   he did.  And again, I think he expressed sincere

21   and genuine remorse as well.  As far as post-

22   conviction factors, Mr. Byrde programs well and

23   in a positive manner.  He's never received a

24   115.  I think that's remarkable.  As mentioned

25   by Mr. Armenta, how he's been able to be in

26   custody for so long without -- staying out of

27   trouble, which bodes well for his adjustment in

Exhibit #2 Page 82

1    prison.  He receives exceptional work reports.

2    He's participated in numerous self-help groups,

3    Hands of Peace, Kiros, Conflict Resolution, and

4    importantly, also, he's able to share the

5    insights into what he's learned in the groups.

6    The psych report is what has been at issue in

7    the past, and I know in '92 it was noted that

8    his last report -- I mean, in 2002, I'm sorry,

9    the last report Dr. Fijman of 2001 was not

10   negative, and it was supportive, and the Board

11   asked that a new report be prepared.  Well, for

12   this hearing that's what the CDC has done.

13        **PRESIDING COMMISSIONER DAVIS:**  Excuse me,

14   officer, can you move the paper from his

15   microphone there?  Go ahead, Counselor.

16        **ATTORNEY CORYN:**  I was talking about the

17   2006 psychiatric report by Fijman, F-I-J-M-A-N,

18   however you pronounce that.  It's noted that Mr.

19   Byrde has developed an understanding of the

20   factors.

21        **DEPUTY COMMISSIONER ARMENTA:**  Switch tapes.

22        **PRESIDING COMMISSIONER DAVIS:**  We need to

23   switch tapes.

24                    R E C E S S

25        **ATTORNEY CORYN:**  Continuation.  I was

26   talking about the 2006 psychiatric report by Dr.

27   Fijman that was ordered for this hearing because

Exhibit #2 Page 83

1   there hadn't been one in a while, and Mr. Byrde

2   complied with that.  The doctor noted that Mr.

3   Byrde has developed an understanding of the

4   factors that influenced the committing of his

5   crime.  He realizes now that he has other

6   options related to the reductions of stress in

7   his life.  It is noted that his violence

8   potential in a controlled setting is below

9   average.  Now it's even decreased than that, and

10  he's developed insight.  And if released to the

11  community, he would likely continue his

12  improvement and his gains.  His parole plans, he

13  should be commended for the fact that he's got

14  marketable skills and education.  He's got a

15  number of letters of support from his wife, his

16  daughters.  He has a home for him.  He has

17  funds.  He can parole to Orange County, San

18  Diego.  And that firm support, financial

19  support, is not going to be an issue.  Lastly,

20  as the Board can see and also in reviewing the

21  ADA rights, Mr. Byrde, he has multiple

22  sclerosis.  He's in a wheelchair.  Probably,

23  he'll be on disability.  I would submit due to

24  that and his increased age, the likelihood of

25  recidivism is decreased, and I would

26  respectfully ask that the Board consider all of

27  these factors in determining parole suitability.

Exhibit #2 Page 84

1    **PRESIDING COMMISSIONER DAVIS:** All right.

2    Thank you, sir. Mr. Byrde, now is your

3    opportunity to address the Panel directly and

4    tell us why you believe you are suitable for

5    parole.

6        **INMATE BYRDE:** Thank you. Before I do, I'd

7    like to say I always loved my wife. Where that

8    came in, I don't want to go. There's no excuse

9    for what I did. I have no excuse. I've spent

10   the last 21 years trying to atone for my

11   actions. I'm not the same person I was in 1985.

12   I've spent a lot of time trying to exert a

13   positive influence on other people through Hands

14   of Peace. It's been talked about. I also do

15   tutoring to help people get a GED in education.

16   I've done a lot of that. It's -- I don't feel

17   that I'm a threat to society in any way should I

18   be paroled. This is supported by, you know, the

19   psychiatric reports, but not just this one, a

20   whole string of them going back ten years with

21   multiple psychiatrists and psychologists. My

22   medical condition is obvious. I'm the victim of

23   a debilitating, irreversible, incurable,

24   progressive neurological disease. It's already

25   taken away my legs. It's taken away have of my

26   right eye. My sister, who also suffers from

27   multiple sclerosis, Shirley Rector (phonetic),

Exhibit #2 Page 85

1    is something on an expert.  Because of that, she

2    wrote the Board a couple hearings ago and said I

3    was probably no match for the average ten year-

4    old, and that's probably even more true today.

5    I'll never drive an automobile.  I'll, as we've

6    said, I'll probably never even leave my

7    residence without another person there to assist

8    me.  So the idea that I present a threat to

9    anyone to me is a little farfetched.  I mean,

10   I'm a totally disabled person at this point, and

11   it's not something that gets better.  We talked

12   about the fact that I do have financial support

13   from my family, friends.  I'm eligible for

14   Social Security.  I do have a small pension of a

15   few hundred dollars a month, so I'm not a

16   financial burden to the state if I'm paroled,

17   and I'm a consider financial to the burden -- to

18   the state in prison because my medical -- my

19   medication costs are kind of exorbitant.  That's

20   about it.  I mean, I think it's all been talked

21   about.  It's all been laid out, and I appreciate

22   you taking the time to listen to me.

23       **PRESIDING COMMISSIONER DAVIS:**  Just one

24   question I'd like to focus on also.

25       **INMATE BYRDE:**  Yes, sir.

26       **PRESIDING COMMISSIONER DAVIS:**  How is --

27   you said you're a different person now?

Exhibit #2 Page 86

1     **INMATE BYRDE:**  Yes.

2     **PRESIDING COMMISSIONER DAVIS:**  What kind of

3     assurance can you give the Panel?  I mean, we're

4     talking about a situation where you leading two

5     different lives at one time.  How is that

6     different today?

7     **INMATE BYRDE:**  Well, I think if you go back

8     20 years, I was an extremely type A aggressive

9     person.  I was focused very selfishly upon

10    myself on just about everything, how I was going

11    to get ahead in life, how was I going to become

12    extremely rich and powerful.  I was doing pretty

13    well at it.  I was still in my 30s.  I was a

14    senior VP of a pretty good size bank.  I think

15    one of the psych reports mentioned the fact that

16    I at one point went 18 months without taking a

17    day off, I mean, not a Sunday, not a Christmas,

18    not a birthday.  I was at work behind my desk 18

19    months in a row, and I'm just not that person

20    anymore.  I mean, I've matured a lot.  I've

21    learned that there's a lot more to life than

22    where I was.  That kind of person I don't even

23    think exists in me anymore.  I don't care about

24    making a lot of money.  I don't care about

25    running anybody's life or getting ahead of

26    anybody.  I'm really -- I don't know if it's

27    maturity or old age or what it is, but I just --

Exhibit #2 Page  87

1    the forces that ruled my life and my attitudes

2    and my behavior back in the '80s are just --

3    they're not part of me anymore.  And so from

4    that point -- or from that point of view is why

5    I've changed.

6        PRESIDING COMMISSIONER DAVIS:  All right.

7    Since it's been some time since the

8    transcriptionist will have heard your voices,

9    who are -- are you both going to speak, or one

10   or the other of you going to speak, or how do

11   you want to do this?

12       MR. WILLIAM ENGSTROM:  I'm going to have

13   something to say at the end.

14       PRESIDING COMMISSIONER DAVIS:  All right.

15   So you're going to speak first?

16       MR. SCOTT ENGSTROM:  Yes, sir.

17       PRESIDING COMMISSIONER DAVIS:  Just

18   identify yourself again, please, for the record.

19       MR. SCOTT ENGSTROM:  My name is Scott

20   Engstrom, E-N-G-S-T-R-O-M, brother of Cindy

21   Engstrom.

22       PRESIDING COMMISSIONER DAVIS:  Go ahead,

23   sir.

24       MR. SCOTT ENGSTROM:  Thank you.  First of

25   all, I want to thank you for what seems to be a

26   very thorough hearing.  I'd like to start out by

27   saying that at the beginning Mr. Byrde read a

Exhibit #2 Page 88

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 68 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 52 of 64

87

1  statement about disabilities that he was given

2  the right to assistance if he cannot walk, if he

3  cannot breathe, if he cannot help himself.  The

4  same individual who read that statement who was

5  given those rights, used tape upon my sister and

6  removed those rights, held her under water, and

7  removed the right to breathe, removed the right

8  to be able to defend herself.  In the statement

9  from Mr. Byrde's sister saying that he's no

10  defense against a ten year-old, in his prime

11  against a 19 year-old he had to use tape to

12  overpower her, not because he was weaker, but

13  because he was a coward.  His disability makes

14  him more dangerous.  More people are willing to

15  help somebody in a wheelchair, which renders

16  them put in danger.  Mr. Byrde has never been in

17  trouble here because he's not capable of it

18  without the cowardice mechanics of having to

19  take his victim's defenses away.  I don't think

20  you'll find anybody in this prison who will

21  allow him to tie them up, and so that is not

22  even a consideration.  Mr. Byrde remembers that

23  it was roughly 10:00 p.m.  He remembers that he

24  had "dated half a dozen prostitutes."  He

25  remembers that his wife was away on a Girl Scout

26  event with his daughters.  He biblically

27  remembers wanting to stand up and close the

Exhibit #2 Page 89

1   windows so his neighbors, who were ten to 12

2   feet away, wouldn't hear, and wanted to run

3   downstairs to close those window and doors to

4   make sure nobody heard, but somehow he can't

5   remember striking my sister.  He says that he is

6   obviously at fault because what else do you say?

7   But he will not admit that he beat, bruised,

8   battered my sister.  Excuse me.  My sister, who

9   is about the same age as my wife, missed out on

10  a chance of watching me get married.  I have a

11  five year-old son now, a four month old daughter

12  that she will never meet.  And somehow in his

13  arguments and discussions and letters from his

14  family, which you got to get those letters, you

15  know, you got to have the support.  Well,

16  somehow it labels Mr. Byrde as a victim.  He

17  spent so much time in here.  Gee, that's

18  something terrible, but he chose to do

19  something.  He chose for that double life.  He

20  chose to take my sister's life.  And he didn't

21  just take her life, he beat her.  My sister knew

22  she was going to die.  And to make himself out

23  to be the victim -- if there's no admitting the

24  crime, there's no healing.  If there's no

25  admittance and taking responsibility other than

26  just lip service, there's no changing.  Mr.

27  Byrde removed from me and my family what we

Exhibit #2 Page 90

1  loved dearly, and it was because of narcissistic

2  and careless and selfish behaviors, as he

3  admitted himself.  I think the reason he's doing

4  so well in prison is because it's structured and

5  he has no ability to go out and be a work

6  alcoholic.  He has no ability to go out and try

7  to get ahead in life.  He has no ability to step

8  on anybody, and that's exactly where he belongs,

9  where society is safe and he can continue to

10  thrive in his perfect environment.  Thank you.

11      **PRESIDING COMMISSIONER DAVIS:**  All right.

12  Thank you.  Did you want to say something, sir?

13      **MR. WILLIAM ENGSTROM:**  Yes.

14      **PRESIDING COMMISSIONER DAVIS:**  Okay.

15      **MR. WILLIAM ENGSTROM:**  William Engstrom,

16  father.

17      **PRESIDING COMMISSIONER DAVIS:**  If you would

18  like to sit down you may, or if you prefer to

19  stand.  It's up to you.

20      **MR. WILLIAM ENGSTROM:**  No, I better sit

21  down.

22      **PRESIDING COMMISSIONER DAVIS:**  All right.

23      **MR. WILLIAM ENGSTROM:**  Mr. Byrde has always

24  in my mind said that he's responsible, and it

25  changes from time to time, but what doesn't

26  change is he's responsible but.  And as you

27  heard today, he's responsible but had not my

Exhibit #2 Page 91

1   daughter panicked, and then hadn't he panicked,

2   this would of been a different situation.  Well,

3   maybe and maybe not, but if you listen to --

4   again to this tape and the previous tapes, I

5   don't think you'll ever have heard him say I'm

6   sorry.  And without saying I'm sorry, there's

7   something really missing from his character.

8   Thank you.

9         **PRESIDING COMMISSIONER DAVIS:**  All right.

10  Thank you, very much.  We'll now recess for

11  deliberation.

                    **R E C E S S**

13                    --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Exhibit #2 Page 92

### CALIFORNIA BOARD OF PAROLE HEARINGS

### D E C I S I O N

**DEPUTY COMMISSIONER ARMENTA:**  Okay.  We're on record.

**PRESIDING COMMISSIONER DAVIS:**  Let the record reflect that everyone previously identified as being in the room have returned, with the exception of the staff from the institution.  This is in the matter of Leslie Byrde, CDC number D-30420.  The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  We come to this conclusion first and foremost from the commitment offense itself, in that the offense was carried out in a especially cruel manner.  The offense was carried out in a dispassionate manner.  The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and the motive for the crime was very trivial in relation to the offense.  These conclusions are drawn from the statement of facts, wherein the prisoner,

**LESLIE BYRDE D-30420 DECISION PAGE 1 7/19/06**

Exhibit #2 Page 93

1  for reasons still best known to him, took

2  advantage of a young woman who was not able to

3  defend herself, struck her, and/or held her

4  under water.  He did so for his stated reason --

5  for no better reason, at this point that we can

6  determine, of simply protecting his reputation.

7  Regardless of the attempt, you did not seek help

8  for the victim.  And although you indicated that

9  you did try and render CPR, there is nothing in

10 the record to quantify that or to verify that.

11 And you chose to dump her nude body in a rural

12 driveway.  While there are statements with

13 regard to stress as a result of work and a

14 diagnosis of MS, there is nothing in the record

15 to suggest that this stress contributed directly

16 or significantly to the commitment of this

17 crime.  With regard to institutional behavior,

18 we do find that you've had one single 128(a)

19 counseling chrono and no serious 115

20 disciplinary reports, which as Commissioner

21 Armenta indicated, that is an exceptional

22 record, and you are to be congratulated for

23 that.  With regard to the psychological report

24 dated July of 2006, by Dr. Fijman, F-I-J-M-A-N,

25 it is this Panel's conclusion that the report

26 itself is inconclusive, in that it does not

27 **LESLIE BYRDE D-30420 DECISION PAGE 2 7/19/06**

Exhibit #2 Page 94

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 74 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 58 of 64

93

1    address issues that seem to leak from the

2    record, specifically the information in the

3    parole officer's report.  Accordingly, this

4    Panel recommends that prior to the next hearing

5    a new psychological report be completed that

6    will fill in this void and address these areas

7    specifically.  With regard to parole plans, we

8    do find that the parole plans are inadequate,

9    that you do not have verification of a place of

10   residence.  And while we don't doubt that you

11   have a lot of talent, your plan with regard to

12   what you're going to do financially lacks any

13   specificity.  So before you come before a Panel

14   again, you need to lie that out exactly what

15   that looks like.  How are you going to continue

16   to -- how are you going to support yourself?

17   With regard to the 3042 notices, we find that

18   the District Attorney from Marin County is here

19   in person by representative and does oppose

20   parole, as does the Marin County Sheriff's

21   Office by letter, the Marin County Sheriff's

22   Office being the agency responsible for the

23   investigation of this crime, as does the retired

24   Judge Savitt who was the judge who presided over

25   this case from the Superior Court of Marin

26   County.  Nevertheless, we do want to commend you

27   **LESLIE BYRDE D-30420 DECISION PAGE 3 7/19/06**

Exhibit #2 Page 95

1    for your -- several things, your work in the

2    Hands of Peace as a facilitator and a

3    facilitation instructor, your long term work as

4    a clerk with exceptional ratings, your

5    participation in vocational computer

6    programming, and your certificates -- actually,

7    many certificates for Hands of Peace and

8    Conflict Resolution from Friends Outside, as

9    well as your continued participation in Breaking

10   Barriers and Kiros.  However, these positive

11   aspects of behavior do not outweigh the factors

12   for -- I'm sorry, you know, I also left out your

13   laudatory chrono from the chaplain, which was a

14   very nice chrono.  We don't want to leave

15   anything like that out.  However, as I started

16   to say, these positive aspects of behavior do

17   not outweigh the factors for unsuitability, and

18   in a separate decision, this hearing Panel finds

19   that the prisoner has been convicted of murder,

20   and it is not reasonable to expect that parole

21   would be granted during the next three years.

22   We come to this conclusion by first and foremost

23   the commitment offense, in that the offense was

24   carried out in a especially cruel manner.  The

25   offense was carried out in a dispassionate

26   manner.  And that the offense was carried out in

27   **LESLIE BYRDE D-30420 DECISION PAGE 4 7/19/06**

Exhibit #2 Page 96

1   a manner which demonstrates an exceptionally

2   callous disregard for human suffering, and the

3   motive for the crime was very trivial in

4   relation to the offense.  These are conclusions

5   are drawn from the statement of facts, wherein

6   the prisoner, for reasons best known to him,

7   took advantage of a young woman who was not able

8   to defend herself, struck her and/or held her

9   head under water.  You did for the stated

10   reason, your stated reason, of protecting your

11   reputation.  Regardless of the intent, you did

12   not seek help for the victim.  You indicated

13   that you did try and provide CPR; however,

14   there's no independent evidence of that saying.

15   And rather, you took the body from a crime scene

16   and dumped it in a rural area.  While there is -

17   - there are statements with regard to stress as

18   a result of work and a diagnosis of MS, there is

19   nothing in the record to suggest that this

20   stress contributed directly or significantly to

21   the commission of this crime.  With regard to

22   the psychological report of July 2006 by Dr.

23   Fijman, this Board finds -- this Board views

24   that report as being inconclusive, in that it

25   does not address the issue that seems to leak

26   from the record, specifically the information

27   **LESLIE BYRDE D-30420 DECISION PAGE 5 7/19/06**

Exhibit #2 Page 97

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 77 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 61 of 64

96

1    contained in the probation officer's report.

2    Accordingly, this Panel recommends that prior to

3    the next hearing a new psychological report to

4    be completed to fill in that void.  With regard

5    to parole plans, once again, the parole plans do

6    lack significant specificity and/or

7    documentation, in that they did not provide

8    documentation for a place of residence, although

9    you've indicated that you believe you could

10   obtain that, so we certainly hope that you do

11   that, as well as we previously discussed some

12   specificity as to exactly how you intend to

13   continue to support yourself.  And if your wife

14   .is going to do that, that would be included in

15   that.  And again, a suggestion that if you do

16   want to transfer your confinement to the state

17   of Arizona that you can look into beginning to

18   do that with your counselor.  With regard to the

19   3042 notices, we note that the District Attorney

20   from Marin County is here in person by

21   representative and does oppose parole as does

22   the Marin County Sheriff's Department by letter,

23   the Marin County Sheriff's Department being the

24   agency responsible for the investigation of this

25   crime.  It is also opposed by retired Judge

26   Savitt, S-A-V-I-T-T, who is the judge from the

27   **LESLIE BYRDE D-30420 DECISION PAGE 6 7/19/06**

Exhibit #2 Page 98

1    Superior Court of Marin County who presided over

2    your case.  This Panel also finds, with regard

3    to other areas for suitability, that while Mr.

4    Byrde says that he is responsible for this

5    crime, this Panel is left with the impression

6    from Mr. Byrde's own presentation that this is a

7    weak acceptance and almost a dismissive

8    acceptance, and certainly not reflective of what

9    this Panel would consider to be a real remorse.

10   As I said, this is a three-year denial.  And the

11   Panel recommends that you remain disciplinary

12   free, that you continue to participate in self-

13   help, that you cooperate with clinicians when

14   the time comes for your new evaluation, and that

15   you develop appropriate parole plans and earn

16   positive chronos.  And with that, Mr. Byrde, we

17   want to wish you the best of luck, and we are

18   adjourned.  I'm sorry, Commissioner, did you

19   have anything you wanted to add?

20        **DEPUTY COMMISSIONER ARMENTA:**  Yeah.  Sir,

21   in the hearing you don't -- you don't have to

22   talk about the offense.  You don't have to

23   admit, but if you're saying that you have

24   remorse, we're always hoping to see it, and I

25   really did not see it in you.  You really

26   mitigated a lot of what happened that night, and

27   **LESLIE BYRDE D-30420 DECISION PAGE 7 7/19/06**

Exhibit #2 Page 99

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 79 of 91
Case 4:07-cv-06375-SBA    Document 2-3    Filed 12/17/2007    Page 63 of 64

98

1   you almost made it sound like it was her fault.

2        **INMATE BYRDE:**  I didn't intend to.

3        **DEPUTY COMMISSIONER ARMENTA:**  When you get

4   a chance to read the transcripts afterwards,

5   read it.  I would recommend that you read the

6   one from the previous hearings and the report

7   through probation.  That was one concern that I

8   have.  That's all I have to say.

9        **PRESIDING COMMISSIONER DAVIS:**  All right.

10  Thank you, very much for that, Commissioner, and

11  we are adjourned.

12

13

14

15

16

17

18

19

20

21

22

23  **PAROLE DENIED THREE YEARS**

24  **THIS DECISION WILL BE FINAL ON:** NOV 1 6 2006

25  **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **LESLIE BYRDE D-30420 DECISION PAGE 8 7/19/06**

Exhibit #2 Page 100

99

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, STACY WEGNER, a duly designated transcriber,
PETERS SHORTHAND REPORTING, do hereby declare and
certify under penalty of perjury that I have
transcribed tape(s) which total two in number and
cover a total of pages numbered 1 - 98, and which
recording was duly recorded at R.J. DONOVAN
CORRECTIONAL FACILITY, SAN DIEGO, CALIFORNIA, in the
matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING
OF LESLIE BYRDE, CDC NO. D-30420, ON JULY 19, 2006,
and that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated October 6, 2006, at Sacramento,
California.


STACY WEGNER
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

Exhibit #2 Page 101

EXHIBIT #3

2005 LIFE PRISONER HEARING DECISION FACE SHEET

BOARD OF PRISON TERMS
LIFE PRISONER HEARING DECISION FACE SHEET                    STATE OF CALIFORNIA

[ ] PAROLE GRANTED-(YES)
    CDC:  Do not release prisoner before
        Governor's review.

[ ] PAROLE DENIED-(NO)

| Records Use Only |
| --- |
| Parole Release Date_____ |
| YR   MO   DAY |
| Attach Prison Calculation Sheet |

[√] AGREED UNSUITABLE (Attach 1001A Form) FOR: __One__ YEAR(S)
[ ] HEARING POSTPONED/REASON:_____

## PANEL RECOMMENDATIONS AND REQUESTS

The Board Recommendations:
[ ]No more 115's or 128A's    [√]Stay discipline free
[ ]Work to reduce custody level  [ ]Learn a trade*    [√]Earn positive chronos
[√]Get self-help*           [ ]Get therapy*        [ ]Get a GED*

[ ]Recommend transfer to _____
[√]Other Inmate request An updated Psc Rpt -
*These programs are recommended if they are offered at your prison and you are eligible/able to participate.
And A better defined Job PLAN should be developed.

Penal Code 3042 Notices   [ X ]Sent   Date:3-30-05

Commitment Offense(s):_____PC 187_____       MURDER 2^ND_____
                Code(s)                  Crime(s)

       MAR 9635_____       01_____
       Case #(s)         Count #(s)

| Date Inmate Came to CDC 5-23-86 | Date Life Term Began 5-23-86 | Minimum Eligible Parole Date 1-5-95 |
| --- | --- | --- |
| [ ]Initial Hearing  [ X ]Subsequent (Hearing No.)__3__ | Date of Last Hearing_____ | |

CDC Representative _____
Attorney for Prisoner _____  Address
D.A. Representative _____  County
This form and the Board's decision at the end of the hearing is only proposed and NOT FINAL.  It will not become final until it is reviewed.

Chair _____  Date  5/31/05
Panel Member _____  Date
Panel Member _____  Date

| NAME | CDC # | PRISON | CALENDAR | DATE |
| --- | --- | --- | --- | --- |
| BYRD, LESLIE | D-30420 | RJDCF | MAY/JUNE | 5-31-05 |

BPT 1001(REV. 08/03)

Exhibit #3 Page  1

**EXHIBIT #4**

**2002 CALIFORNIA BOARD OF PRISON TERMS DECISION**

54

1    CALIFORNIA BOARD OF PRISON TERMS

2              D E C I S I O N

3         DEPUTY COMMISSIONER ESTRADA:   We're on

4    record.

5         PRESIDING COMMISSIONER HEPBURN:   All right.

6    All parties have returned to the room.   It's 4:58

7    p.m., and Mr. Byrd, we denied your parole for

8    three years.   Let me read the decision to you.

9    The Panel reviewed all information received from

10   the public and relied on the following

11   circumstances in concluding that the prisoner is

12   not suitable for parole and would pose an

13   unreasonable risk of danger to society or a threat

14   to public safety if released from prison.   Number

15   one was the timing and gravity of the commitment

16   offense itself, which was carried out in a very

17   cruel and callous manner, also in a manner which

18   demonstrates an exceptionally callous disregard

19   for human suffering.   These conclusions are drawn

20   out from the Statement of Facts wherein the

21   prisoner was carrying out one of his sexually

22   violent fantasies against women when he picked up

23   the victim in San Francisco, with an agreement to

24   engage in a sexual act of bondage.   And Mr. Byrd

25   took her back to his residence where he placed her

26   in the bathtub, she struggled, he held her under

27   LESLIE BYRD   D-30420   DECISION PAGE 1   1/22/02

*Statement OF FACT*

Exhibit #4 Page 1

55

1    the water, resulting in her death, and then took

2    her body to another remote location where he

3    disposed of it.  It was found the next day, and

4    then disposed of her clothing and personal items

5    at another location.  And the record reflects a

6    number of an ongoing pattern of behavior by Mr.

7    Byrd, in which he would pick up prostitutes, talk

8    about his sexually violent fantasies regarding

9    women, and carry out his sexual fantasies of tying

10    up women and committing sexual acts with them

11    while they're tied up.  Regarding his previous

12    record, he didn't have a police record, he didn't

13    have a record of convictions.  However, he does

14    have a self-admitted record of previous acts of

15    prostitution with women that he picked up

16    primarily in San Francisco.  We know that he took

17    a number of them back to his residence.  He

18    discussed that here at the hearing, and engaged in

19    activity with them while his family was out of

20    town.  His prison record has been good.  He's been

21    disciplinary free throughout his incarceration.

22    He came in as an outstanding citizen.  He

23    essentially led a double life.  Very few people

24    who knew him would have guessed the dark side of

25    his life.  And as he has programmed in the

26    institution, of course, he's programmed in a

27    **LESLIE BYRD    D-30420    DECISION PAGE 2    1/22/02**

Exhibit #4 Page 2

56

1    positive manner, consistent with what his behavior
2    was before he came in the institution.  He came in
3    with marketable skills and an education.  His work
4    reports that he's had as a clerk have been
5    exceptional.  He has participated in self—help
6    activities, including Hands of Peace, Conflict
7    Management, Impulse Control, among others.  His
8    psychological evaluation completed by Dr.
9    Pesavento on 10—1 of 2001 is not negative.  It's
10   fairly supportive of release.  We are going to ask
11   for a new psychological evaluation to deal with
12   more specifically with some of the issues
13   involving Mr. Byrd's fantasies of sexual violence
14   toward women and specifically as it pertains to
15   this case.  I don't think that they've been dealt
16   with very completely in the psychological
17   evaluation and they need to be addressed.
18   Regarding his parole plans, he appears to have
19   some financial resources and family support.  He
20   certainly has job skills so parole plans aren't a
21   particular issue with the Board.  In response to
22   3042 Notices, we had significant opposition to
23   parole from a number of individuals.  We had a
24   representative from the District Attorney's       —
25   office, who was present at the hearing and voices
26   strong opposition to parole.  We had several
27   **LESLIE BYRD    D-30420    DECISION PAGE 3    1/22/02**

Exhibit #4 Page 3

1    family members here at the hearing who voiced

2    opposition to parole.  We also received quite a

3    few letters in opposition, including a letter from

4    the judge who handled the trial in this

5    particular case, Beverly Savitt, S-A-V-I-T-T.  She

6    had written in her letter that I attempted to make

7    clear at the time of his sentencing that I thought

8    he should never be paroled because he

9    demonstrated a clear hatred for women that was

10   lifelong.  I continue to believe that should Mr.

11   Byrd be released, he will undoubtedly kill again.

12   As I indicated, this is a three-year denial.  In a

13   separate decision, the Hearing Panel finds that

14   the prisoner has been convicted of murder.  It's

15   not reasonable to expect that parole will be

16   granted at a hearing during the next three years.

17   The specific reasons for this finding are as

18   follows.  The timing and gravity of the

19   commitment offense, which was carried out in a

20   very cruel and brutal callous manner.  Also it was

21   carried out in a manner which demonstrates an

22   exceptionally callous disregard for human

23   suffering.  Although Mr. Byrd doesn't have an

24   official police record, he does have a

25   pattern of behavior involving fantasies of

26   violence against women, and of picking up

27   **LESLIE BYRD    D-30420    DECISION PAGE 4    1/22/02**

Exhibit #4 Page 4

58

1    prostitutes and engaging in prostitution

2    activity, discussing and binding up the women,

3    discussing violence toward women while he was

4    engaged in this sort of activity.  It does cause

5    the Board concern for his future activity, and

6    it's an issue that we think he needs to deal with.

7    We'd like to see some specific self—help programs

8    perhaps and some additional information in the

9    psych report dealing specifically with the issue

10   involving his sexually violent fantasies toward

11   women considering the life offense.  I don't think

12   that that issue has been addressed specifically

13   and certainly not to the extent that it needs to

14   be dealt with.  So the Panel's recommendation is

15   going to be that you remain disciplinary free and

16   there will be a new psychological evaluation prior

17   to the next hearing, participate in self—help and

18   therapy programs that are available, and

19   specifically if one becomes available dealing

20   with his violence toward women.  That will

21   complete the reading of the decision.

22   Commissioner Estrada, do you have any comments you

23   would like to add?

24        **DEPUTY COMMISSIONER ESTRADA:**  None.        —

25        **PRESIDING COMMISSIONER HEPBURN:**  All right.

26   Mr. Byrd, good luck to you.  That will conclude

27   **LESLIE BYRD     D-30420     DECISION PAGE 5     1/22/02**

Exhibit #4 Page 5

59

1    this hearing at 5:04 p.m.

2                    --o0o--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    **PAROLE DENIED THREE YEARS**

26    **EFFECTIVE DATE OF THIS DECISION** _____    FEB 2 6 2002

27    **LESLIE BYRD    D-30420    DECISION PAGE 6    1/22/02**

Exhibit #4 Page 6

60

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, VICKI TAYLOR, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 59, and which recording was duly recorded at RICHARD J. DONOVAN CORRECTIONAL FACILITY, at SAN DIEGO, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of LESLIE BYRD, CDC No. D-30420, on JANUARY 22, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated February 5, 2002, at Sacramento County, California.

_____
Vicki Taylor
Transcriber
**CAPITOL ELECTRONIC REPORTING**

Exhibit #4 Page 7

**EXHIBIT #5**

**1996 CALIFORNIA BOARD OF PRISON TERMS DECISION**