75

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

**PRESIDING COMMISSIONER GUADERRAMA:**    The time
now is 15 minutes after 10:00 a.m. and all those that
are present before the break are back again.
Mr. Byrd, we have a unanimous decision.  The panel
reviewed all the information received from the public
and relied on the following circumstances in
concluding that you're not suitable for parole and
that you would pose an unreasonable risk of danger to
society and a threat to public safety if you were to
be released from prison.  The commitment offense was
carried out in a manner which exhibits a callous
disregard for the life and suffering of another.  The
offense was carried out in a dispassionate manner.
The victim was abused and defiled during the offense.
These conclusions are drawn from the Statement of
Facts where you killed a young lady you had hired for
sex and strangled and drowned her as she was bound in
the bathtub.  You later dumped the body.  Previous
history.  You have escalating pattern of criminal
conduct and an unstable social history which includes
during that period of time you were hiring
prostitutes.  Institutional behavior.  You've
programmed in a limited manner while incarcerated.
You have not sufficiently participated in beneficial

**LESLIE BYRD      D-30420      DECISION PAGE 1      (9/24/96)**

Exhibit #5 Page 1

1   self-help and therapy programming.  The psychiatric

2   factors.  The psychological report dated 5/21/96

3   authored by Dr. J. M. Henry is very superficial and I

4   have to agree with your attorney in saying that if

5   these attorneys [sic] aren't doing a good job, get rid

6   of them and I firmly believe that we ought to.  The

7   panel makes the following findings that the Prisoner

8   needs therapy in order to face, discuss, understand

9   and cope with stress in a non-destructive manner.

10  Until progress is made, you continue to be

11  unpredictable and a threat to others.  Therapy in a

12  controlled setting is needed, but motivation and

13  amenability are questionable.  In view of your

14  assaultive history and lack of adequate program

15  participation, there's no indication that you'd behave

16  differently if paroled.  Nevertheless, you should be

17  commended for being disciplinary free for your entire

18  incarceration and your involvement in some self-help

19  programs.  However, these positive aspects of your

20  behavior do not outweigh the factors of unsuitability.

21  Mr. Byrd, you're being denied parole for five years.

22  The hearing panel finds that it's not reasonable to

23  expect that parole would be granted in a hearing

24  during the following five years.  The specific reason

25  for this finding are as follows.  One, you committed

26  the offense.  Specifically, you beat, bound, strangled

27  **LESLIE BYRD    D-30420    DECISION PAGE 2    (9/24/96)**

Exhibit #5 Page 2

1    and drown a young female victim during a sexual

2    encounter.  As a result, a longer period of

3    observation and evaluation are required before the

4    Board should set a parole date.  Second reason is that

5    you have -- a longer period of time is required to

6    evaluate your suitability in view of your history of

7    misconduct, including the employment of prostitutes.

8    Third reason, you have not completed necessary

9    programming which is essential to your adjustment and

10    you need additional time to gain such programming.

11    You certainly need a lot more insight into the life

12    offense than what you demonstrated here today and you

13    need a lot of therapy in order to deal with the

14    problems that you have coming into the (inaudible).

15    The panel recommends that you remain disciplinary free

16    and that you participate in self-help and therapy

17    programming, especially that kind of therapy that

18    would deal with sex crimes.  That is the official

19    decision.  Again, do whatever you can with programs

20    that are available to you.  We can't hold the psych

21    evaluation against you because it wasn't one that you

22    made.  However, we've really got some problems with

23    the psych evaluation where they don't address these

24    tremendous problems that you had for the longest

25    period of time and they hardly even mention it.

26    You're not ready.  You've got a lot of work to do.

27    **LESLIE BYRD    D-30420    DECISION PAGE 3    (9/24/96)**

Exhibit #5 Page 3

78

1   And we are going to ask Ms. Mitchell to submit those

2   photographs in time for the next hearing, if you

3   would, please.

4          DEPUTY DISTRICT ATTORNEY MITCHELL:   Yes.

5          COMMISSIONER GIAQUINTO:   Can we also ask for

6   the transcript of the interview?

7          DEPUTY DISTRICT ATTORNEY MITCHELL:   Yes.

8          PRESIDING COMMISSIONER GUADERRAMA:   Thank you

9   very much.

10         DEPUTY DISTRICT ATTORNEY MITCHELL:   Now, my

11   question in that regard is do you want that in advance

12   of the next parole hearing or do you want me to submit

13   that at this time so it will be part of his file?

14         PRESIDING COMMISSIONER GUADERRAMA:   If you

15   have it available, you can submit it to staff here

16   today.

17         DEPUTY DISTRICT ATTORNEY MITCHELL:   I will do

18   that.

19         PRESIDING COMMISSIONER GUADERRAMA:   Thank you

20   very much.  Here's a copy of the decision.  We're

21   going to see you in five years, Mr. Byrd.  We want to

22   wish you well.  That ends the hearing.  It's 20

23   minutes after 10:00 a.m.  Good luck.

24               --oOo--

25   PAROLE DENIED FIVE YEARS

26   EFFECTIVE DATE OF THIS DECISION _____ **JAN 1 5 1997** _____

27   LESLIE BYRD   D-30420   DECISION PAGE 4   (9/24/96)

Exhibit #5 Page 4

**EXHIBIT #6**

**1993 LIFE PRISONER HEARING
EXTRAORDINARY ACTION AND DECISION**

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA
LIFE PRISONER HEARING - EXTRAORDINARY ACTION AND DECISION                            BPT 1001.A (Rev. 10/89)

| ACTION TYPE (select one) | ☐ Waiver of Appearance | ☐ Request for Postponement | ☒ Waiver of Parole Consideration Hearing-Stipulation of Unsuitability | |
| HEARING TYPE (select one) | ☒ Parole Consideration | ☐ Progress | ☐ Rescission | Hearing Date 12 - |

## WAIVER OF RIGHT TO ATTEND HEARING

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I do not wish to attend my Board hearing and do not wish to be represented at the hearing. The hearing will be held in my absence.

☐ I do not personally wish to attend my hearing but I do wish to be represented by counsel at the hearing.

　　☐ I will employ counsel to represent me at the hearing.

　　☐ I cannot afford counsel and wish counsel appointed to represent me.

## POSTPONEMENT

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I hereby request that the hearing indicated above be Postponed to _____

The reasons for my request for a postponement are stated below.

## WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I waive my right to a parole consideration hearing and I waive the right to have an attorney represent me at a hearing in my absence. I find that I am unsuitable for parole based on my reasons given on this form and therefore request that you find me unsuitable.

　　☐ One-year Denial　　☒ Two-year Denial　　☐ Three-year Denial

**PRISONER'S REASON(S) FOR REQUEST:**
(For Example: Psychiatric Evaluation Not Supportive, Programming Inadequate, Cat H Incomplete, etc.)

_Needs to get recommended therapy prior to_
_appearing before the Board of prison terms._
_Would request transfer to institution where_
_such therapy is available._

| Signature of Prisoner | Date 12-8-93 |
| Signature of Attorney (if applicable) Patricia Cassady | Date 12-8-93 |
| Signature and Title of Witness (CDC) G.O.G. Nye | Date 12-8-93 |

NAME _____ CDC NUMBER _____ INSTITUTION _____ CALENDAR ____ DATE

Exhibit #6 Page 1

BOARD OF PRISON TERMS
LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

☐ I certify to the best of my knowledge and information, the foregoing reasons as stated by the prisoner are accurate, and that the prisoner was capable of making a knowledgeable decision regarding his/her hearing.

The following information is submitted for the Board's consideration in making their decision:

_____

_____

_____

_____

| CDPR Signature | Date |
|---|---|

### _FOR BOARD OF PRISON TERMS USE ONLY_

## DECISION / ORDER

### WAIVER OF RIGHT TO ATTEND HEARING

1. ☐ Request is denied.
   ☐ Request is granted. Hearing will be conducted in absence of prisoner.

### POSTPONEMENT

2. ☐ Request is denied.
   ☐ Request is granted. Grant based on a finding of good cause. Place on _____ calendar.

### WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

3. ☐ Request is denied.
   ☒ Request is granted. The Board agrees to enter into the stipulation, on a finding of good cause, offered by the prisoner on the waiver of his/her Life Parole Consideration Hearing and orders a:
   ☐ One-year denial    ☒ Two-year denial*    ☐ Three-year denial**

* The Board must find it unreasonable to expect that the prisoner would be eligible for parole during the second, or second and third year, and the Board must state the reasons for its finding.

** In addition to the above (*), the prisoner must have been convicted of more than one offense which involves the taking of a life.

(The basis of the finding of good cause for postponement or multiple-year denial must be stated below.)

   ☒ Good cause based on the reasons given by the prisoner.

Other comments (if applicable):
Prisoner needs Therapy to process his psych problems
Recommend Transfer to CMC or BSD if appropriate
for C.O.C.

_____

| Signature of BPT Commissioners | | |
|---|---|---|
| 1. _[signature]_ | Date | 12-8-93 |
| 2. _[signature]_ | Date | 12/8/93 |

BPT Action Taken At:    ☐ BPT Headquarters    ☐ Institution

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | DATE |
|---|---|---|---|---|
| BYRD, LESLIE | D-30420 | MULE CREEK | | |

Exhibit #6 Page 2

EXHIBIT #7

2006 PSYCHOLOGICAL ASSESSMENT

## RICHARD J. DONOVAN CORRECTIONAL FACILITY

### HEALTH CARE SERVICES
### PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### MENTAL HEALTH EVALUATION

### JULY 2006 Calendar

### (PSYCHOLOGICAL ASSESSMENT)

**I.    IDENTIFYING INFORMATION:**
Mr. Byrd is a married, 61 year old, Caucasian male who was born on September 8, 1945, to David and Eloise Byrd. Mr. Byrd subscribes to the Catholic faith.

This report is based on a review of the Central File, a review of the medical record and on the results of two, one hour interviews with Mr. Byrd. The consulting issues to be explored were the inmates' psychosexual problems and the estimation of the prisoner's potential for violence in society.

**II.    DEVELOPMENTAL HISTORY:**
According to Mr. Byrd, there were no prenatal or perinatal difficulties in his mothers' pregnancy. He was a full-term infant who, at birth, weighed 8 lbs., 6 oz. He was unfamiliar with any difficulties in his early childhood development. He does note that there were no complications during his delivery. Developmental milestones were reached at the appropriate age. There is no history of cruelty to animals, childhood bedwetting or juvenile fire-setting.

There is no significant childhood medical history. Mr. Byrd, during his early years, was positive for measles, whooping cough, asthma and had a severe case of mononucleosis. His only hospitalization, at the age of 6, was for a tonsillectomy.

**III.    EDUCATION:**
Mr. Byrd was enrolled in kindergarten at age 5 and then entered 1st grade a year later. No particular problems were noted in school in his elementary and high school years. He graduated from Arcadia High School in Arizona in 1963. He went on to receive a Bachelor's of Science degree in Business Administration from the University of Arizona in 1971. During his college years, he noted that his only difficulty with any subject was primarily in quadratic equations, for which he later received tutoring. The subjects that he excelled in during his college years were English, History and Economics.

Upon graduating from college and accepting and later maintaining employment in the banking industry, Mr. Byrd went on to receive a graduate banking degree through the Pacific Coast Banking School in Seattle, Washington. According to a test administered in CDC, Mr. Byrd's Grade level equivalent is 13.8

**BYRD, LESLIE**      **D-30420**      **RJDCF/SD**      **F1-05-138L**      **LF/bl**

Exhibit #7 Page 1

Copy sent to inmate 5/30/06

It is not _ that when Mr. Byrd was in high sch__, he was a member of the baseb__ __ m and was actively involved in t__ __ess club. He was later able to obtain national ranking as one of the top ten players in table tennis. Currently, Mr. Byrd's educational interests include U.S. and European history.

## IV.   FAMILY HISTORY:

Mr. Byrd notes that his parents were both college graduates. His father, age 89, was a career Navy Officer. He is negative for significant medical problems, mental illness, substance abuse, as well as contact with law enforcement. Mr. Byrd relates that his relationship with his father during his earlier years was limited based upon his father being frequently out of the home. It was also noted that as a child, his family moved every two to three years. Mr. Byrd describes his relationship with his father as good. Mr. Byrd's mother is deceased. He describes her as being an alcoholic. He further describes her as being a bright woman who was primarily a housewife and did teach school at a later time while his family was stationed in Hawaii. Mr. Byrd speaks in a stoic and matter-of-fact way of the stressful quality of his and his siblings lives. Growing up with an alcoholic mother, who was inebriated daily, starting the drinking in the early afternoons and continuing until passing out and witnessing the raging arguments between his parents made him decide to go to college as far away from home as possible and to make a decision never to return home. Overall, it appears that given his mothers' alcoholism and his fathers' responsibilities, he and his sisters had to take care of themselves. His mother died in 1977, by drowning in the family's swimming pool.

His younger sister, Carol holds a Master's degree in Social work. Mr. Byrd claims to have a good relationship with his sister. She is also noted to be negative for any significant medical problems, mental illness or substance abuse issues. His older sister holds a Bachelor of Science degree. She is negative for mental illness, substance abuse, as well as contact with law enforcement. She is positive, however, for multiple sclerosis.

## V.   PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Mr. Byrd relates that he first became aware of his body changing at approximately 15 to 16 years of age. He first began dating at age 18 and had his first sexual relationship at age 20. Mr. Byrd considers himself as being heterosexual. He has had only one relationship longer than two months duration which has been with his wife with whom he has been with for approximately 38 years. At no time during his adolescence and young adulthood did Mr. Byrd report engaging in any type of activity that would warrant a diagnosis of apparent emotional disorder. The deviant sexual behaviors described during the crime had not been pervasive or extended over time. According to the reports by Mr. Byrd, they started in late 1984, when after 10 years of being diagnosed with multiple sclerosis, he experienced his first debilitating attack. He had difficulties ambulating, experienced weakness of legs and arms and had frightening episodes of diminished visual acuity.

No one in his family with the exception of his wife, knew about his illness for the previous 10 years. Multiple sclerosis is known to be aggravated by any type of stress. Mr. Byrd was (at that time), experiencing a great deal of the stress produced by conflicts at work. His lending decisions were being overruled by his superiors that were questioning his judgment. The combination of his declining health, his conflicts at work and his personal approach to dealing with stress produced some type of emotional disorder.

BYRD, LESLIE      D-30420      RJDCF/SD      F1-05-138L      LF/bl

Exhibit #7 Page 2

(He too driving for extended periods of time after leaving his office to try to calm down before returning home). It was this time that he became engaged in soliciting prostitutes. The contacts occurred for approximately six or seven months. It was a period where several banks merged and he was part of the designated team in charge of reorganizing the work force. This involved letting go of a number of people which created innumerable conflicts and lawsuits. He remembers working seven days a week for a period of months.

## VI.   MARITAL HISTORY:

Mr. Byrd married his present wife on December 23, 1967, after a two year courtship. They have been married for approximately 38 years. Mr. Byrd's wife is a few years younger than he. She is currently employed as a school teacher in Tucson, Arizona. From their union, two children were born. Samantha, who is an architect and Sarah, who is a flight attendant, stationed in Chicago. Mr. Byrd characterizes his relationships with his wife and children as being good and very satisfied.

## VII.   MILITARY HISTORY:

Mr. Byrd has never been a member of the armed forces.

## VIII.   EMPLOYMENT AND INCOME HISTORY:

Upon leaving college, Mr. Byrd was employed by the Arizona Bank in Phoenix, Arizona from 1971 through 1983. He worked at the Arizona Bank as a vice president. Subsequent to this position, he was employed at the West American Bank in San Rafael. He title was Senior Vice President. He was in charge of a loan portfolio of more than $700 million dollars. According to the record, his income at that time was approximately $72,000 per year, in addition to car allowances and bonuses. His current interest is primarily in keeping current in his field by reading financial newspapers and magazines, as well as federal regulations. He would eventually like to return to banking and or work part time in financial counseling.

## IX.   SUBTANCE ABUSE HISTORY:

Mr. Byrd does not claim nor is there any record of any type of abuse or dependence upon disinhibiting agents. More to the point having witnessed first hand the ravages of alcoholism and the suffering it produces, it has been a powerful dissuading factor in his and his sisters' decisions not to drink nor smoke.

## X.   PSYCHIATRIC AND MEDICAL HISTORY:

Mr. Byrd does not claim nor is there any record of any history of psychological illness or disabilities. It is noted, however, that he has been asthmatic since childhood, had a severe case of mononucleosis and that he contracted multiple sclerosis in 1972. Although he was originally hospitalized upon having his first attack, it was not immediately diagnosed as MS. According to the patient's history, Mr. Byrd was diagnosed in 1973 with this illness. He has been hospitalized at various times on occasions, as well as received outpatient treatment throughout the past 29 years. His multiple sclerosis relapses and remits by history with past episodes occurring every two to three years. These episodes have lasted

BYRD, LESLIE          D-30420          RJDCF/SD          F1-05-138L          LF/bl

Exhibit #7 Page 3

approximately two months and result in numbness or weaknesses in his feet, legs, arms and hands. Additional involvement has also included optic neuritis in either side along with decreased vision in the right eye. Mr. Byrd's last attack resulted in left and right leg paralysis, lower trunk paralysis and weaknesses, as well as numbness from his upper abdomen to toes along with urinary urgency. Mr. Byrd is currently on Interferon beta-1A, for this condition. Mr. Byrd is also receiving medications for glaucoma.

**XI.**   **PLANS IF GRANTED RELEASE:**

If Mr. Byrd were to be released, he would move to Tucson, to be with his wife. He further considers his wife, sisters, father and best friend to be in support of him in his attempts to rebuild his life. Although his wife has worked over the years as a school teacher to occupy her time, he states that both of them could live on his pension plan. Job plans, should he be paroled, entail returning to the banking industry or working part time in financial counseling. His primary challenge should he be paroled, would be being paroled to the San Francisco area and being separated from his wife.

## CLINICAL ASSESSMENT

**XII.**   **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

Mr. Byrd was interviewed twice. The first time on April 27th for a period of one hour and the second time on May 1st for 45 minutes.

He is in no apparent, acute distress. He moves about in a wheelchair and he is alert and oriented as to time, place, date and purpose for this interview.

He responded to questions in a polite and appropriate way, is attentive, makes effective eye contact and was spontaneously verbal.

All components of memory are grossly intact as far as I can determine without independent verification of the historical facts.

His thinking seems normal from the perspective of productivity, relevance and coherence.

Speech was relevant, appropriate and without evidence of unusual ideation. It showed good grammatical complexity. There is no obvious preoccupation or obsessions with sexual themes. He distinguishes and is able to identify and control behaviors that may be harmful to self or others and acts on his understanding. He has strong executive functions. Reality testing is intact and he is full self-aware. He is able to comprehend behaviors contrary to social values. Sleep pattern is reported as normal. Mood is euthymic with normal fluctuations and affect is congruent.

BYRD, LESLIE        D-30420        RJDCF/SD        F1-05-138L        LF/bl

Exhibit #7 Page 4

Appetite preserved with no obvious weight changes. The use of alcohol or illicit drugs is denied. There are no obsessions, phobias, ideas of reference, hallucinations nor perceptual disturbances.

He is concerned about his health and appropriately so. Level of intelligence is estimated to be above average. Suicidality and homicidality are absent. He has developed an appropriate understanding of the nature of his crime, its consequences and how it has affected his life, his family's life, and the life of the victim's family.

Clinical diagnosis at the time of this interview.

**DIAGNOSES:**

**Axis I:** No diagnosis.

**Axis II:** No diagnosis.

**Axis III:** Multiple Sclerosis, Cataracts, Asthma.

**Axis IV:** Moderate to Severe, consistent of Legal issues. Incarceration, deterioration of health and separation from family members.

**Axis V:** **Current GAF = Between 75 and 80.**

Mr. Byrd appears to have developed an understanding of the factors that influenced the committing of his crime and the need to develop effective and productive means of communicating and showing his feelings.

XIII.    **REVIEW OF LIFE CRIME:**

Upon describing the context of the commitment offense, Mr. Byrd's description and elaboration of the events, both proceeding and during the commission of the offense, did not deviate significantly from that which has already been reported. Mr. Byrd, given the stressors of his work, along with a chronic, debilitating illness, "he was looking for something completely different". As a result he became fascinated with a subset of life which had previously been unknown to him. Overall, however, Mr. Byrd does not excuse nor condone his behavior that eventful night. He reiterates that given the woman's screams and his fear and being discovered that he "panicked" and held the woman underwater for too long a period of time. It does not appear, however, that he had plans or intended the demise of the victim. Although Mr. Byrd appears to be sincerely remorseful for his actions and he also asks, "God, to forgive me", for taking another's life. In his prayers and spiritual search, he is unclear as how he could indeed experience this forgiveness.

As to the causative factors relative to the commitment offense, it would appear from the record that upon the interview with Mr. Byrd, that stress was indeed a factor in his life and his way of resolving it at the time of the commission of the offense, was through sexual release. Since that time, Mr. Byrd has recognized other options related to the reduction of stress in his life.

**BYRD, LESLIE**        D-30420        RJDCF/SD        F1-05-138L        LF/bl

Exhibit #7 Page 5

**XIV.    ASSESSMENT OF DANGEROUSNESS:**

Mr. Byrd's violence potential outside a controlled a setting in the past was considered to have been less than average and at the present, it is estimated to be reduced from that level. If released to the community, he would in all probability be likely to continue improvement given his defined set of expectations and goals, along with family support. He further appears to have internal resources necessary, along with the motivation to be productive and contribute to helping others.

**XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

A review of both the medical, as well as Central File and upon interviewing Mr. Byrd, it appears that he has certainly matured throughout his time in CDCR Facilities. It is also apparent that his direction in life is focused upon assisting others. This is noted for example through his work with the Hand of Peace program, his involvement with the Morals and Values class, his participation in Kairos, and his self-initiated force in tutoring others to pass their G.E.D. Overall, Mr. Byrd displays maturity and self-initiative in serving others by taking size of himself. It further appears that although he has high hopes of being reunited with his family, he does not have any expectations of that occurring any time soon. He appears resigned to the fact that there is "nothing I can do to change my circumstances". He expresses and experiences a sense of guilt, regret and remorse for his prior actions. He is aware of his strengths and his abilities as well as his limitations.

It is my personal opinion that the effects of stress and the worsening of his multiple sclerosis symptoms (with the frightening expectation of blindness and paralysis), and his introverted personality, played an important role in his choices for releasing accumulated, negative emotions, some of them originating in childhood and as a consequence of growing up with an alcoholic mother.

LUISA F. MAN, M.D.
Staff Psychiatrist

D: 05/11/06
T: 05/15/06

BYRD, LESLIE        D-30420        RJDCF/SD        F1-05-138L        LF/bl

Exhibit #7 Page 6

**EXHIBIT #8**

**2001 PSYCHOLOGICAL ASSESSMENT**

# RICHARD J. DONOVAN CORRECTIONAL FACILITY

# HEALTH CARE SERVICES

### PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS

#### October 2001 Calendar 

#### PSYCHOLOGICAL ASSESSMENT

**I.    IDENTIFYING INFORMATION:**
Mr. Byrd is a married fifty-six-year old Caucasian male who was born on September 8, 1945 to David and Eloise Byrd. Mr. Byrd subscribes to the Catholic faith. He does not have any nicknames nor does he have any type of physically distinguishing characteristics or tattoos.

**II.   DEVELOPMENTAL HISTORY:**
According to Mr. Byrd there were no prenatal or perinatal difficulties in his mother's pregnancy. He was a full term infant who, at birth, weighed eight pounds 6 ounces. He was unfamiliar with any difficulties in his early childhood development. He does note that there were no complications during his delivery. He does not recall if his developmental milestones were within normal limits. As far as he can remember there were no speech, language or motor delays. He further claimed that there were no unusual or peculiar habits and that he interacted well with family members as well as with friends of the same sex and age group. During his early childhood he was primarily involved in activities outside of school which involved children of his own age. There was no history of cruelty to animals, childhood bed wetting, or juvenile fire setting.

There is no significant childhood medical history. Mr. Byrd however, during his early years was positive for measles, whooping cough, and asthma. His only hospitalization during this time was at age six for a tonsillectomy.

**III.  EDUCATION:**
Mr. Byrd was enrolled in kindergarten at age five and then entered first grade a year later. No particular problems were noted in school in his elementary and high school years. He graduated from Arcadia high school in Arizona in 1963. He went on to receive a bachelors of science degree in business administration from the University of Arizona in 1971. During his college years he noted that his only difficulty with any subject was primarily in quadratic equations for which he later received tutoring. The subjects that he excelled in during his college years were English, History and Economics.

**BYRD, L. LESLIE          D-30420          F1-05-178L    GP/rs**

Exhibit #8 Page 1

**BOARD OF PRISON TERMS REPORT
PAGE 2**

Upon graduating from college and accepting and later maintaining employment in the banking industry Mr. Byrd went on to receive a graduate banking degree through the Pacific Coast Banking School in Seattle Washington. In retrospect, Mr. Byrd states that during his college years he was an average student however upon marrying he received A's. According to a test administered in CDC Mr. Byrd's grade level equivalent is 13.8.

It is noted that while Mr. Byrd was in high school was a member of the baseball team and was actively involved in a chess club. He was later able to obtain national ranking as one of the top ten players in table tennis. Currently Mr. Byrd's educational interests include US and European history.

IV.    **FAMILY HISTORY:**
Mr. Byrd notes that his parents were both college graduates. His father, age eighty-three, was a career Navy officer. He is negative for significant medical problems, mental illness, substance abuse as well as contact with law enforcement. Mr. Byrd relates that his relationship with his father during his earlier years was limited based upon his father being frequently out of the home. It was also noted that as a child his family moved every two to three years primarily on the east coast or west coast which later included being stationed in Hawaii. Mr. Byrd however relates that his relationship with his father at this time is described as being good. His mother is deceased. She is negative for mental illness, significant medical problems and contact with law enforcement. Mr. Byrd however describes her as being an alcoholic. He further describes her as being a bright women who was primarily a house wife and did teach school at a later time while his family was stationed in Hawaii. It is noted in the record that his mother had insomnia and frequently got to sleep at approximately five a.m. She would then sleep until noon and start drinking at 5:00 p.m. Overall it appears that given his mother's alcoholism and his father's responsibilities that he and his sisters had to take care of themselves. His mother died in 1977, by drowning in the family swimming pool. Overall, Mr. Byrd's describes his relationship with his mother while growing up as being good.

His younger sister, Carol, age forty-nine, holds a master degree in social work. Mr. Byrd claims to have a good relationship with his sister. She is also noted to be negative for any significant medical problems, mental illness or substance abuse issues. His older sister, age fifty-four, holds a bachelor of science degree. She is negative for mental illness, substance use problems as well as contact with law enforcement. She is positive however, for multiple sclerosis. Overall, Mr. Byrd notes that his relationship with his older sister while growing up was considered as good however now it is considered as being distant.

**BYRD, L. LESLIE        D-30420        F1-05-178L    GP/rs**

Exhibit #8 Page 2

**BOARD OF PRISON TERMS REPORT**
**PAGE 3**

V.     **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**
Mr. Byrd relates that he first became aware of his body changing at
approximately fifteen to sixteen years of age. He first began dating at age
eighteen and had his first sexual relationship at age twenty. Mr. Byrd
considers himself as being heterosexual. He has had only one
relationship longer than two months duration, which has been with his wife
with whom has been with for approximately thirty-six years.

According to the record there is a history of high risk behavior, bondage,
and reports from prostitutes, who testified at his trial, that Mr. Byrd had
fantasies involving homicide and violence toward women.

VI.    **MARITAL HISTORY:**
Mr. Byrd married his present wife on December 23, 1967, after a two-year
courtship. They have been married approximately thirty-four-years. Mr.
Byrd's wife is a few years younger then he is. She is currently employed
as a school teacher in Tucson Arizona. From their union two children
were born. Samantha, age twenty-eight, is currently an architect in San
Francisco. Mr. Byrd's other daughter, Sara, age twenty-six is a flight
attendant stationed in Chicago. Mr. Byrd characterizes his relationships
with his wife and children as being good and very satisfying.

VII.   **MILITARY HISTORY:**
Mr. Byrd has never been a member of the armed forces.

VIII.  **EMPLOYMENT/INCOME HISTORY:**
Upon leaving college Mr. Byrd was employed by The Arizona Bank in
Phoenix Arizona from 1971 through 1983. He worked at the Arizona bank
as a Vice President. Subsequent to this position he was employed at the
West America Bank in San Rafael. His title was Senior Vice President.
He was in charge of a loan portfolio of more than seven hundred million
dollars. According to the record, his income at that time was
approximately seventy-two thousand per year in addition to car
allowances and bonuses. His current interest is primarily in keeping
current in his field by reading financial newspapers and magazines as well
as federal regulations. He would eventually like to return to banking
and/or work part-time in financial counseling.

IX.    **SUBSTANCE ABUSE HISTORY:**
Mr. Byrd does not claim nor is there any record of any type of abuse or
dependence upon disinhibiting agents.

**BYRD, L. LESLIE**     **D-30420**     **F1-05-178L**     **GP/rs**

Exhibit #8 Page 3

**BOARD OF PRISON TERMS REPORT**
**PAGE 4**

He does note however that he did drink some wine beginning at the age
of twenty-two. However, he would only drink approximately two to three
glasses of wine per week.

**X.    PSYCHIATRIC AND MEDICAL HISTORY:**

Mr. Byrd does not claim nor is there any record of any history of
psychological illnesses or disabilities. It is noted however that he has
been asthmatic since childhood and that he contracted multiple sclerosis
in 1972. Although he was originally hospitalized upon having his first
attack it was not immediately diagnosed as MS. According to the patient's
history Mr. Byrd was diagnosed in 1973 with this illness. He has been
hospitalized at various times and locations as well as received outpatient
treatment throughout the past twenty-nine years. His multiple sclerosis
relapses and remits by history with past episodes occurring every two to
three years. These episodes have lasted approximately two months and
result in numbness or weakness in his feet, legs, arms and hands.
Additional involvement has also included optic neuritis in either side along
with decreased vision in the right eye. Mr. Byrd's last attack was last May
which resulted in left and right leg paralysis, lower trunk paralysis and
weakness, as well as numbness from his upper abdomen to toes along
with urinary urgency. Mr. Byrd is currently on Interferon beta-1A for this
condition. Mr. Byrd is also receiving medication for glaucoma.

**XI.    PLANS IF GRANTED RELEASE:**

If Mr. Byrd were to be released he would move to Tucson to be with his
wife. He further considers his wife, sisters, father and best friend to be in
support of him in his attempts to rebuild his life. Although his wife has
worked over the years as a school teacher to occupy her time he states
that both of them could live on his pension plan. Job plans, should he be
paroled, entail returning to the banking industry or working part-time in
financial counseling. His primary challenge should he be paroled would
be being paroled to the San Francisco area and being separated from his
wife. He is not aware of any other difficulties or conditions that might be
levied should he so paroled. Overall Mr. Byrd's plans appear to be viable
in terms of not only having a place to stay but also having the financial
means and support necessary to rebuild his life. Overall, there are no
specific problems noted at this time.

**BYRD, L. LESLIE          D-30420          F1-05-178L    GP/rs**

Exhibit #8 Page 4

**BOARD OF PRISON TERMS REPORT**
**PAGE 5**

### CLINICAL ASSESSMENT

**XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS:**
In the clinical interview of today, the presentation has been quite similar to
the diagnostic picture presented over the past years of which no severe
mental disorder is noted. Mr. Byrd was punctual and presented as neatly
dressed Caucasian male of medium height and build seated in a
wheelchair, which he had navigated to this office. He was cooperative,
made good eye contact and exhibited no noticeable aberrant behavior.
His affect and mood were slightly upbeat and his speech was clear.
Organization of thought processes was clear, sequential and logical.
There were no suicidal or homicidal ideations nor did he describe any type
of perceptual disturbance. His insight relative to the commitment offense
appeared fair and he does have the potential of developing greater self-
awareness. Judgment was also noted to be good. His intelligence level,
although not formally tested, appeared to be in the above average range.

**CLINICAL DIAGNOSES:**
Axis I:     1.  Sexual sadism (by history). ⟵――――――― ✗
            2.  Adult antisocial behavior.
Axis II:    No diagnosis.
Axis III:   Multiple sclerosis and asthma.
Axis IV:    Incarceration.
Axis V:     GAF =80.

Overall Mr. Byrd appears to have made more than a satisfactory
adjustment to be prison setting. He further appears to be focused upon
improving his life and maintaining his contacts and involvement with his
family upon parole. His family appears to give him much emotional
support. Mr. Byrd does not have a severe mental disorde,r however it
may prove useful for him to more fully explore his relationships with
women, other than his wife, as well as his method of relating to them
sexually.

**XIII.   REVIEW OF LIFE CRIME:**
Upon describing the context of the commitment offense Mr. Byrd's
description and elaboration of the events both preceding and during the
commission of the offense did not deviate significantly from that which has
already been recorded.

**BYRD, L. LESLIE          D-30420          F1-05-178L     GP/rs**

Exhibit #8 Page 5

**BOARD OF PRISON TERMS REPORT**
**PAGE 6**

Mr. Byrd did add that given the stressors of his work along with a chronic debilitating illness he was looking for "something completely different". As a result he became fascinated with a sub-set of life which had previously been unknown to him. Overall however, Mr. Byrd does not excuse nor condone his behavior that eventful night. He reiterates that given the woman's screams and his fear of being discovered that he "panicked" and held the woman underwater for too long a period of time. It does not appear however that he had plans or intended the demise of the victim. Overall, Mr. Byrd appears to be sincerely remorseful for his actions and in this vein he also asked "God to forgive me" for taking another's life. In his prayers and spiritual search he is unclear as to how he could indeed experience this forgiveness. He also recognizes the harm that he has caused both families in this matter.

As to causative factors relative to the commitment offense it would appear from the record and upon the interview with Mr. Byrd that stress was indeed a factor in his life and his way of resolving it at the time of the commission of the offense was through sexual release/control. Since that time Mr. Byrd has recognized other options related to the reduction of stress in his life.

XIV.    **ASSESSMENT OF DANGEROUSNESS:**
Mr. Byrd's violence potential outside a controlled setting in the past was considered to have been less than average and at present it is estimated to be reduced from that level. If released to the community he would in all probability be likely to continue improvement given his defined set of expectations and goals along with family support that he receives. He further appears to have the internal resources necessary along with the motivation to be productive and contribute to helping others.

XV.    **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**
In reviewing both the medical as well as central file and upon interviewing Mr. Byrd it appears that he has certainly matured throughout his time in CDC facilities. It is also apparent that his direction in life is focused upon assisting others. This is noted, for example, through his work with the Hand of Peace Program, his involvement with the morals and values class,

**BYRD, L. LESLIE        D-30420        F1-05-178L    GP/rs**

Exhibit #8 Page 6

**BOARD OF PRISON TERMS REPORT
PAGE 7**

his participation in Kairos, and his self-initiated efforts in tutoring others to
pass their GED. Overall Mr. Byrd displays maturity and self-initiative in
serving others by taking his eyes off of himself. It further appears that
although he has high hopes of being reunited with his family he does not
have any expectations of that occurring anytime soon. He appears
resigned to the fact that there is "nothing I can do to change my
circumstance". He expresses and experiences a sense of guilt, regret
and remorse for his prior actions. He is aware of his strengthens and his
abilities as well as his limitations. He desires however to be of service to
others. In closing Mr. Byrd should be removed from the special calendar
because psychopathology is not related to future criminal behavior.
Psychological opinion would not contribute to a release decision. There
are no other recommendations that can be made other than to support the
efforts of Mr. Byrd in continuing his service to others and maintaining his
connection educationally to his career field.

*Removes +*


**GARY PESAVENTO, Ph.D.
Clinical Psychologist**


D: 10-01-01
T: 10-02-01


**BYRD, L. LESLIE**        **D-30420**        **F1-05-178L    GP/rs**

Exhibit #8 Page 7

EXHIBIT #9

CATEGORY "T" FINAL REPORT

# CATEGORY "T"

# FINAL REPORT

BYRD, LESLIE
CDC# D-30420
F1-2-105L
RICHARD J. DONOVAN CORRECTIONAL FACILITY

Exhibit #9 Page 1

# RICHARD J. DONOVAN CORRECTIONAL FACILITY

## HEALTH CARE SERVICES

### CATEGORY "T" FINAL REPORT

INMATE:                          Byrd, Leslie
CDC NUMBER:                      D-30420
CATEGORY "T" START DATE:         February, 1995
CATEGORY "T" END DATE:           May, 1996
CASE MANAGER:                    Ruth Hansen, MSW
                                 Psychiatric Social Worker
REPORT WRITER:                   J.M. Henry, Ph.D.
                                 Senior Psychologist

INTRODUCTION:
Mr. Byrd is a fifty year old inmate on a life term for the
crime of second degree murder.  He was referred by the BPT
for the Category "J" program at Richard J. Donovan
Correctional Facility/PSU and was entered into the program
by MICC endorsement in January of 1995.  He was seen for an
initial evaluation in February of 1995 by his Case Manager
and presented to the Multidisciplinary Treatment Team during
that same month.  The Case Manager and this reporter have
frequently discussed the issues related to this report.

OPINIONS:
I offer the following opinions based on a review of the
Central File, a review of the Medical Record, information
from and discussion with other clinicians and their reports,
knowledge of the inmate through the Process group and an
interview with the inmate.

VIOLENCE POTENTIAL OUTSIDE A CONTROLLED SETTING:
Mr. Byrd's violence potential outside of a controlled
setting is considered quite low.  The most accurate
predictor of future violence is a history of past violence.
The inmate does not have a history of violence either as a
victim or predator.  An assessment in August of 1993 by a
staff psychiatrist indicated that his violence potential was
lower than the average inmate at that time.  More recently,
staff psychologist, Dr. Singer further suggested that the
inmate's violence potential is quite low.  In discussing
violence with Mr. Byrd, his self report revealed, "My
conception of myself was I was a good person.  If there's
any message it's this sort of thing can happen to anybody.
I don't think I represent a threat to anyone today.  My
values are so different than what they were."


BYRD, LESLIE   D-30420   RJDCF/SD   F1-02-105L   JH/rmp
D:  05/21/96
T:  05/29/96

Exhibit #9 Page 2

CATEGORY "T" FINAL REPORT
PAGE 2

## THE ROLE OF ALCOHOL/DRUGS IN THE COMMITMENT OFFENSE:

Mr. Byrd had no history of illicit drug use. His use of
alcohol was moderate and involved limited social
opportunities. There is sufficient documentation on this
inmate to support the fact that he has never had nor does he
have an alcohol or drug problem. His interest in and
willingness to participate in a Substance Abuse group is
indicative of this inmate's interest in understanding
himself better. It is likely that much of his interest was
further piqued by his mother's involvement with alcohol.
She had experienced frequent alcoholic black outs and was
found dead at age fifty-eight in the swimming pool in their
backyard. Mr. Byrd's interest in the Substance Abuse group
seemed motivated by his desire to understand the effects of
his mother's substance abuse history on his development.

## EXPLORATION OF COMMITMENT FACTORS:

It should be mentioned that Mr. Byrd self-initiated his
participation in the Category "T" process. There is ample
documentation that he requested an opportunity to
participate in this program for the purposes of determining
the factors that led to his crime. He has been consistent
in seeking information to help him understand this tragedy.
Some of the specific factors that he has identified include
a lack of communication with his parents, a history of
repressing emotions and anger, learning to be intolerant
with himself, feelings of inadequacy and limited self worth,
being introverted, the influence of an alcoholic mother and
an absent father. He further realizes that he has had
unrealistic self-expectations and has learned to insulate
himself from his feelings. At this point he has gone from
intellectualizing his feelings to recognizing them and
acting on them more appropriately. Considering the other
successes in his life, prior to this crime, it is not
surprising that he has been appropriately zealous in
exploring the factors that contributed to his early
development and later were influential in the instant
offense.

## REMORSE:

Mr. Byrd's own self report perhaps offers the most eloquent
testimony to his remorse for his crime. He stated, "I think
about it every day, it's the first thing I think of
everyday. The remorse gets worse as my daughters get close
to the age of my victim. My victim was innocent. There's
nothing she did to precipitate my behavior. I thought
several times about writing them but I don't think they want
to hear from me. I think it would just hurt them more."
BYRD, LESLIE    D-30420    RJDCF/SD    F1-02-105L    JH/rmp
D:  05/21/96
T:  05/29/96

Exhibit #9 Page 3

**CATEGORY "T" FINAL REPORT**
**PAGE 3**

This writer has known Mr. Byrd for the fourteen months of his Category "T" participation. He was also a participant in the writer's Communication group. He has frequently discussed his remorse on a formal and an informal basis in a number of settings. He is consistent with his feelings and emotions. In discussing remorse for this report, he had to pause a number of times to regain his composure. In this writer's opinion, Mr. Byrd's remorse is appropriate, pervasive, and genuine.

**NEED FOR FURTHER TREATMENT:**

No further individual or group therapy is seen as necessary to prepare Mr. Byrd to return to the community. The soul searching and hard work of attempting to answer "why" has been accomplished. There is little more of a substantive nature to consider with respect to Mr. Byrd understanding causes of his behavior or being concerned for his penchant for violence in the future. As always, should the inmate choose additional therapy to further develop additional self awareness, that choice should be his. No additional therapy is seen as needed to explore any other commitment-related issues. As stated in Mr. Byrd's Category "T" Clinical Summary, he has benefited optimally from those services available to him.

A further consideration is Mr. Byrd's deteriorating physical health as a result of multiple sclerosis, first diagnosed in 1972. His periods of temporary blindness, paralysis, psychomotor dysfunction and other symptoms associated with his MS have clearly tempered his life and his plans for the future. His twenty-nine year old marriage remains intact as does his contact with his wife and two daughters. Given the circumstances in Mr. Byrd's life, his nonviolent lifestyle with the exception of his commitment offense, the support of his family, his declining health, his educational background, his lack of any substance abuse and his day to day manner of getting the most good out of the rest of his life. It is highly likely that this inmate represents a minimal risk to society when he is released.

J.M. HENRY, Ph.D.
Senior Psychologist

BYRD, LESLIE   D-30420   RJDCF/SD   F1-02-105L   JH/rmp
D:  05/21/96
T:  05/29/96

Exhibit #9 Page 4

**CATEGORY "T" FINAL REPORT.**
**PAGE 4**

<u>ACKNOWLEDGMENT</u>:
I have read the Category "T" Final Board Report and
understand the information in it.

_(signature)_ 6/21/96          _(signature)_ 6/21/96
<u>INMATE SIGNATURE/DATE</u>          FINAL REPORT WRITER

<u>INMATE ADDENDUM SECTION</u>:
I disagree with the Category "T" Final Board Report.  I
would like to add the following comments.

-------------------------------------------------------

-------------------------------------------------------

-------------------------------------------------------

-------------------------------------------------------

-------------------------------------------------------



INMATE SIGNATURE/DATE          FINAL REPORT WRITER



BYRD, LESLIE    D-30420    RJDCF/SD    F1-02-105L    JH/rmp
D:  05/21/96
T:  05/29/96

Exhibit #9 Page 5

1    Leslie Arthur Byrd
     D-30420, F1-05-138L
2    P.O. Box 799001
     San Diego, CA 92179-9001
3
                                    E-filing              **FILED**
4
5                UNITED STATES DISTRICT COURT          DEC 1 7 2007
6       FOR THE NORTHERN DISTRICT OF CALIFORNIA   RICHARD W. WIEKING
                                                  CLERK, U.S. DISTRICT COURT
7                                                 NORTHERN DISTRICT OF CALIFORNIA
8
9
10                                    **CV 07      6375**
      In re:                    )
11                              )    Case No. _____
          LESLIE ARTHUR BYRD    )
12        Petitioner, Pro Se    )
                                )
13                              )
                                )       **SBA**    **(PR)**
14        On Habeas Corpus      )
                                )    DOCUMENTS IN SUPPORT OF PETITION
15                              )    FOR WRIT OF HABEAS CORPUS
                                )
16                              )
                                )
17    _____  )
18
19                                   **EXHIBITS**
20                                   10 - 18
21
22
23
24
25
26
27
28

**EXHIBIT #10**

**LETTERS OF SUPPORT**

Nancy G. Byrd
1865 West Chapala Drive
Tucson. Arizona 85704
March 18, 2006

R.J. Donovan Correctional Facility
Attn: Board of Prison Hearings Desk
P.O. Box 799006
San Diego, CA 92179-9006

Board of Prison Hearings
Re: Byrd, L., D-30420

My husband of thirty-eight years, Leslie Arthur Byrd, has spent the majority of our married years in prison. I have missed him greatly and after the shock of having him gone and losing his support, the support of my best friend, I have continued to love the man he was and the man he is today.

Art has missed seeing his two daughters grow up.  When he was sent to prison our youngest daughter was third grade and the oldest in fifth. Now they are living their own lives, but he has missed out on so much.  He has been gone for dance recitals, band concerts, graduations, and weddings. He has missed out on good night kisses, checking out prom dates, and walks down wedding aisles. His daughters have been without fatherly advise, monetary backing, vacations together, and so much more.

Beyond the fact that we have suffered without him is the fact that he caused the death of a fellow human being.  He deeply regrets-this and will probably never forgive or understand his doing this.  Art is and always was a person who respected life.  One of my fondest memories was when we were at Sea World looking at the tidal pools.  A small child was being careless with a sea anemone and Art took the time to tell the boy and our daughters that this was a living creature and needed to be treated with respect.

In prison, Art has tried not to waste his mind and talents.  He took classes in computers when they were available, he has always enjoyed working as a clerk, and he has been a respected helper in *Hands of Peace*. I am proud of him for these efforts.

Art's health has become much worse in the last twenty-one years. He was diagnosed with multiple sclerosis thirty-three years ago and has had flare-ups on and off since that time.  It was shortly after a particularly bad flare-up that he went to prison. Now, without the steady use of his legs he is unable to walk. At sixty he is slower to recover from set backs and needs to be home where he can get the care he needs.

I feel that my husband has served his time in punishment. Although nothing can truly make up for his crime he can be of better service to his family and humanity at home.  I am a teacher fully vested in retirement and can support him if need be.  I love him and want to spend my remaining years with him.  Please grant him a parole date.

Respectfully,

*Nancy G. Byrd*

Exhibit #10 Page 1

Sarah C. Horton (formerly Byrd)
4757 Mansfield St., Apt. B
San Diego, CA 92116

March 25, 2006

R.J. Donovan Correctional Facility
Attn: Board of Prison Hearings Desk
P.O. Box 799006
San Diego, CA 92179-9006

Board of Prison Hearings
Re: Byrd, L., D-30420

Dear Members of the Board of Prison Hearings:

As the daughter of Leslie Arthur Byrd, D-30420, I am writing to show my support for him and the possibility of his release. He was a great father for the ten years of my life when he was a free man. He has missed so much of my family's lives that cannot be conveyed through phone calls, photos, and brief visits. He missed walking me, (or wheeling me as the case may be,) down the aisle on me wedding day. There have been countless other occasions in the lives of my family when he has been painfully missed.

My father has turned into an old man during his twenty one years of incarceration. He is confined to his wheelchair due to his increasingly debilitating multiple sclerosis. Although he has tried to make the best of prison life through his work there, being an intelligent man, my father has suffered the drudgery of an isolated unchanging world around him.

I beg of you to grant my father a release date. He is a harmless old man who regrets deeply what he has done. I know that as a free man he would contribute to society in a positive way rather than being a burden on taxpayers by remaining in prison. His release would mean so much to my family, especially my dear mother who has waited twenty one years for his homecoming. Please take this plea into consideration.

Sincerely,

*Sarah Horton*

Sarah Horton

Exhibit #10 Page 2

Samantha C. Byrd
464 West 27th Street Apt. 1-F
Chicago, Illinois 60661
March 17, 20616

R.J. Donovan Correctional Facility
Attn: Board of Prison Hearings Desk
P.O. Box 799006
San Diego, CA 92179-9006

Board of Prison Hearings
Re: Byrd, L., D-30420

My father, Leslie Arthur Byrd, has been a prisoner in the California Department of
Corrections for over twenty years. During this time he has missed seeing my sister and
me grow up. We have been punished by not having him near us in these years. I have
missed him greatly and due to the location of my job have not been able to even visit him
on a regular basis.

I feel that he has served his punishment. I would respectfully request his release from
prison in the near future. He is needed at home and in our lives, and we want him back.

Sincerely,

Samantha C. Byrd

Exhibit #10 Page 3

February 21, 2006

Board of Prison Hearings
RE: Byrd, L., D-30420

This letter is written in support of Arthur Byrd's parole. I have written a variation of this letter for many years, and each time I write the Board of Prison Hearings I am more convinced that my brother's incarceration no longer serves society. Despite being a model prisoner, Art has served many years beyond his minimum sentence. He has a diagnosis of multiple sclerosis, is wheelchair dependent, and clearly is not a threat to society. His immediate and extended family continues to support him emotionally and is willing and able to assist financially, should he be released from prison. His wife has had a long career as an elementary school teacher and has financial resources for their senior years. Both of his siblings have family businesses that can assist in employment and health costs, if needed.

I work in a medical hemodialysis clinic that serves prisoners and I am well aware of the high costs of chronic medical care being billed to the State of California. In Arthur's case, it seems to be an unnecessary burden on the taxpayers. Art is a prisoner who is ready to re-enter society. He clearly has served his time, has remorse for the past, has a good prison record, and poses no threat to society. I strongly urge you to show compassion and finally grant Arthur parole.

Thank you for your consideration.

Sincerely,

*Carol Sullivan*

Carol Sullivan

Exhibit #10 Page 4

*Please put in the file for
L. Art Byrd for his upcoming
hearing*

March 6, 2006

O 30420

Dear Board of Prison Hearings:

I am writing on behalf of my brother, L. Arthur Byrd. He has been incarcerated for a number of years and is shortly up for parole.

My brother committed a horrible crime for which we are all deeply sorry. However, he is now in a wheelchair permanently and has extreme muscular weakness. He is no longer a threat to anyone and is, in fact, a great expense to the State of California for his necessary medications. I don't know what purpose would be served to keep him longer.

I know there is a campaign that is always waged by the newspapers in Northern California whenever he comes up for parole. The family of his victim, understandably, wants him to remain in jail. However, he has led a model life both before and after his crime. He is neither physically capable nor psychologically predisposed to commit any other crimes. The role his disease, multiple sclerosis, played in his crime is open to question. MS is one of the very few diseases that crosses the blood brain barrier and can cause such things as emotional instability and impotence. Although MS does not turn one into a murderer, the brain functions affected by the disease are only beginning to be understood. My point is only that it may have played a role in what happened that day many years ago.

Art has a wife who is willing to still support him. If released, he would move to Tucson to be with her. He has a family that would ensure his reintegration into society and I can assure you that neither the State of California nor society in general would find him a further burden.

My father is 87 years old and served his country throughout World War II at every major battle. I know this has been his greatest disappointment and we all would like him to see Art going home and being productive before his dies. I hope you will find it within yourselves to show Art some mercy and let him be released.

Sincerely,

Shirley Rector

Exhibit #10 Page 5

25 February 2006

**Correctional Counselor I and
The Board of Prison Hearings**

RE:    **Inmate L. Byrd
         D-30420**

Dear Sir/Madam:

This letter of support is for Inmate Byrd, D-30420, who is scheduled to appear before a Board of Prison Hearings for parole consideration in the near future.

Inmate Byrd and I served part of our incarceration together at Richard J. Donovan Correctional Facility. Inmate Byrd and I met while working together in the Facility 4 Program Office. Our friendship grew and together we spent time working as clerks in support of the Program Staff, Facility Captain and Associate Warden. I found Inmate Byrd to be a quiet and reserved man, a model prisoner with whom I have great respect.

I paroled in March of 1998. Upon completion of my parole in 2001, I vowed to return to the prisons and visit those brothers which had befriended me and had made a positive impact on my own life during my incarceration. Now, even as an accomplished professional in the world business community, it is most important to me to take time to write and visit Inmate Byrd at RJDCF Prison. Inmate Byrd is not a threat to society, and with his current medical care costing the state a large expense, he is an ideal candidate for parole. I have met his family and he has strong family support from his wife and children.

Although I can offer nothing more than a kind word on the behalf of Inmate Byrd--because of my own status as an ex-felon--I would still challenge you look closely a the man I know, and thoughtfully consider his parole release. For he is worthy to be given a second chance at freedom, and if given that chance, to prove he can be successful, law-biding citizen while on parole and beyond. As his health erodes with each passing day, please give him the chance to prove himself.

Best regards,

*Rod Stark*

Dr. Rod Stark

Exhibit #10 Page 6

# LADAR & KNAPP

### ATTORNEYS AT LAW

507 POLK STREET, SUITE 310
SAN FRANCISCO, CALIFORNIA 94102-3339

JERROLD M. LADAR
JOYCE B. LADAR                                             TELEPHONE (415) 928-2333
BERNARD L. KNAPP                                           TELECOPIER (415) 928-4499

March 22, 1995

Board of Prison Terms
State of California
Attention: CCI Long
Richard J. Donovan Correction Facility
280 Alta Road
San Diego, CA 92179

　　　　Re:　Leslie Arthur Byrd -- Parole

Dear CCI Long:

　　　　I was one of Mr. Byrd's attorneys at his trial in Marin
County. He was charged with first degree murder and convicted
of second degree murder, the jury having acquitted him of
first degree.

　　　　His social history, past and present mental state, past
criminal history (none), his behavior from the time he was
small through the offense were all chronicled in the lengthy
transcript of trial. An extensive history of his background
and the circumstances leading to and causing the offense were
testified to by Dr. Roger Freed, M.D., a psychiatrist and Ann
Coho, a psychologist, who tested Mr. Byrd. All these materials
and their testimony were placed in the record in open court.
Mr. Byrd had offered to plead guilty to second degree murder,
accepting responsibility therefore, and stating his remorse
for the offense, but this offer was rejected by the District
Attorney, thus forcing Mr. Byrd and the County to the extended
trial and expense to achieve a conviction for the offense he
had offered to admit to in the first place.

　　　　The extensive psychiatric and psychological review of Mr.
Byrd's case reliably indicated that he had no previous record
of violence. He was raised in a home where neither he nor his
siblings suffered unusual physical abuse. Over a relatively
short period of time he engaged in consensual bondage sex with
a series of prostitutes from San Francisco, however he did not
inflict injury upon any of them, other than the deceased.
There was absolutely no indication of a history of mental
problems related to the defendant until a period of extreme
stress, which ran less than a year prior to the unfortunate
act resulting in Miss Cythia Engstrom's death. His mental

Exhibit #10 Page 7

Page 2

situation during this brief period was complicated by the presence of an episode of multiple sclerosis (MS), and his psychological testing revealed absolutely no psychiatric factors which would indicate that he had any potential for recidivism.

Indeed, in respect to the psychiatric and psychological evidence presented at the trial, the prosecution offered no expert witnesses of their own, and the jury accepted the analyses of Dr. Freed and Miss Coho. (Otherwise, they would have returned a different verdict.) The lack of a previous record, the stable social history (Mrs. Byrd stood by him throughout the proceedings), his expressions of remorse, the fact that he committed his crime as a result of a significant stress in his life all are factors which tend to show suitability for parole.

I am not aware of the contents of your file in respect to his understanding and plans for the future and his institutional behavior, but I would assume that they are all positive.

I write to have this letter placed in the file and to inquire whether you have the transcript at the time of sentencing or the trial transcripts (Dr. Freed was on the stand for a substantial number of days).

Very truly yours,

JERROLD M. LADAR

Jerrold M. Ladar

JML/jp
1:2prlbd
cc: Arthur Byrd

Exhibit #10 Page 8

**EXHIBIT # 11**

**LAUDATORY / SELF-HELP / WORK CHRONOS**

Page 1

| NAME and NUMBER | BYRD, L., D-30420 | CDC-128-B (4/74) |
|---|---|---|

This is the third recommendation I have written regarding the release of Inmate BYRD. I have known Inmate BYRD for over six years and have served as his direct supervisor on several occasions. Inmate Byrd has always displayed a high degree of skill and maturity in his job performance. In addition to producing a high volume of quality work, he has been instrumental in keeping the paperwork flowing in a timely manner through his excellent working relationships with both staff and other inmates. Several times Inmate BYRD has alerted me to situations in the office and then worked with me to avoid them. He is extremely reliable and maintains a professional attitude at work which includes exhibiting discretion toward any information that crosses his desk.

I would also like to state again that, based on my 31 years experience in the Department of Corrections, I do not feel that Inmate BYRD would re-offend if released from prison. This is not a statement I make lightly. Inmate BYRD is only the second inmate for which I have made such an evaluation. I am aware of Inmate BYRD's commitment offense, but based on my day-to-day observations of him and his interaction with staff, I feel comfortable with my evaluation. My opinion is further supported by Inmate BYRD's deteriorating physical condition. The increasing cost of maintaining Inmate BYRD in prison represents, in my opinion, both an unwarranted and unnecessary cost to the State.

ORIG: C-file
Writer
CC-I R. Ravelo
Inmate

J. W. DRESBACH
Facility Captain
Facility 1

DATE  01/27/06    LAUDATORY – PAROLE RECOMMENDATION RJDCF        GENERAL CHRONO

Exhibit #11 Page 1

NAME and NUMBER  BYRD,    D30420          RJDCF                    CDC-128-B (Rev. 4/74)

The above named inmate has completed 88 hours of training required to become a facilitator
for the Friends Outside Creative Conflict Resolution workshops on JANUARY 13, 14, 15, 2006.
Inmate _____ BYRD _____, has received his Training for Trainers Certificate, is
eligible to be an Inside Facilitator for future Hands of Peace/Friends Outside workshops,
and is commended for his support, interest and conduct in the workshop projects here
at R.J. Donovan Correctional Facility.

Original:  Records
     cc:   CCI
           Chapel Files
           Inmate

                                        Protestant Chaplain
                                        Activity Group Sponsor

DATE        JANUARY 20, 2006          (INFORMATIVE)           GENERAL CHRONO

NAME and NUMBER          BYRD, L. A., D-30420          Page 1
                                                      CDC-128-B (4/74)

Inmate Byrd is to be commended for his substantial role in serving as a member of the Management
Team, preparing other inmates to become Inside Facilitators for the Hands of Peace/Alternative to
Violence Project Creative Conflict Resolution Workshops.  He has not only participated in the training of
other facilitators, but has also been instrumental in actively recruiting others inmates to both participate
in and become facilitators in the program.  The outside facilitators consider Inmate Byrd a valuable
resource in the continuing self-help program in the prison community.

C-File                                  Dr. WILLIAM O. BROWN
Chapel Files                            Protestant Chaplain
CCI
Inmate

DATE      01/23/06          LAUDATORY CHRONO               RJDCF

Exhibit #11 Page 2

CDC-128-8 (Rev. 4/74)

NAME and NUMBER          BYRD,

This is the second recommendation I have written regarding the release of Inmate BYRD. I have known Inmate BYRD for over five years and have also served as his direct supervisor on several occasions. Inmate BYRD has always displayed a high degree of skill and maturity in his job performance. In addition to producing a high volume of quality work, he has been instrumental in keeping the paperwork flowing in a timely manner through his excellent working relationships with both staff and other inmates. Several times Inmate BYRD has alerted me to situations in the office and then worked with me to avoid them. He is extremely reliable and maintains a professional attitude at work which includes exhibiting discretion toward any information that crosses his desk.

I would also like to state again that, based on my over 30 years of experience in the Department of Corrections, I do not feel that Inmate BYRD would re-offend if released from prison. This is not a statement I make lightly. Inmate BYRD is only the second inmate for which I have made such an evaluation. I am aware of Inmate BYRD's commitment offense, but based on my day-to-day observations of him and his interaction with staff, I feel comfortable with my evaluation. My opinion is further supported by Inmate BYRD's deteriorating physical condition. The increasing cost of maintaining Inmate BYRD in prison represents, in my opinion, both an unwarranted and an unnecessary cost to the State.

ORIG:   C-FILE
   cc:  BPT Desk
        CCI R. Ravelo
        Writer
        Inmate

_J. W. Dresbach_
J. W. DRESBACH
Facility Captain
Facility III

DATE   09/06/05          (PAROLE RECOMMENDATION)        RJDCF        GENERAL CHRO

Exhibit #11 Page 3

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128-B    REV. 4/74

**NAME and NUMBER**          **BYRD, L.**          **D-30420**

I have known Inmate BYRD for approximately five years, during which period I have been his supervisor on several occasions. For the past two years, he has been assigned as the Facility IV Reception Center Captain's Clerk under my direct supervision. Inmate BYRD has always displayed a high degree of skill and maturity in his job performance. He not only produces a high volume of quality work, but he has been instrumental in keeping the paperwork flowing in a timely manner through his excellent working relationships with both staff and other inmates. Several times Inmate BYRD has alerted me to situations in the office that represented potential problems and then worked with me to avoid them. He is extremely reliable and maintains a professional attitude toward his work that includes exhibiting discretion toward any information that crosses his desk.

I would also like to state that, based on my nearly 29 years of experience in the Department of Corrections, I do not feel that Inmate BYRD would re-offend if released from prison. This is especially true in light of his deteriorating physical condition. This is not a statement I make lightly. Inmate BYRD is only the second inmate in 29 years for which I have made such an evaluation. I am aware of Inmate BYRD's commitment offense, but based upon my day-to-day observations of him and his interaction with staff, I feel comfortable in my evaluation.

ORIG:    C-File
cc:      CCI L. Muniz
        Writer
        Inmate

J. W. DRESBACH
Facility Captain
Facility IV Reception Center

DATE:  02/05/04          (LAUDATORY)          RJDCF          GENERAL CHRONO

Exhibit #11 Page 4

NAME and NUMBER   BYRD, L   D30420           5-138           CDC-128-B (Rev. 4/74)

The above named inmate has successfully completed the Basic, 22 hour,
Hands of Peace/Friends Outside Creative Conflict Resolution Workshop,
held on: JAN 14,15,16,2005          .  Inmate participation was voluntary,
and inmate   BYRD                    , D30420     , is commended for his
interest and conduct throughout the program.

Original: Records
      cc: CCI
          Chapel files
          Inmate

                                   STATE CHAPLAIN
                                   GROUP ACTIVITY SPONSOR

DATE  1,31,05              (LAUDATORY)                    GENERAL CHRONO

NAME and NUMBER   Byrd   D-30420   F1-5-138L                CDC-128-B (Rev. 4/74)
      A.Byrd         PARTICIPATED IN THE HANDS OF PEACE/FRIENDS OUTSIDE FACILITATOR
TRAINING-ON-TRAINING WORKSHOP ON   November 17,2003
THE WORKSHOP INVOLVED 10 HOURS OF TRAINING BY HANDS OF PEACE OUTSIDE FACILITATORS,
FOR TECHNIQUES AND PROGRAMS FOR THE CREATIVE CONFLICT RESOLUTION WORKSHOPS.

ORIGINAL:  RECORDS
      CC:  CCI
           CHAPEL FILES
           INMATE
                                   STATE CHAPLAIN

DATE  November 17,2003        (LAUDATORY)                 GENERAL CHRONO

NAME and NUMBER   BYRD   D-30420 .                         CDC-128-B (Rev. 4/74)
                 PARTICIPATED IN THE HANDS OF PEACE/FRIENDS OUTSIDE FACILITATOR
TRAINING-ON-TRAINING WORKSHOP ON
THE WORKSHOP INVOLVED 10 HOURS OF TRAINING BY HANDS OF PEACE OUTSIDE FACILITATORS,
FOR TECHNIQUES AND PROGRAMS FOR THE CREATIVE CONFLICT RESOLUTION WORKSHOPS.

ORIGINAL:  RECORDS
      CC:  CCI
           CHAPEL FILES
           INMATE
                                   STATE CHAPLAIN

DATE  08-08-03               (LAUDATORY)                  GENERAL CHRONO

Exhibit #11 Page 5

NAME and NUMBER     BYRD, L.     D-30420     F1-05-138L                    CDC-128-8 (Rev. )

Inmate BYRD , L., D-30420, served as an Inside Facilitator Mentor, mentoring new
Facilitators during the Hands of Peace/Friends Outside Creative Conflict Resolution
Workshop held on February 7, 8, 9, 2003.  To become a Facilitator involves a minimum of
88 hours of training.  Inmate BYRD's support, interest and conduct during this workshop
are to be commended.

Original:  C-FILE
    cc:    CCI
           Chapel Files
           Inmate

                                          Chaplain B. Brown
                                          State Chaplain
                                          Activity Group Sponsor


DATE     2-09-03          (LAUDATORY)     RJDCF          GENERAL CHRONO

---

NAME and NUMBER     BYRD     D30420     F1-5-138L                    CDC-128-8 (Rev. 4/74)

BYRD, D30420          SERVED AS AN INSIDE FACILITATOR FOR THE HANDS OF PEACE/
FRIENDS OUTSIDE CREATIVE CONFLICT RESOLUTION WORKSHOP ON     OCTOBER 18-20, 2002
TO BECOME A FACILITATOR INVOLVES A MINIMUM OF 88 HOURS OF TRAINING.  HIS SUPPORT,
INTEREST AND CONDUCT IN THE WORKSHOP PROJECTS ARE COMMENDABLE.


ORIGINAL:  RECORDS
    CC:    CCI
           CHAPEL FILES
           INMATE

                                          STATE CHAPLAIN
                                          ACTIVITY GROUP SPONSOR

DATE   OCTOBER 22, 2002       (LAUDATORY)                   GENERAL CHRONO

---

NAME and NUMBER  BYRD          D30420     F1-5-138L                    CDC-128-8 (Rev. 4/74)

BYRD, D30420          SERVED AS AN INSIDE FACILITATOR FOR THE HANDS OF PEACE/
FRIENDS OUTSIDE CREATIVE CONFLICT RESOLUTION WORKSHOP ON  JULY 5-7, 2002
TO BECOME A FACILITATOR INVOLVES A MINIMUM OF 88 HOURS OF TRAINING.  HIS SUPPORT,
INTEREST AND CONDUCT IN THE WORKSHOP PROJECTS ARE COMMENDABLE.


ORIGINAL:  RECORDS
    CC:    CCI
           CHAPEL FILES
           INMATE

                                          STATE CHAPLAIN
                                          ACTIVITY GROUP SPONSOR

DATE  JULY 9, 2002          (LAUDATORY)                     GENERAL CHRONO

Exhibit #11 Page 6

NAME and NUMBER    BYRD    D30420    F1-5-138L .                CDC-128-B (Rev. 4/74)

BYRD, D30420,                  SERVED AS AN INSIDE FACILITATOR FOR THE HANDS OF PEACE/
FRIENDS OUTSIDE CREATIVE CONFLICT RESOLUTION WORKSHOP ON APRIL 5-7, 2002.
TO BECOME A FACILITATOR INVOLVES A MINIMUM OF 88 HOURS OF TRAINING.  HIS SUPPORT,
INTEREST AND CONDUCT IN THE WORKSHOP PROJECTS ARE COMMENDABLE.

ORIGINAL:  RECORDS
       CC:  CCI
            CHAPEL FILES
            INMATE

                                    STATE CHAPLAIN
                                    ACTIVITY GROUP SPONSOR

DATE APRIL 8, 2002          (LAUDATORY)                    GENERAL CHRONO

---

NAME and NUMBER  BYRD          D-30420     2-105L                CDC-128-B (Rev. 4/74)

The above named inmate has successfully completed participation as an Inside
Facilitator in the following 22 hour Hands of Peace/Friends Outside Creative
Conflict Resolution workshop held on NOVEMBER 3-5, 2000_____.  Par-
ticipation as a Facilitator is voluntary and inmate _____BYRD_____,
is commended for his conduct, interest, and support in the Hands of Peace/
Friends Outside project.

Original: Records
      cc: CCI
          Chapel Files
          Inmate

                                    CHAPLAIN C. M. BREWER
                                    Workshop Coordinator

DATE    NOVEMBER 6, 2000        (LAUDATORY)                GENERAL CHRONO

---

NAME and NUMBER    BYED, A.   D-30420  1-2-105L                CDC-128-B (Rev. 4/74)

The above named inmate has successfully completed the Basic, 22 hour,
Hands of Peace/Friends Outside Creative Conflict Resolution workshop,
held on: ____MAY 5 - 7, 2000_____.  Inmate participation was
voluntary, and inmate _BYRD_____, _D-30420_, is commended
for his interest and conduct throughout the program.

Original: Records
      cc: CCI
          Chapel Files
          Inmate

                                    CHAPLAIN C. M. BREWER
                                    Workshop Coordinator

DATE  5-7-00              (LAUDATORY)                    GENERAL CHRONO

Exhibit #11 Page 7

NAME and NUMBER    **BYRD, A., D-30420**    **F1-02-105L**    CDC-128-B (Rev. 4/74)

The above-named inmate has successfully completed a Morals and Values Class which deals with social issues and is designed to assist the inmate in the development of socialization skills. This inmate is to be commended for his participation in the class and the effort he put forth.

Orig: Central File
  cc: Inmate
     Chaplain File

Randy N. Pollack, Ph.D.
Facility 11 Chaplain

DATE  4/11/00        (INFORMATIVE)                    **GENERAL CHRONO**

NAME and NUMBER    **BYRD, L.    D-30420   F1-02-225U**    CDC-128-B (Rev. 4/74)

The above named inmate has successfully completed the Basic, 22 hour, Hands of Peace/Friends Outside Creative Conflict Resolution workshop, held on: __AUGUST 11, 12, 13, 1995__. Inmate participation was voluntary, and inmate _____**BYRD**_____, **D-30420**, is commended for his interest and conduct throughout the program.

Original: Records
  cc: CCI
     Chapel Files
     Inmate

CHAPLAIN C. M. BREWER
Workshop Coordinator

DATE      8-13-95        (LAUDATORY)                    **GENERAL CHRONO**

NAME and NUMBER  BYRD, D-30420, 2-105L    CDC-128-B (Rev. 4/74)

The above named inmate has successfully completed the Advanced, 22 hour, Hands of Peace/Friends Outside, Creative Conflict Resolution Workshop held on __AUGUST 1-3, 1997__. Inmate participation was voluntary, and inmate _____**BYRD**_____, CDC Number, __D-30420__, is commended for his interest and conduct throughout this program.

Original:  Records
    cc:  CCI
      Chapel Files
      Inmate

CHAPLAIN C. M. BREWER
Activity Group Sponsor

DATE    8/12/97            (LAUDATORY)                    **GENERAL CHRONO**

Exhibit #11 Page 8

NAME and NUMBER    BYRD, L.  D-30420  F1-02-105L                    CDC-128-B (Rev. 4/74)

During my assignment as Facility 4 Third Watch Program Lieutenant, Inmate BYRD has worked directly for me as the Lieutenant's Clerk.  For approximately one (1) year, Inmate BYRD has performed his duties in an exceptional manner completing a high-volume of tasks accurately, efficiently and with little supervision.  Inmate BYRD is proficient at disciplinary processing, report preparation, CDC-602 Inmate Appeal formatting, general memoranda and office work.  Inmate BYRD is reliable and respectful and is the most competent clerk I have supervised.

Original:  C-File
    CC:   CC-I
          Writer                          A. J. VISS
          Inmate                          Correctional Lieutenant
                                          Facility 4 Reception Center


DATE   October 30, 1996        (LAUDATORY CHRONO)    RJDCF    GENERAL CHRONO

_____

NAME and NUMBER  BYRD, L.        D-30420      F1-02-105L        CDC-128-B (Rev. 4/74)

Inmate BYRD, L., D-30420, has worked as the Facility 4 Lieutenant's Clerk under my direct supervision for approximately seven (7) months.  During that time Inmate BYRD has displayed exceptional skills, especially in the areas of disciplinary processing, report preparation, Incident Reports and general office procedures.  He has proven himself to be prompt, reliable and trustworthy in the performance of his duties.  He requires little supervision and gets along well with both staff and inmates.  I would recommend Inmate BYRD to any prospective supervisor.

ORIG: C-FILE
  cc: CC-I
      Writer
      Inmate                          J. S. MACIAS
                                      Correctional Lieutenant
                                      RJD Correctional Facility


DATE  6-18-97          LAUDATORY          RJDCF          GENERAL CHRONO
_____

NAME and NUMBER   BYRD        D-30420        1-2-105L        CDC-128-B (Rev. 4/74)

The above-named inmate has completed the Breaking Barriers Program. This program was developed by the Pacific Institute in Seattle, Washington, and assists in the development of socialization skills that help a person upon reentry into society.  This inmate is to be commended for his effort and participation in this program.

DIST:
                                      Rabbi N. Pollack, Ph.D.
Orig: Central File                    Facility II Chaplain
  cc: Chaplain                        Richard J. Donovan Correctional Facility
      Inmate


DATE  7-10-96              (INFORMATIVE)                GENERAL CHRONO

                                                    Exhibit #11 Page 9

NAME and NUMBER   BYRD, LESLIE, D-30420, 1-2-105L                    CDC-128-B (Rev. 4/74)

The above named inmate has successfully completed the Advance, 22 hour, Hands of Peace/Friends Outside Creative Conflict Resolution workshop held on ___MARCH 15-17, 1996___. Inmate participation was voluntary, and inmate ___BYRD___, ___D-30420___, is commended for his interest and conduct throughout this program.

Original: Records
    cc: CCI
        Chapel Files
        Inmate

_____
CHAPLAIN C. M. BREWER
Workshop Coordinator

DATE   MARCH 19, 1996          (LAUDATORY)              GENERAL CHRONO

---

NAME and NUMBER BYRD, L.    D-30420    F1-02-105L              CDC-128-B (Rev. 4/74)

Inmate BYRD, L., D-30420 has worked for me as Lieutenant's Clerk in the Facility 4 Reception Center Program Office for approximately one (1) year. During that time he had demonstrated exceptional skills in the areas of disciplinary processing, report preparation and general office procedures. Inmate BYRD has proven himself to be prompt, reliable and trustworthy and performs all tasks in an exemplary manner. He is a self-starter who needs little or no supervision. Inmate BYRD gets along well with both staff and inmates. I would highly recommend Inmate BYRD as a clerk to any prospective supervisor.

Original: Central File
    cc: Counselor
        Inmate
        Writer

_____
D. G. SMITH, Correctional Sergeant
Facility 4 Program Office 3rd Watch
RJD Correctional Facility

DATE   5-30-96        LAUDATORY CHRONO          RJDCF   GENERAL CHRONO

---

NAME and NUMBER   BYRD, L.       D-30420        F1-02-225U    CDC-128-B (Rev. 4/74)

Inmate BYRD, D-30420, has served as the Facility 4 Program Clerk under my supervision for approximately four (4) months. His duties during that period consisted of typing CDC-115's, Investigative Reports, Disciplinary Dispositions, Memoranda and other documents. He also maintained a number of daily and monthly records including Meal Reports and the Daily Activity Report. Inmate BYRD has proven to be an excellent clerk, completing a high volume of work in an accurate and timely manner. He maintains good working relationships with both staff and fellow inmates and is highly reliable. I recommend him to any prospective supervisor who is looking for a good clerk.

ORIG: C-File
  cc: CCI Long
      Writer
      Inmate

_____
M. G. GRISSOM
Correctional Lieutenant
Facility 4, Third Watch

DATE   12-19-95       (LAUDATORY)              RJDCF       GENERAL CHRONO

Exhibit #11 Page 10

NAME NUMBER  BYRD, D-30420          (V)          C-14-142-L,    CDC 128-8 (Rev. 4/74

Inmate BYRD, D-30420, has been assigned as a Program Lieutenant's Clerk for more than one year. During that time he has demonstrated exceptional performance in the completion of his duties. He gets along well with both staff and inmates, is very reliable, and produces a high volume of quality work. I would recommend him highly to any prospective supervisor. I feel that the constant effort which he has displayed, which includes numerous hours of voluntary overtime, entitles him to this Laudatory chrono.

Orig:  C-FILE
  cc:  CC-I
       WRITER
       INMATE                              L. ITURBIDE
                                           Correctional Lieutenant
                                           Mule Creek State Prison


DATE  2/8/90      (LAUDATORY CHRONO)      MCSP-JFF     GENERAL CHRONO


NAME  BYRD          CDC No.  D30420      SUBJ:  "VIEWS" PARTICIPATION

Inmate  BYRD          , CDC No.  D30420          has regularly
attended the MCSP Victim Education Workshop Series (VIEWS) group in Facility
"C" for over five months.  He has actively participated in group discussions
and has shown a sincere interest and has improved his understanding of the
impact of crime on victims.  As group sponsors, we especially appreciate this
inmate's positive contributions to the objectives of the VIEWS program and
encourage him to continue his education and awarenesss concerning victims.

_M. Aguirre_                          _R. Johnson_
M. Aguirre, VIEWS Sponsor             R. Johnson, VIEWS Sponsor

cc:  Warden
     P.A.
     Inmate
     C-File              Laudatory Chrono      (MCSP)      CDC 128-B


Exhibit #11 Page 11

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

**GRADE**
**ATTITUDE** S=SATISFACTORY
U=UNSATISFACTORY

**TOTAL CERTIFICATION UNITS IN COURSE:** 13

VOCATION (VOC): 13
ADULT BASIC EDUCATION (ABE): 0
GENERAL EDUCATION DEVELOPMENT (GED):
HIGH SCHOOL (H.SCH):
ENGLISH SECOND LANGUAGE (ESL):

ADAPTABILITY= S
CONDUCT= S
COOPERATION= S
DEPENDABILITY= S
INITIATIVE= S    TOTAL CERTIFICATION UNITS PRIOR TO QUARTER: 6
**SPECIFIC CERTIFICATION UNITS COMPLETED:** VO1.01.01-.06, .11
DATE STUDENT ENROLLED: 1/09/91    DATE STUDENT TERMINATED:
REASON FOR TERMINATION:

**COMMENTS:** Third Quarter. Highly motivated and professional. Employable. Co-author of a major System "Library System". Should be certified in one year and be given ACP exam.

DATE OF CHRONO: 9-30-94    GRADE: S    INSTRUCTOR: Michael MacDonald
COURSE TITLE: *Vocational Computer Technology*

CDC#: D-30420    NAME: Byrd, Art    INSTITUTION: MCSP-IONE

CDC 128-E (7/89)

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

**GRADE**
**ATTITUDE** S=SATISFACTORY
U=UNSATISFACTORY

**TOTAL CERTIFICATION UNITS IN COURSE:** 13

VOCATION (VOC): 13
ADULT BASIC EDUCATION (ABE): 0
GENERAL EDUCATION DEVELOPMENT (GED):
HIGH SCHOOL (H.SCH):
ENGLISH SECOND LANGUAGE (ESL):

ADAPTABILITY= S
CONDUCT= S
COOPERATION= S
DEPENDABILITY= S
INITIATIVE= S    TOTAL CERTIFICATION UNITS PRIOR TO QUARTER: 8
**SPECIFIC CERTIFICATION UNITS COMPLETED:** VO1.01.01 - .07, .11
DATE STUDENT ENROLLED: 1/09/91    DATE STUDENT TERMINATED:
REASON FOR TERMINATION:

**COMMENTS:** First Quarter. Highly motivated and professional. Exceptional organizational skills. Employable. Working on "Library System".

DATE OF CHRONO: 3-31-94    GRADE: S    INSTRUCTOR: Michael MacDonald
COURSE TITLE: *Vocational Computer Technology*

CDC#: D-30420    NAME: Byrd, Art    INSTITUTION: MCSP-IONE

**EDUCATION PROGRESS REPORT**

CDC 128-E (7/89)

Exhibit #11 Page 12

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

**GRADE**
**ATTITUDE** S=SATISFACTORY
U=UNSATISFACTORY

**TOTAL CERTIFICATION UNITS IN COURSE:** 10

VOCATION (VOC): 10
ADULT BASIC EDUCATION (ABE): 0
GENERAL EDUCATION DEVELOPMENT (GED):
HIGH SCHOOL (H.SCH):
ENGLISH SECOND LANGUAGE (ESL):

ADAPTABILITY= S
CONDUCT= S
COOPERATION= S
DEPENDABILITY= S
INITIATIVE= S

**TOTAL CERTIFICATION UNITS PRIOR TO QUARTER:** 5

**SPECIFIC CERTIFICATION UNITS COMPLETED:** V01.01.01,.02,.05,.06,.07
**DATE STUDENT ENROLLED:** 1-09-91
**REASON FOR TERMINATION:**
**DATE STUDENT TERMINATED:**

**COMMENTS:** Fourth Quarter. Center Member responsible for a team of trainee programmers. Has started to work on shop projects and requirements. Exceptional work and organizational skills. Is qualified to be an Apprentice should more positions be created.

**DATE OF CHRONO:** 12-31-92     **GRADE:** S     **INSTRUCTOR:** Michael MacDonald

**COURSE TITLE:** *Vocational Computer Technology*

**CDC#:** D-30420     **NAME:** Byrd     **INSTITUTION:** MCSP-IONE

**EDUCATION PROGRESS REPORT**

STATE OF CALIFORNIA                                          CDC 128-E (7/89)
DEPARTMENT OF CORRECTIONS

**GRADE**
**ATTITUDE** S=SATISFACTORY
U=UNSATISFACTORY

**TOTAL CERTIFICATION UNITS IN COURSE:**

VOCATION (VOC): 10
ADULT BASIC EDUCATION (ABE): 0
GENERAL EDUCATION DEVELOPMENT (GED): 0
HIGH SCHOOL (H.SCH): 0
ENGLISH SECOND LANGUAGE (ESL): 0

ADAPTABILITY= S
CONDUCT= S
COOPERATION= S
DEPENDABILITY= S
INITIATIVE= S

**TOTAL CERTIFICATION UNITS THIS QUARTER:** 5

**SPECIFIC CERTIFICATION UNITS COMPLETED:** V01.01.01,.02,.05,.06,.07
**DATE STUDENT ENROLLED:** 1/9/91     **DATE STUDENT TERMINATED:**
**REASON STUDENT TERMINATED:**

**COMMENTS:** SECOND QUARTER.
Completed Panel IV on 5/21/92. Exceptional progress as demonstrated by achieving Center Phase in less than eighteen months. Has begun training other students. Will soon be given assignment of Team Leader.

**DATE OF CHRONO:** 7-1-92     **GRADE:** S     **INSTRUCTOR:** Michael MacDonald

**COURSE TITLE:** *Vocational Computer Technology*

**CDC#:** D-30420     **NAME:** BYRD, LESLIE     **INSTITUTION:** MCSP-IONE

**EDUCATION PROGRESS REPORT**     CDC 128-E (7/89)

Exhibit #11 Page 13

STATE OF CALIFORNIA                                          DEPARTMENT OF CORRECTIONS

**GRADE**
**ATTITUDE** S=SATISFACTORY                    **TOTAL CERTIFICATION UNITS IN COURSE:**
              U=UNSATISFACTORY

                                                          VOCATION (VOC):10
                                        ADULT BASIC EDUCATION (ABE):0
ADAPTABILITY= **S**              GENERAL EDUCATION DEVELOPMENT(GED):0
      CONDUCT= **S**                          HIGH SCHOOL (H.SCH):0
   COOPERATION= **S**                ENGLISH SECOND LANGUAGE (ESL):0
 DEPENDABILITY= **S**
    INITIATIVE= **S**              **TOTAL CERTIFICATION UNITS THIS QUARTER:3**

**SPECIFIC CERTIFICATION UNITS COMPLETED: V01.01.01,.05,.06.**
**DATE STUDENT ENROLLED: 1-9-91**          **DATE STUDENT TERMINATED:**
                                         **REASON STUDENT TERMINATED:**

**COMMENTS:FIRST QUARTER.** Exceptional performance! Work is detailed, accurate and
prompt. Shows all the personal, organizational, and technical skills needed to
progress in the trade.

**DATE OF CHRONO: 4-1-92**          **GRADE: S**          **INSTRUCTOR: Michael MacDonald**

**COURSE TITLE:** *Vocational Computer Technology*

**CDC#: D-30420**                    **NAME:BYRD**            **INSTITUTION: MCSP-IONE**
                        **EDUCATION PROGRESS REPORT**           CDC 128-E (7/89)

STATE OF CALIFORNIA                                          DEPARTMENT OF CORRECTIONS

**GRADE**
**ATTITUDE** S=SATISFACTORY                    **TOTAL CERTIFICATION UNITS IN COURSE:**
              U=UNSATISFACTORY

                                                          VOCATION (VOC): 10
                                        ADULT BASIC EDUCATION (ABE):0
ADAPTABILITY= **S**              GENERAL EDUCATION DEVELOPMENT(GED):0
      CONDUCT= **S**                          HIGH SCHOOL (H.SCH):0
   COOPERATION= **S**                ENGLISH SECOND LANGUAGE (ESL):0
 DEPENDABILITY= **S**
    INITIATIVE= **S**              **TOTAL CERTIFICATION UNITS THIS QUARTER:**

**SPECIFIC CERTIFICATION UNITS COMPLETED:** V01.01.01, .05, .06
**DATE STUDENT ENROLLED: 1-9-91**          **DATE STUDENT TERMINATED:**
                                         **REASON STUDENT TERMINATED:**

**COMMENTS:** Fourth Quarter. Excellent performance, fast and accurate progress. Has
been approved for Apprenticeship Program. Completed Panel 3 on 12-11-91. Very
detailed course work.

**DATE OF CHRONO: 12-31-91**          **GRADE: S**          **INSTRUCTOR: Michael
                                                          MacDonald**
**COURSE TITLE:** *Vocational Computer Technology*

**CDC#: D-30420**                    **NAME: BYRD, L.A.**        **INSTITUTION: MCSP-IONE**
                        **EDUCATION PROGRESS REPORT**           CDC 128-E (7/89)

Exhibit #11 Page 14

EXHIBIT #12

MATRIX OF BASE TERMS FOR SECOND DEGREE MURDER

### CIRCUMSTANCES

| FIRST DEGREE MURDER<br>Penal Code § 189 25 years and does not include past conviction credit as provided in § 2290 | A. Indirect<br>Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force, e.g., shock producing heart attack, a crime partner actually did the killing. | B. Direct or Victim Contribution<br>Death was almost immediate or resulted at least partially from contributing factors from the victim, e.g., victim inflicted strugly or had provoked the prisoner. This does not include victim acting in defense of self or property. | C. Severe Trauma<br>Death resulted from severe trauma inflicted with deadly intensity, e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon and resulting in immediate death or actions calculated to induce terror in the victim. | D. Torture<br>Victim was tortured by the prolonged infliction of pain and/or the denial of any of the necessities of life prior to not resulting in the death. |
|---|---|---|---|---|
| **I. Participating Victim** Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc. | 25-26-27 | 26-27-28 | 27-28-29 | 28-29-30 |
| **II. Prior Relationship** Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. Victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 26-27-28 | 27-28-29 | 28-29-30 | 29-30-31 |
| **III. No Prior Relationship** Victim had little or no personal relationship with prisoner or motivation for act resulting in death was related to the accomplishment of another crime, e.g., death of victim during robbery, rape, or other felony. | 27-28-29 | 28-29-30 | 29-30-31 | 30-31-32 |
| **IV. Threat to Public Order or Murder for Hire** The act resulting in the victim's death constituted a threat to public order beyond the murder of a single victim, e.g., public place, period of prisoner dealing with mass of persons, or any killing where the prisoner hired and/or paid another person to commit the offense. | 28-29-30 | 29-30-31 | 30-31-32 | 31-32-33 |

### SUGGESTED BASE TERM

(c) Matrix of Base Terms for Second Degree Murder on or after November 8, 1978.

### CIRCUMSTANCES

| SECOND DEGREE MURDER<br>Penal Code § 189 15 years and does not include past conviction credit as provided § 2290 | A. Indirect<br>Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force, e.g., shock producing heart attack, a crime partner actually did the killing. | B. Direct or Victim Contribution<br>Death was almost immediate or resulted at least partially from contributing factors from the victim, e.g., victim inflicted strugly or had provoked the prisoner. This does not include victim acting in defense of self or property. | C. Severe Trauma<br>Death resulted from severe trauma inflicted with deadly intensity, e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon and resulting in immediate death or actions calculated to induce terror in the victim. |
|---|---|---|---|
| **I. Participating Victim** Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc. | 15-16-17 | 16-17-18 | 17-18-19 |
| **II. Prior Relationship** Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. Victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see Category IV. | 16-17-18 | 17-18-19 | 18-19-20 |
| **III. No Prior Relationship** Victim had little or no personal relationship with prisoner or motivation for act resulting in death was related to the accomplishment of another crime, e.g., death of victim during robbery, rape, or other felony. | 17-18-19 | 18-19-20 | 19-20-21 |

### SUGGESTED BASE TERM

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code.

HISTORY

1. Editorial correction filed 10-8-81; effective thirtieth day thereafter (Register 81, No. 41).
2. Amendment of subsection (a) filed 1-20-88; operative 2-19-88 (Register 88, No. 5).
3. Change without regulatory effect amending subsection (a) to clarify the applicability of the matrices in subsections (b) and (c) when setting the base term for prisoners sentenced to prison for attempted murder, filed 2-16-2001 pursuant to section 100, title 1, California Code of Regulations (Register 2001, No. 7).

## § 2404. Circumstances in Aggravation of the Base Term.

(a) General. The panel may impose the upper base term or another term longer than the middle base term upon a finding of aggravating circumstances. Circumstances in aggravation of the base term include:

(1) The crime involved some factors described in the appropriate matrix in a category higher on either axis than the categories chosen as most closely related to the crime;

(2) The victim was particularly vulnerable;

(3) The prisoner had a special relationship of confidence and trust with the victim, such as that of employee-employer;

(4) The murder was committed to preclude testimony of potential or actual witnesses during a trial or criminal investigation;

(5) The victim was intentionally killed because of his race, color, religion, nationality or country or origin;

(6) During the commission of the crime the prisoner had a clear opportunity to cease but instead continued;

(7) The manner in which the crime was committed created a potential for serious injury to persons other than the victim of the crime;.

Register 2003, No. 25; 6-20-2003

Exhibit #12 Page 1

**EXHIBIT 13**

**MULTIPLE SCLEROSIS VERIFICATION**

STATE OF CALIFORNIA                                                                                                  DEPARTMENT OF CORRECTIONS
DISABILITY PLACEMENT PROGRAM VERIFICATION (DPPV)                                          CHECK ALL APPLICABLE BOXES
CDC 1845 (Rev. 01/04)

**THIS FORM ONLY VERIFIES OR DISCONFIRMS CLAIMED PHYSICAL DISABILITIES LISTED IN SECTION B**

| INMATE NAME: | CDC NUMBER: | INSTITUTION: | HOUSING ASSIGNMENT: | DATE FORM INITIATED: |
|---|---|---|---|---|
| Byrd, Leslie | D30420 | RJD | FI-5-138L | 6/21/06 |

*Sections A - B to be completed by licensed medical staff.*

| SECTION A: REASON FOR INITIATION OF FORM | SECTION B: DISABILITY BEING EVALUATED |
|---|---|
| ☐ Inmate self-identifies to staff   ☐ Third party evaluation request | ☐ Blind/Vision Impaired   ☐ Speech Impaired |
| ☒ Observation by staff   ☒ Medical documentation or Central File information | ☐ Deaf/Hearing Impaired   ☒ Mobility Impaired |

*Sections C - G to be completed by a physician only.*

| SECTION C: PERMANENT DISABILITIES IMPACTING PLACEMENT | SECTION D: PERMANENT DISABILITIES NOT IMPACTING PLACEMENT |
|---|---|
| 1. ☐ **FULL TIME WHEELCHAIR USER - DPW** Requires wheelchair accessible housing and path of travel. | 1. NO CORRESPONDING CATEGORY |
| 2. ☒ **INTERMITTENT WHEELCHAIR USER - DPO** Requires lower bunk, wheelchair accessible path of travel and *does not require wheelchair accessible cell.* | 2. NO CORRESPONDING CATEGORY |
| 3. ☐ **MOBILITY IMPAIRMENT - With or Without Assistive Device (Wheelchairs shall not be prescribed) - DPM** Orthopedic, neurological or medical condition that substantially limits ambulation (cannot walk 100 yards on a level surface without pause). Requires lower bunk, no triple bunk, and no stairs in path of travel. | 3. ☐ **MOBILITY IMPAIRMENT (Lower Extremities) - DNM** Walks 100 yards without pause with or without assistive devices.   ☐ No Housing Restrictions   ☐ See HOUSING RESTRICTIONS in Section E   ☐ Requires relatively level terrain and no obstructions in path of travel. *Do not place at:* CCI, CMC-E, CRC, CTF-C, FSP, SCC I or II, SOL, or SQ. (CDC 128-C: ____) |
| 4. ☐ **DEAF/HEARING IMPAIRMENT - DPH** Must rely on written communication, lip reading or signing as residual hearing, with assistive devices, will not enable them to hear, understand or localize emergency warnings or public address announcements. | 4. ☐ **HEARING IMPAIRMENT - DNH** With residual hearing at a functional level with hearing aid(s). |
| 5. ☐ **BLIND/VISION IMPAIRMENT - DPV** Not correctable to central vision acuity of better than 20/200 with corrective lenses in at least one eye (See HOUSING RESTRICTIONS IN SECTION E). | 5. NO CORRESPONDING CATEGORY |
| 6. ☐ **SPEECH IMPAIRMENT - DPS** Does not communicate effectively speaking or in writing. | 6. ☐ **SPEECH IMPAIRMENT - DNS** Does not communicate effectively speaking, but does when writing. |

**SECTION E: ADDITIONAL MEDICAL INFORMATION**

CSRA ALERT:                                                                    HEALTH CARE APPLIANCE / IDENTIFICATION VEST:
☒ Requires relatively level terrain and no obstructions in path of travel      ☐ Cane  ☐ Crutch  ☐ Walker  ☐ Leg/Arm prosthesis  ☐ Vest
☒ Complex medical needs affecting placement   ☐ CDC 128-C _____    ☒ Other: _wheelchair_   ☐ CDC 128-C(s) dated: 6/21/06

**ASSISTANCE NEEDED WITH ACTIVITIES OF DAILY LIVING:**              **OTHER DPP DESIGNATIONS:**
☐ Feeding or Eating  ☐ Bathing  ☐ Grooming  ☐ W/C transferring      ☐ NONE  _____  _____
☐ Toileting  ☐ Other: _____  ☐ CDC 128-C(s) dated: _____                CODE    DATED    CODE    DATED

**HOUSING RESTRICTIONS:**  ☒ Lower bunk  ☒ No stairs  ☒ No triple bunk. CDC 128-C(s) dated: 6/21/06

**SECTION F: EXCLUSIONS**

☐ **VERIFICATION OF CLAIMED DISABILITY NOT CONFIRMED:** My physical examination or other objective data DOES NOT SUPPORT *claimed* disability. (Explain in Comments Section and CDC 128-C dated _____)
☐ **REMOVAL FROM A DPP CODE:** Removal from previous DPP code: _____. (Explain in Comments Section and CDC 128-C dated: _____.)
☐ **REMOVAL FROM ENTIRE PROGRAM:** Removal from DPP code(s): _____. (Explain in Comments Section and CDC 128-C dated: _____.)

**SECTION G: EFFECTIVE COMMUNICATION FACTORS**

☐ Uses Sign Language Interpreter (SLI)  ☐ Reads Braille  ☐ Communicates with written notes  ☐ Requires large print or magnifier
☐ Reads lips  ☐ NO "EFFECTIVE COMMUNICATION" ISSUES OBSERVED OR DOCUMENTED IN THE UNIT HEALTH RECORD

**PHYSICIAN'S COMMENTS:** *(Focus on affected systems and functional limitations. No specific diagnoses or other confidential medical information.)*

_patient has chronic lower extremity weakness, multiple sclerosis_

| PHYSICIAN'S NAME (Print) | PHYSICIAN'S SIGNATURE | DATE SIGNED |
|---|---|---|
| J. Richards MD | _signature_ | 6/21/06 |
| HEALTH CARE MANAGER'S / DESIGNEE'S NAME (Print) | HEALTH CARE MANAGER'S / DESIGNEE'S SIGNATURE | DATE SIGNED |
| Ivy Chas | | 6/21/06 |

**NOTE:** After review by the Health Care Manager or Chief Physician & Surgeon, health care staff shall retain green copy for the UHR, send the inmate copy via institutional mail, and route the original and remaining copies to the C&PR/RC CC-III for tracking and further distribution according to the instructions below.

DISTRIBUTION: Original - Top General Chrono Section of C-File;    Green - Chrono Section, Unit Health Record    Canary - C&PR/CC-III;    Pink-CC-I;    Gold-Inmate

Exhibit #13 Page 1

NAME and NUMBER BYRD, LESLIE    D-30420    F1-02-225U

CDC-128

This inmate requires LOWER BUNK/LOWER TIER   OTHER

This chrono is to be:

DUE TO SYMPTOMS OF MULTIPLE SCLEROSIS.
If temporary, this chrono expires at midnight on.

|  | [ ] TEMPORARY | [XX] PERMANENT |

DATE

Orig: C-File
  cc: Medical Record
      Inmate
      Housing Officer

JAMES R. HUTZLEY, M.D.
Staff Physician/Surgeon

DATE   MARCH 6, 1996    RJDCF/SD    (rs)        MEDICAL—PSYCHIATRIC—DENTAL

---

NAME and NUMBER    BYRD, LESLIE    D-30420    F1-02-225U

CDC-128-A

The above named inmate should be status restricted light duty, no prolonged
standing, walking due to gradually increasing symptoms of multiple sclerosis.
A disease of the nervous system resulting in increasing weakness, lack of
coordination, numbness, visual disturbance, etc.

This chrono to remain in force throughout inmate's stay at Richard J. Donovan
Correctional Facility.

Orig: C-File
  cc: Medical Record
      Housing Officer
      Inmate Assignment
      Inmate

JAMES R. HUTZLEY, M.D.
Staff Physician and Surgeon

DATE   MARCH 5, 1996      RJDCF/SD   (rs)           MEDICAL—PSYCHIATRIC—DENTAL

Exhibit #13 Page 2

**EXHIBIT #14**

**BOARD OF PRISON TERMS STATISTICS**

VOLUME 2   NUMBER 5    CALIFORNIA LIFER NEWSLETTER #11    SEPTEMBER 2006   PAGE 3

**BPH News** (from page 2)

## STATISTICS

# 2006 Governor Statistics – As of August 9, 2006

| Offense | Reversed | Declined Review | En Banc (*) Referral | Total |
|---|---|---|---|---|
| First Degree Murder | 18 (95%) | 1 | | 19 |
| Second Degree Murder | 60 (83%) | 12 | | 72 |
| Attempted Murder | (*) | 0 | 6 (100%) | 6 |
| Aggravated Kidnapping (*) | | 0 | 14 (100%) | 14 |

(*) the governor does not have reversal power in these cases

# 2005 BPT/Governor Parole Statistics

**Parole Consideration Hearings Conducted** ........... 4953

    **Male First-Degree Murder Cases** ........... 1320
    **Female First-Degree Murder Cases** ........... 88
       **Total First Degree Murder Cases** ........... 1408
       **All Other Cases** ........... 3545

**Overall Suitability Rate**

    **All BPH Hearings** ........... 3.6% (179/4953)
    **After Governor Reversals** ........... 1.2% ( 58/4953)

**Suitability Rate by Offense**

    **All First-Degree Murder Cases**

       **BPH Hearings** ........... 2.30% (32/1408)
       **After Governor Reversals** ........... 0.36% ( 5/1408)

    **Male First-Degree Murder Cases**

       **BPH Hearings** ........... 1.97% (26/1320)
       **After Governor Reversals** ........... 0.08% ( 1/1320)

    **Female First-Degree Murder Cases**

       **BPH Hearings** ........... 6.8% (6/88)
       **After Governor Reversals** ........... 4.5% (4/88)

Source: Letter from Governor's Legal Affairs Secretary, June 6, 2005.

The number of hearings for female prisoners was obtained from subtracting the number of male cases from the total number of cases

(Continued on page 8)

Exhibit #14 Page 1

VOLUME 2   NUMBER 6   **CALIFORNIA LIFER NEWSLETTER   #12**   NOVEMBER 2006   PAGE 10

## BPH (from page 4)

Following are tables and excerpts of the Board's parole statistics taken from our files and provided by Carl McQuillion and Michael Brodheim (many thanks!).

### Lifer Statistics:1998-2005

| | A | B | C | D1/D2 | E | F1/F2 | G |
|---|---|---|---|---|---|---|---|
| | | | # Grants | | Net # | Net % | |
| Year | # Hrgs | Denials | Prop./Eff. | #/% Rev'd | Suitable | Suitable | # Rescinded |
| 1998 | 2,191 | 2,047 | 27/23 | 3/13% | 20 | 0.91%/0.96% | 1 |
| 1999 | 1,953 | 1,827 | 21/13 | 10/77% | 3 | 0.15%/0.16% | 1 |
| 2000 | 2,179 | 1,873 | 52/37 | 12/32% | 25 | 1.15%/1.30% | 0 |
| 2001 | 3,645 | 3,098 | 84/69 | 33/48% | 36 | 0.99%/1.13% | 1 |
| 2002 | 4,826 | 3,746 | 168/140 | 102/73% | 38 | 0.79%/0.97% | 3 |
| 2003 | 4,499 | 2,957 | 168/158 | 134/85% | 24 | 0.53%/0.77% | 3 |
| 2004 | 4,552 | 2,630 | 214/204 | 128/63% | 76 | 1.67%/2.68% | 3 |
| 2005 | 4,953 | 3,177 | 161/166* | 121/73% | 45 | 0.91%/1.35% | 3 |
| | 28,798 | 21,365 | 895/810 | 543/67% | 267 | 0.93%/1.20% | 15 |

¹Other than reversals, all the statistics here were obtained in discovery from AG James E. Flynn in Brodheim v. DiNinni, et al., a 42 U.S.C. § 1983 action pending in the U.S. District Court for the Eastern District of California, case no. 2:05-CV-1512 LKK GGH P. Flynn's statistics were 'Life Prisoner Hearing and Decision Information' data sheets for calendar years 1998 through 2005 and were compiled by the Board's Management Information Section, Administrative Services Division.

²C1 lists the number of proposed grants. C2 lists the number of effective grants.

³The # of reversals (D1) was obtained from the Governor's Executive Reports. The % reversed (D2) was calculated as (# reversed x 100) / (# eff. grants), i.e., (D1 x 100)/ C2.

⁴The net # suitable (E) was calculated as (# eff. grants - # reversed), i.e., (C2 - D1).

⁵The net % suitable was calculated in two different ways. The first number (F1) was calculated as (net # suitable x 100) / (# hearings), i.e., (E x 100) / A. The second number (F2) was calculated as (net # suitable x 100) / (# denials + # proposed grants), i.e., (E x 100) / (B + C1). The calculations differ somewhat because the # hearings (apparently) includes stipulations and postponements, as well as other miscellaneous-type hearings which do not lead directly to either grants or denials of parole.

⁶It is not clear why (or how) the number of effective grants could exceed the number of proposed grants in 2005.

Exhibit #14 Page 2

VOLUME 2    NUMBER 6    CALIFORNIA LIFER NEWSLETTER    #12    NOVEMBER 2006    PAGE 11

# LIFER SENTENCES 1940-2005
## FOOTNOTES ON PAGE 12

| Year | # Hearing | #Suitable | # Rev'd | #Rescinded | %Suitable | Net % Suitable | %Rescinded |
|------|-----------|-----------|---------|------------|-----------|----------------|------------|
| 1940/41 | 4266 | 2093 | | 55 | 69.09% | | 1.29% |
| 1978/79 | | | | | 45% | | |
| 1979/80 | 515 | 96 | | | 18.44% | | |
| 1980/81 | 606 | 78 | | | 12.87% | | |
| 1981/82 | 715 | 50 | | | 6.99% | | |
| 1982/83 | 818 | 36 | | | 4.40% | | |
| 1983/84 | 636 | 53 | | | 8.34% | | |
| 1984/85 | 660 | 49 | | | 7.42% | | |
| 1985/86 | 841 | 62 | | | 7.37% | | |
| 1986/87 | 740 | 48 | | | 6.49% | | |
| 1987/88 | 807 | 31 | | | 3.87% | | |
| 1988/89 | 875 | 22 | | | 2.51% | | |
| 1989/90 | 1266 | 45 | | | 3.55% | | |
| 1990/91 | 1241 | 63 | | | 5.07% | | |
| 1991 | 1813 | 50 | 6 | 7 | 2.76% | 2.43% | 0.39% |
| 1992 | 1823 | 17 | 2 | 19 | 0.93% | 0.82% | 1.04% |
| 1993 | 1676 | 14 | 9 | 23 | 0.84% | 0.66% | 1.37% |
| 1994 | 2019 | 9 | 1 | 23 | 0.45% | 0.40% | 1.14% |
| 1995 | 2180 | 6 | 2 | 20 | 0.28% | 0.18% | 0.92% |
| 1996 | 2304 | 2 | 2 | 8 | 0.39% | 0.30% | 0.35% |
| 1997 | 2286 | 13 | 1 | 2 | 0.57% | 0.52% | 0.09% |
| 1998 | 2177 | 22 | 3 | 2 | 1.01% | 0.87% | 0.09% |
| 1999 | 1853 | 16 | 16 | | 0.82% | 0.31% | |
| 2000 | 2168 | 27 | 32 | | 1.25% | 0.69% | |
| 2001 | 3656 | 51 | 23 | | 1.46% | 0.59% | |
| 2002 | 4826 | 133 | 102 | | 2.76% | 0.64% | |
| 2003 | 4498 | 158 | 134 | | 3.53% | 0.56% | |
| 2004 | 2813 | 226 | 128 | | 8.00% | 3.45% | |
| 2005 | 4853 | 178 | 128 | | 3.61% | 1.17% | |
| **SUMMARY** | | | | | | | |
| pre-1979 | | | | | 50% | 90% | |
| 1979/80-1982/83 | 2,694 | 260 | 0 | 0 | 9.60% | 9.80% | |
| 1983/84-1990/91 | 7,260 | 373 | 0 | 0 | 5.14% | 5.14% | |
| 1991-1998 | 16,278 | 140 | 20 | 104 | 0.86% | 0.74% | 0.66% |
| 1999-2005 | 24,845 | 792 | 560 | | 3.19% | 1.01% | |
| 1941-2005 | 41,123 | 932 | 560 | | 2.27% | 0.90% | |

(Footnotes on page 12)

Exhibit #14 Page 3

VOLUME 2   NUMBER 6   CALIFORNIA LIFER NEWSLETTER   #12   NOVEMBER 2006   PAGE 12

# FOOTNOTES: LIFER SENTENCES 1940-2005

a. Board of Prison Terms and Paroles, 10th Annual Report to the Governor, p. 15.

b. Id., p. 17.

c. Estimate based on graph on p. 3 of 1988 BPT Life Prisoner Report.

d. Statistics on Parole Suitability of Life Prisoners, BPT/MIS Report, Apr. 9, 1992.

e. BPT Life Prisoner Hearing and Decision Information, Oct. 1, 1999 Report.

f. Governor's Executive Reports on Parole Review Decisions, 1991-96.

g. Communication from BPT Public Information Representative, Bill Sessa, July 16, 2003.

h. Governor's Executive Report on Parole Review Decisions, 1999.

i. Life Prisoner Hearing and Decision Information for CY 2000, MIS Report.

j. Governor's Executive Report on Parole Review Decisions, 2000.

k. Life Prisoner Hearing and Decision Information for CY 2001, MIS Report.

l. Governor's Executive Report on Parole Review Decisions, 2001.

m. Communication from BPT Public Information Representative, Bill Sessa, May 9, 2003.

n. Governor's Executive Report on Parole Review Decisions, 2002.

o. Communication from BPT Public Information Office, March 15, 2004, as modified by subsequent communication dated July 30, 2004.

p. Governor's Executive Report on Parole Review Decisions, Nov. 17, 2003 (when Schwarzenegger assumed office) through Dec. 31, 2004.

q. Does not include 18 en banc referrals (in non-murder cases).

r. June 6, 2006 letter from Daniel P. Maguire, Deputy Legal Affairs Secretary.

s. Governor's Executive Report on Parole Review Decisions (CY 2005).

t. Estimate.


\* "net % suitable" = 100 x (# suitable - # reversed)/(# hearings)

Additional Notes

1. The 1999 totals do not include 3 YA cases found suitable by the Board but reversed by Governor Davis that year.

2. It is unclear whether the Board held any rescission hearings after 1998. It appears, however, that (since that time) en banc reviews have resulted in "reversal" by the Board of many of its own previous suitability findings, so that the actual (or net) number of suitability findings may be less than the figures in the table indicate (even after taking into account reversals by the Governor).

3. The 2001 figures reflect the fact that California courts declared invalid two "reversals" by Governor Davis on the ground that the Governor does not have the authority under California law to "reverse" BPT decisions in the case of those convicted of conspiracy to commit murder.

4. The 1979/80-1982/83 summary figures coincide roughly with the results attributable to the last term of Governor Jerry Brown's administration. The 1983/84-1990/91 summary figures coincide roughly with the results attributable to the two terms of the George Deukmejian administration. The 1991-1998 summary figures coincide roughly with the results attributable to the two terms of the Governor Pete Wilson administration.

Exhibit #14 Page 4

### TABLE OF TIME SERVED
### FIRST DEGREE MURDER OFFENDERS
### YEARS 1986-2005
### MEANS & MEDIANS

## 1st Degree Murder

| YEAR | MEAN | MEDIAN | NUMBER PAROLED |
|------|------|--------|------|
| 1986 | 168.9 | 169.4 | 33 |
| 1987 | 167.7 | 157.7 | 75 |
| 1988 | 158.6 | 159 | 42 |
| 1989 | 166.3 | 166 | 51 |
| 1990 | 174.6 | 171.6 | 33 |
| 1991 | 168.9 | 169.4 | 33 |
| 1992 | 205.5 | 200.3 | 8 |
| 1993 | 193.7 | 193.7 | 2 |
| 1994 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 |
| 1998 | ISL 361.3<br>DSL 241.7 | ISL 361.3<br>DSL 241.7 | 1<br>1 |
| 1999 | ISL 286.2 | ISL 286.2 | 2 |
| 2000 | 0 | 0 | 0 |
| 2001 | DSL 251.4 | DSL 251.4 | 1 |
| 2002 | DSL 240.0 | DSL 239.1 | 3 |
| 2003 | DSL 253.2 | 243.2 | 2 |
| 2004 | (pre-78 DSL) 342.5 (28.5 yrs)<br>DSL 284.7 | (pre-78 DSL) 336.6 (28 yrs)<br>DSL 286.4 | 7<br>8 |
| 2005 | (pre-78 DSL) 372.0 (31 yrs)<br>DSL 290.4 (24.2 yrs) | (pre-78 DSL) 372.0 (31 yrs)<br>DSL 306.3 (25.5 yrs) | 2<br>3 |

Source:    California Department of Corrections, Offender Information Services Branch
Statistics and Analysis (Complete data supporting this chart is at EXHIBIT GG.)


### LIFE PRISONER RELEASES
### 1979-1987

| Year | Total Heard | Total Granted | Percentage |
|------|------|------|------|
| 1979 | N/A | N/A | 32% |
| FY 1979/1980 | 515 | 96 | 19% |
| FY 1980/1981 | 606 | 78 | 13% |
| FY 1981/1982 | 715 | 50 | 7% |
| FY 1982/1983 | 819 | 36 | 4% |
| FY 1983/1984 | 838 | 53 | 6% |
| FY 1984/1985 | 661 | 49 | 7% |
| FY 1985/1986 | 835 | 61 | 7% |
| FY 1986/1987 | 740 | 48 | 5% |

Source:    Board of Prison Terms    (1988)
Beulah Hayward
Management Information Section

&

Board of Prison Terms    (1983)
Joan W. Cavanagh
Executive Officer

Exhibit #14 Page 5

VOLUME 2   NUMBER 6     CALIFORNIA LIFER NEWSLETTER   #12     NOVEMBER 2006   PAGE 14

# 2006 PAROLES
## AS OF AUGUST 9, 2006

| PAROLE STATISTICS (Updated) 08/09/06 | Decline to Review | Reverse | En Banc | Affirm |
|---|---|---|---|---|
| 115 Total | 13 Total | 73 Total | 29 Total | 0 Total |
| | 13 - 3041.1<br>0 - 3041.2 | 73 - 3041.2 | 29 - 3041.1 | 0 - 3041.2 |

| BREAKDOWN BY CRIME AND GUBERNATORIAL ACTION (Updated 08/09/06) | 2nd Degree Murder | 1st Degree Murder | Attempted Murder | Kidnap | Other | Total |
|---|---|---|---|---|---|---|
| Decline to Review | 12 | 1 | | | | 13 |
| Affirm | | | | | | |
| Reverse | 48 | 18 | | | | 73 |
| En Banc | | | | 14 | | 29 |
| Modify | | | | | | |
| Total | 71 | 19 | 8 | 14 | | 121 |

# LATE-BREAKING NEWS

### GOVERNOR'S STAFF AGAIN REVERSED
### Court of Appeal Orders
### Jeffrey Elkins' Release

#### In re Elkins
__Cal.Rptr.3d__, __Cal.App.4th__,
2006 WL 3072139

On October 31, the Court of Appeal, First Appellate District, voided still another of Conan's staff's parole reversals, and ordered the petitioner's release on parole forthwith. Elkins, sentenced to 25-to-life for first degree felony murder and robbery in 1980, became eligible to parole on his 1994 MEPD, but had been denied parole ten times before the eleventh panel found him suitable in 2005. Predictably, Conan's staff reversed the decision, based on the gravity of the offense and the notion that Elkins had insufficient insight because he allegedly accepted responsibility only "recently."

The Court affirmed Elkins' liberty interest in his parole date, and found no evidence to support either of "the Governor's" grounds for reversal. Regarding the offense, committed by a 19-year old drug addict 26 years earlier, described by the Governator's clerks using verbiage they use in all cases: "atrocious," "cold-blooded," "brutal," and "calculated," the court found that the facts cited for reversal pertained more to the robbery and the events occurring after the murder than to the murder itself, which was not planned or calculated, but an after-thought committed during a robbery, the determinate term for which Elkins had long completed. The court found no evidence to support the Governor's staff's characterization of the murder, and no evidence that the 26-year old offense, given Elkins' exemplary prison record of conduct and reform, and his forensically determined low parole risk, suggests that his parole currently poses and undue risk to public safety.

The court also found the notion that Elkins' acceptance of responsibility was "recent" to be contrary to the record and, in any event, and, as the Lee court held (supra), that the recentness of such acceptance is irrelevant as long as it is complete and genuine, as the record indicated in the case.

Finally, the court indicated that aggravating and mitigating offense facts are appropriately considered in setting the term, and noted that Elkins had served 11 years more than his eligible parole date. The court held:

"Thus, a governor, in reviewing a suitability determination, must remain focused not on circumstances that may be aggravating in the abstract, but, rather, on facts indicating that release poses "am unreasonable risk of danger to society [cites]."

"Given the lapse of 26 years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating facts of the crime no longer amount to 'some evidence' supporting denial of parole . . . The commitment offense . . . is an unsuitability factor that is immutable and whose predictive value 'may be very questionable after a long period of time' . . . Reliance on an immutable factor, with regard to or consideration of subsequent circumstances, may be unfair, run contrary to the rehabilitative goals."

Exhibit #14 Page 6

EXHIBIT #15

MARIN COUNTY SUPERIOR COURT DENIAL

1

2

3

4

5

6

7

**FILED**

**MAR 19 2007**

KIM TURNER
Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: W. Murphy, Deputy

8                          SUPERIOR COURT OF CALIFORNIA

9                                COUNTY OF MARIN

10   LESLIE ARTHUR BYRD,                      )
                                              )   Case No.  SC 152472A
11              Petitioner,                   )
                                              )
12       v.                                   )
                                              )   **ORDER DENYING PETITION FOR**
13   ROBERT J. HERNANDEZ, WARDEN, et al.      )   **WRIT OF** *HABEAS CORPUS*
                                              )
14              Respondent.                   )
     _____)

15

16          Petitioner Leslie Arthur Byrd is an inmate currently housed in the Richard J. Donovan

17   Correctional Facility, San Diego, California.  In 1986 he was convicted in the Marin Superior

18   Court of murder (second degree) and sentenced to fifteen years to life.  His requests for parole

19   have been repeatedly denied.

20          Having reviewed the matter the Court finds that there is no good cause for the granting of

21   the petition.  Petitioner's Petition for Writ of *Habeas Corpus* is therefore denied.

22   Dated:  March 19, 2007

23

24                                            JUDGE OF THE SUPERIOR COURT

25

26

27

28

ORDER DENYING PETITION FOR WRIT OF *HABEAS CORPUS* – PAGE 1

**EXHIBIT #16**

**CALIFORNIA COURT OF APPEAL DENIAL**

**COURT OF APPEAL, FIRST APPELLATE DISTRICT**
350 MCALLISTER STREET
SAN FRANCISCO, CA 94102
DIVISION 1



In re LESLIE ARTHUR BYRD on Habeas Corpus.

A117276
Marin County No. SC152472A

**F I L E D**

MAY 3 0 2007

Court of Appeal - First App. Dist.
DIANA HERBERT
By _____

BY THE COURT:

    The petition for writ of habeas corpus is denied.

The justices participating in this matter were:

Acting Presiding Justice Stein, Justice Swager and Justice Margulies

Date: __MAY 3 0 2007__        __SWAGER, J.__        P.J.

EXHIBIT #17

CALIFORNIA SUPREME COURT DENIAL

S153569

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

In re LESLIE ARTHUR BYRD on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
**FILED**

NOV 2 8 2007

Frederick K. Ohlrich Clerk

---

Deputy

---

**GEORGE**

Chief Justice

Exhibit #17    Page 1

**EXHIBIT #18**

**In Re CRISCIONE**

09/12/2007  11:08

PAGE  01/34

**(ENDORSED)**
**FILED**

AUG 3 0 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BRET MORROW
DEPUTY

1
2
3              SUPERIOR COURT OF CALIFORNIA
4                 COUNTY OF SANTA CLARA
5
6        ┌─────────────────────────────┐
7        │ In re                       )    No.: 71614
8        │    ARTHUR CRISCIONE,        )
9        │ On Habeas Corpus            )    ORDER
10       └─────────────────────────────┘
11
12                    <u>INTRODUCTION</u>
13         Petitioner alleges that he has been denied due process of law
14    because the Board has used standards and criteria which are
15    unconstitutionally vague in order to find him unsuitable for parole.
16    Alternatively, he argues that those standards, even if
17    constitutionally sound, are nonetheless being applied in an arbitrary
18    and meaningless fashion by the Board.  He relies upon evidence that
19    in one hundred percent of 2690 randomly chosen cases, the Board found
20    the commitment offense to be "especially heinous, atrocious or
21    cruel", a factor tending to show unsuitability under Title 15
22    §2402(c)(1).
23       <u>Are the Board Criteria Unconstitutionally Vague?</u>
24         Our courts have long recognized that both state and federal due
25    process requirements dictate that the Board must apply detailed
26    standards when evaluating whether an individual inmate is unsuitable
27    for parole on public safety grounds.  (See In re Dannenberg (2005) 34
28

1

P.4                                              Judge Burland      Sep 07 07 11:30a

Exhibit #18 Page 1

1  Cal.4th 1061 at p. 1096, footnote 16.). Those standards are found in

2  15 CCR §2402 (c) (Dannenberg, supra, 34 Cal.4th at p. 1080,) and do

3  include detailed criteria to be applied by the Board when considering

4  the commitment offense:

5      (c) Circumstances Tending to Show Unsuitability. The following
       circumstances each tend to indicate unsuitability for release.
6      These circumstances are set forth as general guidelines; the
       importance attached to any circumstance or combination of
7      circumstances in a particular case is left to the judgment of
       the panel. Circumstances tending to indicate unsuitability
8      include:

9      (1) Commitment Offense. The prisoner committed the offense in an
       especially heinous, atrocious or cruel manner. The factors to be
10     considered include:

11         (A) Multiple victims were attacked, injured or killed in
           the same or separate incidents.
12
           (B) The offense was carried out in a dispassionate and
13         calculated manner, such as an execution-style murder.

14         (C) The victim was abused, defiled or mutilated during or
           after the offense.
15
           (D) The offense was carried out in a manner which
16         demonstrates an exceptionally callous disregard for human
           suffering.
17
           (E) The motive for the crime is inexplicable or very
18         trivial in relation to the offense.

19
20     In response to Petitioners claim that the regulations are

21     impermissibly vague, Respondent argues that while "especially

22     heinous, atrocious or cruel" might be vague in the abstract it is

23     limited by factors (A)-(E) of §2402(c)(1), and thus provides a

24     'principled basis' for distinguishing between those cases which are

25     contemplated in that section and those which are not.  An examination

26     of cases involving vagueness challenges to death penalty statutes is

27     instructive here and shows that Respondent's position has merit:

28         "Our precedents make clear that a State's capital sentencing

2

Exhibit #18 Page 2

1   scheme also must genuinely narrow the class of persons eligible
    for the death penalty.  When the purpose of a statutory
2   aggravating circumstance is to enable the sentencer to
    distinguish those who deserve capital punishment from those who
3   do not, the circumstance must provide a principled basis for
    doing so.  If the sentencer fairly could conclude that an
4   aggravating circumstance applies to every defendant eligible for
    the death penalty, the circumstance is constitutionally infirm."
5     (Arave v. Creech (1993) 507 U.S. 463, 474, citing Maynard v.
    Cartwright (1988) 496 U.S. 356, 364: "invalidating aggravating
6   circumstance that 'an ordinary person could honestly believe'
    described every murder," and, Godfrey v. Georgia (1980) 446 U.S.
7   420, 428-429: "A person of ordinary sensibility could fairly
    characterize almost every murder as 'outrageously or wantonly
8   vile, horrible and inhuman.'")

9
10    It cannot fairly be said that 'every murder' could be

11  categorized as "especially heinous, atrocious or cruel" under the

12  Board regulations, since the defining factors contained in

13  subdivisions (A)-(E) clearly narrow the group of cases to which it

14  applies.  Although Petitioner also argues that the "vague statutory

15  language is not rendered more precise by defining it in terms or

16  synonyms of equal or greater uncertainty"  (People v. Superior Court

17  (Engert) (1982) 31 Cal.3d 797, 803, Pryor v. Municipal Court (1979)

18  25 Cal.3d 238, 249. See also Walton v. Arizona (1990) 497 U.S. 639,

19  654), the factors in those subdivisions are not themselves vague or

20  uncertain..  The mere fact that there may be some subjective component

21  (such as "exceptionally callous" disregard for human suffering) does

22  not render that factor unconstitutionally vague.   The proper degree

23  of definition of such factors is not susceptible of mathematical

24  precision, but will be constitutionally sufficient if it gives

25  meaningful guidance to the Board.

26    A law is void for vagueness if it "fails to provide adequate
    notice to those who must observe its strictures and
27  impermissibly delegates basic policy matters to policemen,
    judges, and juries for resolution on an ad hoc and subjective
28  basis, with the attendant dangers of arbitrary and

                                    3

                                    Exhibit #18 Page 3

1  discriminatory application."  (People v. Rubalcava (2000) 23
Cal.4th 322, 332, quoting People ex rel. Gallo v. Acuna (1997)
2  14 Cal. 4th 1090, 1116, quoting Grayned v. City of Rockford
(1972) 408 U.S. 104, 108-109.)

3  A review of cases expressing approval of definitions to limit the

4  application of otherwise vague terms in death penalty statutes leads

5  inextricably to the conclusion that the limiting factors in §2402(c)

6  easily pass constitutional muster.  An Arizona statute was upheld

7  that provided a crime is committed in an 'especially cruel manner'

8  when the perpetrator inflicts mental anguish or physical abuse before

9  the victim's death," and that "mental anguish includes a victim's

10  uncertainty as to his ultimate fate."  (Walton v. Arizona (1990) 497

11  U.S. 639, 654.)  Similarly, the court in Maynard v. Cartwright, 486

12  U.S. at 364-365, approved a definition that would limit Oklahoma's

13  "especially heinous, atrocious, or cruel" aggravating circumstance to

14  murders involving "some kind of torture or physical abuse.  In

15  Florida, the statute authorizing the death penalty if the crime is

16  "especially heinous, atrocious, or cruel," satisfied due process

17  concerns where it was further defined as "the conscienceless or

18  pitiless crime which is unnecessarily torturous to the victim."

19  State v. Dixon (1973) 283 So. 2d 1 at p. 9.

20       Here, the factors in subdivisions (A)-(E) provide equally clear

21  limiting construction to the term "especially heinous, atrocious, or

22  cruel" in §2402(c).

23  **Has the Board Engaged in a Pattern of Arbitrary Application of the**

24  **Criteria?**

25       As previously noted, 15 CCR §2402 provides detailed criteria for

26  determining whether a crime is "exceptionally heinous, atrocious or

27  cruel" such that it tends to indicate unsuitability for parole.  Our

28

4

Exhibit #18 Page 4

Case 3:08-cv-00651-JM-AJB    Document 1-3    Filed 04/09/2008    Page 77 of 114
Case 4:07-cv-06375-SBA    Document 3-2    Filed 12/17/2007    Page 9 of 38
09/12/2007  11:00    PAGE  05/34

1  courts have held that to fit within those criteria and thus serve as

2  a basis for a finding of unsuitability, the circumstances of the

3  crime must be more aggravated or violent than the minimum necessary

4  to sustain a conviction for that offense. (*In re Rosenkrants* (2002)

5  29 Cal.4th 616, 682-683.)  Where that is the case, the nature of the

6  prisoner's offense, *alone*, can constitute a sufficient basis for

7  denying parole. (*In re Dannenberg, supra*, 34 Cal.4th at p. 1095.)

8      Petitioner claims that those criteria, even if constitutionally

9  sound, have been applied by the Board in an arbitrary and capricious

10  manner rendering them devoid of any meaning whatever. The role of

11  the reviewing court under these circumstances has been addressed

12  previously in the specific context of Parole Board actions:

13      "[Courts have] an obligation, however, to look beyond the facial
   validity of a statute that is subject to possible
14  unconstitutional administration since a law though fair on its
   face and impartial in appearance may be open to serious abuses
15  in administration and courts may be imposed upon if the
   substantial rights of the persons charged are not adequately
16  safeguarded at every stage of the proceedings. We have
   recognized that this court's obligation to oversee the execution
17  of the penal laws of California extends not only to judicial
   proceedings, but also to the administration of the Indeterminate
18  Sentence Law." (*In re Rodriguez* (1975) 14 Cal.3d 639, 648,
   quoting *Minnesota v. Probate Court* (1940) 309 U.S. 270, 277.)

19

20      Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case

21  closest on point to the present situation, the California Supreme

22  Court stated: "This court has traditionally accepted its

23  responsibility to prevent an authority vested with discretion from

24  implementing a policy which would defeat the legislative motive for

25  enacting a system of laws."  Where, as here, the question is whether

26  determinations are being made in a manner that is arbitrary and

27  capricious, judicial oversight "must be extensive enough to protect

28

-5-

Exhibit #18 Page 5

1  limited right of parole applicants 'to be free from an arbitrary

2  parole decision... and to something more than mere pro-forma

3  consideration.'" (*In re Ramirez* (2001) 94 Cal.App.4th 549 at p. 564,

4  quoting *In re Sturm* (1974) 11 Cal.3d 258 at p. 268.)

5      This Court, therefore, now examines Petitioner's "as applied"

6  void for vagueness challenge.

7

8                    The Evidence Presented

9      A similar claim to those raised here, involving allegations of

10  abuse of discretion by the Board in making parole decisions, was

11  presented to the Court of Appeal in *In re Ramirez, supra*. The court

12  there observed that such a "serious claim of abuse of discretion"

13  must be "adequately supported with evidence" which should be

14  "comprehensive." (*Ramirez, supra*, 94 Cal.App.4th at p. 564, fn. 5.)

15  The claim was rejected in that case because there was not "a

16  sufficient record to evaluate." (*Ibid.*) In these cases, however,

17  there is comprehensive evidence offered in support of Petitioner's

18  claims.

19      Discovery orders were issued in five different cases involving

20  life term inmates (Petitioners) who all presented identical claims.[1]

21

22  [1] This Court takes judicial notice of the several other cases currently
    pending (Lewis #68038, Jameison #71194, Bragg #108543, Ngo #127611.) which

23  raise this same issue and in which proof was presented on this same point.
    (Evidence Code § 452(d). See specifically, in the habeas corpus context,

24  *In re Vargus* (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
    notice was taken of the evidence in four other cases and in which the court

25  noted: "Facts from other cases may assist petitioner in establishing a
    pattern." See generally *McKell v. Washington Mutual, Inc.* (2006) 142

26  Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take
    judicial notice of ... established facts from both the same case and other

27  cases." And see *AB Group v. Wartin* (1997) 59 Cal.App.4th 1022, 1036:
    Judicial notice taken of other cases when matters are "just as relevant to

    the present [case] as they are to the others.")

28

                                    6

Exhibit #18 Page 6

1  The purpose of the discovery was to bring before the Court a
2  comprehensive compilation and examination of Board decisions in a
3  statistically significant number of cases.  The Board decisions under
4  examination consisted of final decisions of the Board for life-term
5  inmates convicted of first or second degree murder and presently
6  eligible for parole.  Included were all such decisions issued in
7  certain months, chosen by virtue of their proximity in time to the
8  parole denials challenged in the pending petitions.  All Board
9  decisions in the months of August, September and October of 2002,
10  July, August, September, October, November, and December of 2003,
11  January and February of 2004, February of 2005, and January of 2006
12  were compiled.  This resulted in a review of 2690 cases decided in a
13  total of 13 months.
14      The purpose of the review was to determine how many inmates had
15  actually been denied parole based in whole or in part on the Board's
16  finding that their commitment offense fits the criteria set forth in
17  Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A
18  member of the research team conducting the review, Karen Rega,
19  testified that in its decisions the Board does not actually cite CCR
20  rule §2402(c), but consistently uses the specific words or phrases
21  ("verbiage from code") contained therein, so that it could easily be
22  determined when that criteria was being applied.  (For example,
23  finding "multiple victims" invokes §2402(c)(1)(A); finding the crime
24  "dispassionate" "calculated" or "execution style" invokes
25  §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"
26  invokes §2402(c)(1)(C);  a crime that is "exceptionally callous" or
27  demonstrated a "disregard for human suffering" fits criteria
28

<center>7</center>

Exhibit #18 Page 7

1  §2402(c)(1)(D); and finding the motive for the crime "inexplicable"

2  or "trivial" invokes §2402(c)(1)(E).)

3      Petitioners provided charts, summaries, declarations, and the

4  raw data establishing the above in the cases of Lewis #68038,

5  Jameison #71194, Bragg #108543, and Ngo #127611.  In this case

6  (Criscione #71614) the evidence was presented somewhat differently.

7  Both to spread the burden of the exhaustive examination, and to

8  provide a check on Petitioners' methods, this Court ordered

9  Respondent to undertake an examination of two randomly chosen months

10  in the same manner as Petitioner had been doing.  Respondent complied

11  and provided periodic updates in which they continued to report that

12  at all "the relevant hearings the Board relied on the commitment

13  offense as a basis for denying parole."  (See "Respondent's Final

14  Discovery Update" filed April 5, 2007.)  At the evidentiary hearing

15  on this matter counsel for Respondents stipulated that "in all of

16  those cases examined [by Respondent pursuant to the Criscione

17  discovery orders] the Board relied on the commitment offense as a

18  basis for denying parole."  (See pages 34-35 of the June 1, 2007,

19  evidentiary hearing transcript.)

20      The result of the initial examination was that in over 90

21  percent of cases the Board had found the commitment offense to be

22  "especially heinous, atrocious or cruel" as set forth in Title 15

23  §2402(c)(1).  In the remaining 10% of cases either parole had been

24  granted, or it was unclear whether §2402(c)(1) was a reason for the

25  parole denial.  For all such cases, the decisions in the prior

26  hearing for the inmate were obtained and examined.  In every case,

27  the Board had determined at some point in time that every inmate's

28

8

Exhibit #18 Page 8

Case 3:08-cv-00651-JM-AJB    Document 1-3    Filed 04/09/2008    Page 81 of 114
Case 4:07-cv-06375-SBA    Document 3-2    Filed 12/17/2007    Page 13 of 38
09/12/2007  11:00                                              PAGE  09/34

1  crime was "especially heinous, atrocious or cruel" under Title 15
2  §2402(c)(1).

3      Thus, it was shown that 100% of commitment offenses reviewed by
4  the Board during the 13 months under examination were found to be
5  "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6      A further statistic of significance in this case is that there
7  are only 9,750 inmates total who are eligible for, and who are
8  currently receiving, parole consideration hearings as life term
9  inmates.  (See "Respondent's Evidentiary Hearing Brief," at p. 4,
10  filed April 16, 2007.)

11
12                    <u>USE OF STATISTICS</u>
13      In *International Brotherhood of Teamsters v. United States*
14  (1977) 431 U.S. 324, 338-340, the United States Supreme Court
15  reaffirmed that statistical evidence, of sufficient "proportions,"
16  can be sound and compelling proof.  As noted by the court in *Everett*
17  *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited
18  therein, "courts regularly have employed statistics to support an
19  inference of intentional discrimination."

20      More recently, the United States Supreme Court, in *Miller-El v.*
21  *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas
22  petitioner's allegations that the prosecutor was illegally using his
23  peremptory challenges to exclude African-Americans from the
24  petitioner's jury, noted that "the statistical evidence alone" was
25  compelling.  The high court analyzed the numbers and concluded:
26  "Happenstance is unlikely to produce this disparity."  (See also
27  *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

28

                              9

                                        Exhibit #18 Page 9

1  evidence" was noted as possibly being dispositive.  And see *People v.*

2  *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and

3  analysis, combined into an "actuarial instrument" was substantial

4  proof.)

5      A statistical compilation and examination such as has been

6  presented in these cases is entirely appropriate and sufficient

7  evidence from which to draw sound conclusions about the Board's

8  overall methods and practices.

9

10                        **THE EXPERT'S TESTIMONY**

11      Petitioners provided expert testimony from Professor Mohammad

12  Kafai regarding the statistics and the conclusions that necessarily

13  follow from them.  Professor Kafai is the director of the statistics

14  program at San Francisco State University, he personally teaches

15  statistics and probabilities, and it was undisputed that he was

16  qualified to give the expert testimony that he did.  No evidence was

17  presented that conflicts or contradicts the testimony and conclusions

18  of Professor Kafai.  By stipulation of the parties, Professor Kafai's

19  testimony was to be admissible and considered in the cases of all

20  five petitioners.  (See page 35 of the June 1, 2007, evidentiary

21  hearing transcript.)

22      Professor Kafai testified that the samples in each case, which

23  consisted of two or three months of Board decisions, are

24  statistically sufficient to draw conclusions about the entire

25  population of life term inmates currently facing parole eligibility

26  hearings.  Given that every inmate within the statistically

27  significant samples had his or her crime labeled "'particularly

28

Sep 07 07 11:53a    Jacob Burland

Exhibit #18 Page 10

1  egregious'" or "especially heinous, atrocious or cruel" under Title
2  15 §2402(c)(1), it can be mathematically concluded that the same
3  finding has been made for every inmate in the entire population of
4  9,750. Although he testified that statisticians never like to state
5  unequivocally that something is proven to a 100% certainty, (because
6  unforeseen anomalies are always theoretically possible,) he did
7  indicate the evidence he had thus far examined came as close to that
8  conclusion as could be allowed. Not surprisingly, Professor Kafai
9  also testified that "more than 50% can't by definition constitute an
10  exception."

11       Having found the data provided to the expert to be sound this
12  Court also finds the expert's conclusions to be sound. In each of
13  the five cases before the Court over 400 inmates were randomly chosen
14  for examination. That number was statistically significant and was
15  enough for the expert to draw conclusions about the entire population
16  of 9,750 parole eligible inmates. The fact that the approximately
17  2000 inmates examined in the other cases also had their parole denied
18  based entirely or in part on the crime itself (§2402(c)(1)), both
19  corroborates and validates the expert's conclusion in each individual
20  case and also provides an overwhelming and irrefutable sample size
21  from which even a non expert can confidently draw conclusions.

22

23                          DISCUSSION

24       Although the evidence establishes that the Board frequently says
25  parole is denied "first," "foremost," "primarily," or "mainly,"
26  because of the commitment offense, this statement of primacy or
27  weight is not relevant to the question now before the Court.

28

                             11

1 | Petitioners acknowledge that the Board generally also cites other
2 | reasons for its decision.  The question before this Court, however,
3 | is not whether the commitment offense is the primary or sole reason
4 | why parole is denied -- the question is whether the commitment
5 | offense is labeled "'particularly egregious'" and thus could be used,
6 | under *Dannenberg*, primarily or exclusively to deny parole.

7 | The evidence proves that in a relevant and statistically
8 | significant period where the Board has considered life term offenses
9 | in the context of a parole suitability determination, every such
10 | offense has been found to be "particularly egregious" or "especially
11 | heinous, atrocious or cruel."[2] This evidence conclusively
12 | demonstrates that the Board completely disregards the detailed
13 | standards and criteria of §2402(c).  "Especially" means particularly,
14 | or "to a distinctly greater extent or degree than is common."[3]  (EC §
15 | 431(e).)  By simple definition the term "especially" as contained in
16 | section 2402(C)(1) cannot possibly apply in 100% of cases, yet that
17 | is precisely how it has been applied by the Board.  As pointed out by
18 | the Second District Court of Appeal, not every murder can be found to
19 | be "atrocious, heinous, or callous" or the equivalent without "doing

20 | [a] In a single case out of the 2690 that were examined Petitioner has conceded that
21 | the Board did not invoke §2402(c)(1).  This Court finds that concession to be
improvidently made and the result of over caution.  When announcing the decision at
the initial hearing of S. Fletcher (B-10330) on 4/6/06, the commissioner did begin
22 | by stating "I don't believe this offense is particularly aggravated..."  However
the commissioner proceeds to describe the crime as a drug deal to which Fletcher
23 | brought a gun so "we could say there was some measure of calculation in that."  The
commissioner continued by observing that the reason someone would bring a gun to a
24 | drug transaction was to make sure things went according to their plan "so I guess
we can say that that represents calculation and perhaps it's aggravated to that
25 | extent."  As is the Board's standard practice, by using the word 'calculated' from
§2402(c)(17)(b) the Board was invoking that regulation.  Certainly if Mr. Fletcher
26 | had brought a habeas petition Respondent's position would be that there is 'some
evidence' supporting this.  The ambiguity created by the commissioner's initial
27 | statement was cleared up several pages later when he announces that "based upon the
crime coupled with ..." parole was denied for four years.  (See *In re Burns* (2006)
136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
year denial.)

28 |

12

Exhibit #18 Page 12

Case 3:08-cv-00651-JM-AJB    Document 1-3    Filed 04/09/2008    Page 85 of 114
Case 4:07-cv-06375-SBA    Document 3-2    Filed 12/17/2007    Page 17 of 38

09/12/2007  11:08

PAGE  13/34

violence" to the requirements of due process.  (*In re Lawrence* (2007)

150 Cal.App.4th 1511, 1557.)  This is precisely what has occurred

here, where the evidence shows that the determinations of the Board

in this regard are made not on the basis of detailed guidelines and

individualized consideration, but rather through the use of all

encompassing catch phrases gleaned from the regulations.


## THE BOARD'S METHODS

Because it makes no effort to distinguish the applicability of

the criteria between one case and another, the Board is able to force

every case of murder into one or more of the categories contained in

§2402(c).

For example, if the inmate's actions result in an instant death

the Board finds that it was done in a "dispassionate and calculated

manner, such as an execution-style murder."  At the same time the

Board finds that a murder not resulting in near instant death shows a

"callous disregard for human suffering" without any further analysis

or articulation of facts which justify that conclusion.  If a knife

or blunt object was used, the victim was "abused, defiled, or

mutilated."  If a gun was used the murder was performed in a

"dispassionate and calculated manner, such as an execution-style

murder."  If bare hands were used to extinguish another human life

then the crime is "particularly heinous and atrocious."

Similarly, if several acts, spanning some amount of time, were

necessary for the murder the Board may deny parole because the inmate

had "opportunities to stop" but did not.  However if the murder was

---

[3] Princeton University World Net Dictionary (2006).

Sep 07 07 11:34a        Jacob Burland

Exhibit #18 Page 13

1  accomplished quickly parole will be denied because it was done in a
2  dispassionate and calculated manner and the victim never had a chance
3  to defend themselves or flee.  If the crime occurred in public, or
4  with other people in the vicinity, it has been said that the inmate
5  "showed a callous disregard" or "lack of respect" for the
6  "community."  However if the crime occurs when the victim is found
7  alone it could be said that the inmate's actions were aggravated
8  because the victim was isolated and more vulnerable.
9      In this manner, under the Board's cursory approach, every murder
10  has been found to fit within the unsuitability criteria.  What this
11  reduces to is nothing less than a denial of parole for the very
12  reason the inmates are present before the Board - i.e. they committed
13  murder.  It is circular reasoning, or in fact no reasoning at all,
14  for the Board to begin each hearing by stating the inmate is before
15  them for parole consideration, having passed the minimum eligible
16  parole date based on a murder conviction, and for the Board to then
17  conclude that parole will be denied because the inmate committed acts
18  that amount to nothing more than the minimum necessary to convict
19  them of that crime.  As stated quite plainly by the Sixth District:
20  "A conviction for murder does not automatically render one unsuitable
21  for parole."  (Smith, supra, 114 Cal.App.4th at p. 366, citing
22  Rosenkrantz, supra, 29 Cal.4th at p. 683.)
23      In summary, when every single inmate is denied parole because
24  his or her crime qualifies as a §2402(c)(1) exception to the rule
25  that a parole date shall normally be set, then the exception has
26  clearly swallowed the rule and the rule is being illegally
27  interpreted and applied.  When every single life crime that the Board
28

14

Exhibit #18 Page 14

1  examines is "particularly egregious" and "especially heinous,

2  atrocious or cruel" it is obvious that the Board is operating without

3  any limits and with unfettered discretion.

4      Other examples of the failure to 'connect up' the facts of the

5  individual case with the criteria and the ultimate findings abound in

6  the decisions of the reviewing courts.  Some of the state cases to

7  have reversed Parole Board or Governor abuses of discretion in

8  denying parole include *In re Roderick, In re Cooper, In re Lawrence,*

9  *In re Barker, In re Gray, In re Lee, In re Elkins, In re Weider, In*

10  *re Scott, In re Deluna, In re Ernest Smith, In re Mark Smith;* and *In*

11  *re Capistran.*

12      When "the record provides no reasonable grounds to reject, or

13  even challenge, the findings and conclusions of the psychologist and

14  counselor concerning [the inmate's] dangerousness" the Board may not

15  do so.  (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16      When an inmate, although only convicted of a second degree

17  murder, has been incarcerated for such time that, with custody

18  credits, he would have reached his MEPD if he had been convicted of a

19  first, the Board must point to evidence that his crime was aggravated

20  or exceptional even for a first degree murder if they are going to

21  use the crime as a basis for denying parole.  (*In re Weider* (2006)

22  145 Cal.App.4th 570, 582-583.)⁴

23

24  ⁴   This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz, supra,* is particularly applicable in this case.  Petitioner was convicted of second degree, but acquitted of first degree, murder over 25 years ago.  (*People v. Criscione*

25  (1981) 125 Cal.App.3d 275.)  With his custody credits he is beyond the matrix even had he been convicted of a first.  In a currently pending habeas petition in which

26  he challenges his 2007 parole denial the first reason the Board gave was the crime itself and the presiding commissioner explained: "His actions go well beyond the

27  minimum necessary for a conviction of murder in the second degree."  (Decision page 2 of 4/2/07 transcript.)  For the Board to penalize the Petitioner for the fact that he was acquitted of first degree is further proof of their willfulness and

28

Exhibit #18 Page 15

1    A "petitioner's young age at the time of the offense" must be

2 considered. (In re Elkins (2006) 144 Cal.App.4th 475, 500, quoting

3 Rosenkrantz v. Marshall (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,

4 1085: "The reliability of the facts of the crime as a predictor for

5 his dangerousness was diminished further by his young age of 18, just

6 barely an adult. The susceptibility of juveniles to immature and

7 irresponsible behavior means their irresponsible conduct is not as

8 morally reprehensible as that of an adult.'")[5]

9    The Board's formulaic practice of stating §2402(c)(1) phrased in

10 a conclusory fashion, and then stating "this is derived from the

11 facts" without ever linking the two together, is insufficient. (In

12 re Roderick, (2007) ____ Cal.App.4th ____ (A113370): "At minimum, the

13 Board is responsible for articulating the grounds for its findings

14 and for citing to evidence supporting those grounds." (See also In

15 re Barker (2007) 151 Cal.App.4th 346, 371, disapproving

16 "conclusorily" announced findings.)

17    After two decades, mundane "crimes have little, if any,

18 predictive value for future criminality. Simply from the passing of

19 time, [an inmate's] crimes almost 20 years ago have lost much of

20 their usefulness in foreseeing the likelihood of future offenses than

21 if he had committed them five or ten years ago." (In re Lee (2006)

22 143 Cal.App.4th 1400, 1412.) It should be noted that this rule

23 _____

bias. The jury had a reasonable doubt that Petitioner committed first degree
24 murder but under the Board's 'reasoning' and 'analysis' this puts him in a worse
position than if they had not. Had the jury convicted him of the greater offense
25 Petitioner has served so much time that he would already be having subsequent
parole hearings on a first and the Board would not have been able to use the 'some
26 evidence' of first degree behavior against him. As observed previously, the
Board's position in this regard is "so ridiculous that simply to state it is to
refute it." (Weider, supra, 145 Cal.App.4th at p. 583.)
27 This point is particularly significant in the case of Mike Ngo. Mr. Ngo was only
18 at the time of his crime. The impetus behind the shooting was youth group or

28

Exhibit #18 Page 16

1 applies with even more force when the Board is relying on any
2 criminality that occurred before the crime.  In that situation, just
3 as with the crime itself, the Board must explain why such old events
4 have any relevance and especially when the inmate has spent a decade
5 as a model prisoner.

6     Murders situationally related to intimate relationships are
7 unfortunately commonplace because emotions are strongest in such
8 domestic settings.  When a murder occurs because of "stress unlikely
9 to be reproduced in the future" this is a factor that affirmatively
10 points towards suitability.  (*In re Lawrence* (2007) 150 Cal.App.4th
11 1511 and cases cited therein.)

12     "The evidence must substantiate the ultimate conclusion that the
13 prisoner's release currently poses an unreasonable risk of danger to
14 the public.  It violates a prisoner's right to due process when the
15 Board or Governor attaches significance to evidence that forewarns no
16 danger to the public."  (*In re Tripp* (2007) 150 Cal.App.4th 306,
17 313.)

18     The Board "cannot rely on the fact that the killing could have
19 been avoided to show the killing was especially brutal."  (*In re
20 Cooper* (2007) 153 Cal.App.4th 1043, 1064.)

21     The Board's focus must be upon how the inmate "actually
22 committed his crimes" not the "incorporeal realm of legal
23 constructs."  (*Lee, supra,* 143 Cal.App.4th at p. 1413.)  This is
24 especially significant when the murder conviction is based on the
25 felony murder rule, provocative act doctrine, or accomplice liability
26 such that the inmate did not intend to kill or may not have even been

27 _____
gang rivalries, posturing, and threats which mature adults would not have been
28

17

Case 3:08-cv-00651-JM-AJB    Document 1-3    Filed 04/09/2008    Page 90 of 114
09/12/2007  11:08
Case 4:07-cv-06375-SBA    Document 3-2    Filed 12/17/2007    Page 22 of 38    PAGE  18/34



1  the actual killer.

2      The Board has ample guidance before it in the decisions of the

3  various reviewing courts to constrain its abuse, but has failed to

4  avail itself of the opportunity to do so.

5

6                     SEPARATION OF POWERS DOCTRINE

7      The evidence presented, as discussed above, has established a

8  void for vagueness "as applied" due process violation.  That same

9  evidence also proves a separate but related Constitutional violation

10  -- an as applied separation of powers violation.

11      The separation of powers doctrine provides "that the legislative

12  power is the power to enact statutes, the executive power is the

13  power to execute or enforce statutes, and the judicial power is the

14  power to interpret statutes and to determine their

15  constitutionality."  (*Lockyer v. City and County of San Francisco*

16  (2004) 33 Cal.4th 1055, 1068.)  Because the evidence has proven the

17  Board is not executing/enforcing the legislature's statutes as

18  intended it is this Court's duty to intervene.  The question here is

19  whether the Board is violating the separation of powers doctrine by

20  appropriating to itself absolute power over parole matters and

21  disregarding the limits and guidelines placed by the statute.[6]

22      "Government Code section 11342.2 provides: 'Whenever by the

23  _____

   caught up in.
24  [6] "It is settled that Administrative regulations that violate acts of the
   Legislature are void and no protestations that they are merely an exercise of
25  administrative discretion can sanctify them.  They must conform to the legislative
   will if we are to preserve an orderly system of government.  Nor is the motivation
26  of the agency relevant: It is fundamental that an administrative agency may not
   usurp the legislative function, no matter how altruistic its motives are."
   (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16
27  Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of
   San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

28

                                   18

1 | express or implied terms of any statute a state agency has authority
2 | to adopt regulations to implement, interpret, make specific or
3 | otherwise carry out the provisions of the statute, no regulation
4 | adopted is valid or effective unless consistent and not in conflict
5 | with the statute and reasonably necessary to effectuate the purpose
6 | of the statute.'  Administrative regulations that alter or amend the
7 | statute or enlarge or impair its scope are void and courts not only
8 | may, but it is their obligation to strike down such regulations."
9 | (Pulaski v. Occupational Safety & Health Stds. Bd. (1999) 75
10 | Cal.App.4th 1315, 1341, citations omitted.)
11 |      The vice of overbroad and vague regulations such as are at issue
12 | here is that they can be manipulated, or 'interpreted,' by executive
13 | agencies as a source of unfettered discretion to apply the law
14 | without regard to the intend of the people as expressed by the
15 | legislature's enabling statutes.  In short, agencies usurp unlimited
16 | authority from vague regulations and become super-legislatures that
17 | are unaccountable to the people.  As it has sometimes been framed and
18 | addressed in the case law, a vague or all encompassing standard runs
19 | the risk of "violat[ing] the separation of powers doctrine by
20 | 'transforming every [executive decisionmaker] into a "mini-
21 | legislature" with the power to determine on an ad hoc basis what
22 | types of behavior [satisfy their jurisdiction].'"  (People v. Ellison
23 | (1998) 68 Cal.App.4th 203, 211, quoting People v. Superior Court
24 | (Caswell) (1988) 46 Cal.3d 381, 402.)
25 |      "It is concern about 'encroachment and aggrandizement,' the
26 | [United States Supreme Court] reiterated, that has animated its
27 | separation of powers jurisprudence.  'Accordingly, we have not
28 |

19

1  hesitated to strike down provisions of law that either accrete to a

2  single Branch powers more appropriately diffused among separate

3  Branches or that undermine the authority and independence of one or

4  another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th

5  472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,

6  382.)  This articulation of the principle speaks directly to the

7  situation at hand.  The Board, by its enactment and interpretation of

8  Title 15, §2402, has appropriated to itself absolute power over

9  'lifer' matters.  Overreaching beyond the letter and spirit of the

10 Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by

11 the Board to supply the power to declare every crime enough to deny

12 parole forever.  The fact that Title 15, §2402, has been invoked in

13 every case, but then sometime later not invoked, tends to show either

14 completely arbitrary and capricious behavior or that unwritten

15 standards are what really determine outcomes.  In either event, all

16 pretenses of taking guidance from, or being limited by, the

17 legislature's statutes have been abandoned.  "[I]t is an elementary

18 proposition that statutes control administrative interpretations."

19 (*Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 78.)

20 Title 15 §2402 as applied, however, has no controls or limitations.

21     The PC § 3041(b) exception to the rule can only be invoked when

22 the "gravity of the current convicted offense or offenses, or the

23 timing and gravity of current or past convicted offense or offenses,

24 is such that consideration of the public safety requires a more

25 lengthy period of incarceration for this individual."  The word

26 "gravity" is a directive for comparison just as "more lengthy"

27 indicates a deviation from the norm.  While *Dannenberg* held there

28

20

Exhibit #18 Page 20

1   does not need to be intra case comparison for the purposes of term
2   uniformity or proportionality, there necessarily has to be some sort
3   of comparison for the purposes of adhering to the legislative mandate
4   that parole is available.  The Board employs no meaningful yardstick
5   in measuring parole suitability.  This is a violation of the
6   separation of powers doctrine.  (People v. Wright (1982) 30 Cal.3d
7   705; 712-713.  And see Terhune v. Superior Court (1998) 65
8   Cal.App.4th 864, 872-873.  Compare Whitman v. Am. Trucking Ass'ns
9   (2001) 531 U.S. 457, 472, describing a delegation challenge as
10  existing when the legislature fails to lay down "an intelligible
11  principle to which the person or body authorized to act is directed
12  to conform.")

13

14                        RESPONDENT'S POSITION

15      The Attorney General has suggested, without pointing to any
16  concrete examples, that it is possible that the Board, when invoking
17  the crime as a reason to deny parole, is not placing it within
18  §2402(c)(1) but instead using is as some sort of 'lesser factor'
19  which, only when combined with other unsuitability criteria, can
20  contribute to a valid parole denial.  The two problems with this
21  position are, first, there is no evidentiary support for this
22  assertion, and second, it would have no impact on the constitutional
23  infirmities outlined and proven above.

24      Even if Respondent had produced evidence that the Board was
25  utilizing the crime as a 'lesser factor' which needs others to fully
26  support a parole denial, the Board would then be admitting it was
27  denying parole, in part, for the very reason that the person is

28

                                21

1  before the panel and eligible for parole in the first place - the
2  commitment offense.  Respondent's argument suggests that a crime that
3  only qualified as the *Dannenberg* "minimum necessary" could still be
4  invoked as a reason for denying parole.  Respondent argues that when
5  the crime is invoked 'not in the *Dannenberg* sense,' there must be
6  other reasons for the parole denial and the crime alone would not be
7  enough in this context.  This position is inconsistent with the law
8  and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly
10  egregious," or one where "no circumstances of the offense reasonably
11  could be considered more aggravated or violent than the minimum
12  necessary to sustain a conviction for that offense."  (*Dannenberg*,
13  *supra*, 34 Cal.4th at pp. 1094-1095.)  These are the only two choices.
14  If a crime consists of only the bare elements then it is not
15  aggravated and it cannot, in and of itself, serve as a basis for
16  parole denials once the inmate becomes eligible for parole.  It is
17  the reason an inmate may be incarcerated initially for the equivalent
18  of 15 or 25 years, and then examined to determination rehabilitation
19  efforts when they come before the Board, but a crime that is no more
20  than the bare minimum cannot be factored into the equation pursuant
21  to PC § 3041(b) or any of the case law interpreting it.

22      In oral argument Respondent suggested a second way the
23  commitment offense can be used outside of §2402(c)(1).  If for
24  example a crime had its roots in gang allegiances or rivalries and
25  the inmate continued to associate with gangs while incarcerated, then
26  an aspect of the crime, even if the crime otherwise consisted of no
27  more than the minimum elements, could be combined with other behavior
28

22

Exhibit #18 Page 22

1   to support a parole denial.  Similarly, if a crime was rooted in an

2   inmate's then existing drug addiction, and the Board was to point to

3   a recent 115 involving drugs, the evidence that the inmate's drug

4   issues had not been resolved would justify a parole denial even if

5   the crime itself was not aggravated.  A finding that the inmate is

6   not suitable for release under these circumstances, however, is not

7   based on the facts of the commitment offense as tending to show

8   unsuitability..  It is based on the conclusion that can be drawn about

9   Petitioner's lack of rehabilitation or change since the offense, and

10  thus, his present dangerousness..

11      Respondent has not demonstrated any flaws in Petitioner's

12  methodology or analysis, nor provided any actual evidence of the

13  crime being invoked *other* than pursuant to §2402(c)(1).  Drawing

14  conclusions from the Board's direct statements, or its precise

15  recitations of the §2402(c)(1) language, logically indicates an

16  invocation of §2402(c)(1), and Respondent's suggestion otherwise is

17  insupportable.

18

19              THE QUESTION OF BIAS

20      Because the issue has been squarely presented, and strenuously

21  argued by Petitioners, this Court is obligated to rule on the charge

22  that the Board's actions prove an overriding bias and deliberate

23  corruption of their lawful duties.

24      In the discrimination and bias case of *USPS Bd. of Governors v.*

25  *Aikens* (1983) 460 U.S. 711, the United States Supreme Court

26  acknowledged "there will seldom be 'eyewitness' testimony as to the

27  [] mental processes" of the allegedly biased decisionmaker.  Instead,

28

                                23

Exhibit #18 Page 23

1  an examination of other cases for trends or patterns can provide the

2  necessary circumstantial evidence. (See *Aikens*, *supra*, at footnote

3  2.) Reaffirming that such circumstantial evidence will be sufficient

4  the Court stated: "The law often obliges finders of fact to inquire

5  into a person's state of mind. As Lord Justice Bowen said in

6  treating this problem in an action for misrepresentation nearly a

7  century ago, 'The state of a man's mind is as much a fact as the

8  state of his digestion. It is true that it is very difficult to

9  prove what the state of a man's mind at a particular time is, but if

10 it can be ascertained it is as much a fact as anything else.'"

11 (*Aikens*, at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29

12 Ch. Div. 459, 483.)[7]

13     The discovery in these cases was granted in part due to the

14 Petitioners' prima facie showing of bias and the necessity that it be

15 "adequately supported with evidence" if such evidence is available.

16 (*Ramirez*, *supra*, 94 Cal.App.4th at p. 564, fn. 5. See also *Nasha v.*

17 *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking

18 to show bias or prejudice on the part of an administrative decision

19 maker is required to prove the same 'with concrete facts.'" And see

20 *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,

21 841: "The challenge to the fairness of the adjudicator must set forth

22 concrete facts demonstrating bias or prejudice." See also *Hobson v.*

23

24 [7] As occurred in *Aikens*, *supra*, and as suggested in prior orders of this Court,
Respondent should have provided direct evidence from the decisionmakers. While the

25 fact that a *Defendant* does not explain his or her actions cannot be held against
him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S.

26 610,) it is appropriate to give some weight to the consideration that the Board has
failed to offer any direct evidence or explanation on its own behalf. While the

27 case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the
proposition that *Petitioner* may not inquire into the Board members mental
processes, Respondent is not precluded from offering such direct evidence if they

28 were able to testify as to their good faith and conscientious efforts.

qxd

Exhibit #18 Page 24

1  *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.
2  school desegregation case in which the court determined from a
3  statistical and factual analysis that racial bias was influencing
4  policy.)

5      In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,
6  a similar claim of biased decision making was asserted and it was
7  rejected because, although the defendant clearly articulated it, "he
8  has not demonstrated it. Therefore, he has failed to bear his burden
9  of showing a constitutional violation as a demonstrable reality, not
10  mere speculation." In the present cases Petitioners have provided
11  overwhelming concrete evidence. It is difficult to believe that the
12  Board's universal application of §2402(c)(1) has been an inadvertent
13  mistake or oversight on their part. It is hard to credit the Board's
14  position that it does not know its own patterns and practices reveal
15  a complete lack of standards or constraints on their power.
16  Respondent's protestations ring hollow, and it seems a statistical
17  impossibility, that the Board's use of "detailed" criteria in such a
18  fashion that they are rendered meaningless is a result of good faith
19  efforts on their part. That *every* murder is "especially heinous,
20  atrocious or cruel," and can therefore be an exception to the rule
21  that a parole date should be set, does not seem to be an accident on
22  their part.

23      Although no court has thus far agreed with the accusation that
24  the Board approaches its duties with a predetermination and a bias,
25  no court has previously been presented the comprehensive evidence
26  outlined herein. While this Court does not turn a blind eye to the
27  reasonable conclusion that the Board's unconstitutional practices are
28

25

Exhibit #18 Page 25

1  willful, there is another possibility.  The pattern of errors
2  demonstrated by the discovery in this case, and the continuously
3  growing body of Court of Appeal opinions finding consistent and
4  persistent abuse of discretion, may instead be caused by the fact
5  that the Board is simply overworked and substantively untrained.  The
6  impossibility of the blanket applicability of §2402(c)(1) may be only
7  the result of sloppy preparation and inadvertent carelessness.
8      The Board must first be given an opportunity to comply with the
9  necessary remedy provided by this court before it is possible to
10  enter a finding of conscious bias and illegal sub rosa policy.  To do
11  otherwise would ignore the complexities and magnitude of the largely
12  discretionary duties with which that Board is vested.
13
14                          CONCLUSION
15      The conclusive nature of the proof in this case, and the
16  suggestion of institutional bias do not preclude formulation of an
17  remedy which will guarantee adequate restrictions on, and guidance
18  for, the Board's exercise of discretion in making parole suitability
19  determinations.  The Board can be made to lawfully perform its duties
20  if given explicit instructions.
21      As noted supra, a reason the proof in this case irrefutably
22  establishes constitutional violations is because the Board does not,
23  in actual fact, operate within the limiting construction of the
24  regulations.  The Board's expansive interpretation allows it to
25  operate without any true standards.  Although numerous rulings of
26  both state and federal courts of appeal have invalidated the Board's
27  application of the §2402(c) criteria to particular facts, the Board
28

                              26

1   does not take guidance from these binding precedents and ignores them
2   for all other purposes.  In the most recent of these cases, *In re*
3   *Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District
4   held four of five §2402 factors "found" by the Board to be
5   unsupported by any evidence.  At footnote 14 the court took the time
6   to criticize the Board for its repeated use of a "stock phrase"
7   "generically across the state."  The court also clarified that "at
8   minimum, the Board is responsible for articulating the grounds for
9   its findings and for citing to evidence supporting those grounds."
10      There is nothing in the evidence presented that would allow any
11  conclusion but that, without intervention of the Courts, the Board
12  will ignore the lessons of these rulings in the future and continue
13  to employ its formulaic approach of citing a criteria from
14  §2402(c)(1), repeating the facts of the crime, but never
15  demonstrating a logical connection between the two.    This is the
16  core problem with the Board's methodology -- they provide no
17  explanation or rationale for the findings regarding the crime itself.
18    This practice results in violence to the requirements of due
19  process and individualized consideration which are paramount to the
20  appropriate exercise of its broad discretion.
21      The only solution is one that compels the Board to identify the
22  logical connection between the facts upon which it relies and the
23  specific criteria found to apply in the individual case.  For
24  example, the Board often finds that an inmate's motive is "trivial"
25  without ever suggesting why, on these facts, that motive is not just
26  as trivial as the motive behind any other murder.  What motive is not
27  trivial?  By any definition "trivial" is a word of comparison and
28

27

1  only has meaning when there can be examples that are not "trivial."

2      Similarly, although the Sixth District made it plain four years

3  ago that "all [] murders by definition involve some callousness," (*In*

4  *re Smith* (2003) 114 Cal.App.4th 343, 345,) the Board has continued to

5  deny countless paroles labeling the crime "callous" without ever

6  suggesting what crime would not qualify as "callous" and without

7  consistently explaining why the individual case before it

8  demonstrates "exceptional" callousness.

9      Respondent has consistently refused to suggest what possible

10  instances of murder would not fit the Board's amorphous application

11  of the §2402 criteria.  Citing *Dannenberg*, Respondent insists such

12  comparative analysis is unnecessary.  Respondent fundamentally

13  misunderstands the *Dannenberg* holding.

14      The PC § 3041(b) exception to the rule can only be invoked when

15  the "gravity of the current convicted offense or offenses, or the

16  timing and gravity of current or past convicted offense or offenses,

17  is such that consideration of the public safety requires a more

18  lengthy period of incarceration for this individual."  The word

19  "gravity" is a directive for comparison just as "more lengthy"

20  indicates a deviation from the norm.  While *Dannenberg* held there

21  does not need to be intra case comparison for the purposes of term

22  uniformity or proportionality, there necessarily has to be some sort

23  of comparison for the purposes of adhering to the legislative mandate

24  that parole is available.  This is implicit in §2402 because the

25  qualifier "especially," in "especially heinous atrocious or cruel',"

26  requires that some form of comparison be made.  While the original

27  drafters of §2402 seemed to have recognized this fact, the ongoing

28

Exhibit #18 Page 28

1  conduct of the Board has completely ignored it, and this is the

2  essence of the due process violation Petitioners have asserted.

3       As noted in his dissent in the recent case of *In re Roderick,*

4  *supra,* Justice Sepulveda would have deferred to the Board's

5  'exercise' of discretion because "Board members have both training

6  and vast experience in this field.  They conduct literally thousands

7  of parole suitability hearings each year.  The Board therefore has

8  the opportunity to evaluate the egregiousness of the facts of a great

9  number of commitment offenses. ...  The Board's training and

10 experience in evaluating these circumstances far exceeds that of

11 most, if not all, judges."  The evidence in this case, however,

12 suggests a flaw in granting such deference.  Since the Board

13 continues to place every murder in the category of offenses "tending

14 to show unsuitability," something is certainly wrong.  Since the

15 Board's vast experience is undeniable, the problem must be in the

16 Board's training and understanding of the distinguishing features of

17 the guidelines and criteria.  Although Justice Sepulveda presumes

18 that Board members receive substantive training, there is no evidence

19 before this court to suggest that it does, and substantial

20 circumstantial evidence to suggest that it does not.

21      In the vast numbers of Santa Clara County cases reviewed by this

22 Court, the Board's formulaic decisions regarding the commitment

23 offense do not contain any explanation or thoughtful reasoning.

24 Instead, the Board's conclusionary invocation of words from

25 §2402(c)(1) is linked to a repetition of the facts from the Board

26 report by the stock phrase: "These conclusions are drawn from the

27 statement of facts wherein ...."  Thereafter the inmate files a habeas

28

                                    29

```
 1   corpus petition and Respondent, after requesting an extension of
 2   time, files a boilerplate reply asserting the Board's power is
 3   "great" and "almost unlimited" and thus any "modicum" of evidence
 4   suffices.  Respondent does not cite or distinguish the expanding body
 5   of case law that is often directly on point as to specific findings
 6   made.  Thereafter, if the writ is granted, the Board is directed to
 7   conduct a new hearing "in compliance with due process" and that order
 8   is appealed by Respondent.  On appeal the order is usually upheld
 9   with modifications and in the end, after countless hours of attorney
10   and judicial time, the Board conducts a new two hour hearing at which
11   they abuse their discretion and violate due process in some different
12   way.

13       This system is malfunctioning and must be repaired.  The
14   solution must begin with the source of the problem.  The Board must
15   make efforts to comply with due process in the first instance.  The
16   case law published over the last five years provides ample and
17   sufficient guidelines and must be followed.  Although the Board
18   methods suggest it believes this to be optional, it is not.
19
20                          THE REMEDY
21       Thus, it is the order of this Court that the Board develop,
22   submit for approval, and then institute a training policy for its
23   members based on the current and expanding body of published state,
24   and federal, case law reviewing parole suitability decisions, and
25   specifically the application of §2402 criteria.  In addition to
26   developing guidelines and further criteria for the substantive
27   application of §2402 the Board must develop rules, policies and
28
```

30

Exhibit #18 Page 30

Case 3:08-cv-00651-JM-AJB   Document 1-3   Filed 04/09/2008   Page 103 of 114
Case 4:07-cv-06375-SBA   Document 3-2   Filed 12/17/2007   Page 35 of 38
09/12/2007  11:00                                          PAGE  31/34

1   procedures to ensure that the substantive guidelines are followed.
2        This Court finds its authority to impose this remedy to flow
3   from the fundamental principles of judicial review announced over two
4   centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.
5   Citing that landmark case, the California Supreme Court has
6   recognized "Under time-honored principles of the common law, these
7   incidents of the parole applicant's right to 'due consideration'
8   cannot exist in any practical sense unless there also exists a remedy
9   against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)
10       In *Sturm* the court directed that the Board modify its rules and
11  procedures so that thereafter "The Authority will be required [,]
12  commencing with the finality of this opinion, to support all its
13  denials of parole with a written, definitive statement of its reasons
14  therefor and to communicate such statement to the inmate concerned."
15  (*Sturm* at p. 273.)
16       Similarly, in the case of *Minnis, supra,* the California Supreme
17  Court held the Board's policy of categorically denying parole to drug
18  dealers was illegal.  Based on its analysis the court there was
19  clearly prepared to order that Board to modify its rules and
20  procedures however such was unnecessary because the Board
21  "voluntarily rescinded" the illegal policy.  While the remedy in this
22  case is of greater scope than that necessary in either *Sturm* or
23  *Minnis, supra,* so too has been the showing of a systematic abuse of
24  discretion and distortion of process.
25       The most recent case to address the court's roles and duties in
26  overseeing the parole suitability process has been *In re Rosenkrantz,*
27  *supra,* 29 Cal.4th 616.  In that case the court explained that
28

                                  31

Exhibit #18 Page 31

1   judicial review of a Governor's parole determination comports with,
2   and indeed furthers, separation of powers principles because the
3   courts are not exercising "complete power" over the executive branch
4   and do not "defeat or materially impair" the appropriate exercise or
5   scope of executive duties.  (Rosenkrantz at p. 662.)  Citing Strum,
6   supra, the court reaffirmed that a life term inmate's "due process
7   rights cannot exist in any practical sense without a remedy against
8   its abrogation." (Rosenkrantz at p. 664.)
9       The Rosenkrantz court also put forth what it believed was an
10  extreme example but which, unfortunately, has been shown to exist in
11  this case.  The court stated: "In the present context, for example,
12  judicial review could prevent a Governor from usurping the
13  legislative power, in the event a Governor failed to observe the
14  constitutionally specified limitations upon the parole review
15  authority imposed by the voters and the Legislature."  This is
16  exactly what the evidence in this case has proven.  As noted above
17  the Board has arrogated to itself absolute authority, despite
18  legislative limitations and presumptions, through the mechanism of a
19  vague and all inclusive, and thus truly meaningless, application of
20  standards.  The remedy this Court is imposing is narrowly tailored to
21  redress this constitutional violation.
22      The consequence of the Board's actions (of giving § 2402(c)(1)
23  such a broadly all encompassing and universal application) is that
24  they have unwittingly invalidated the basis of the California Supreme
25  Court's holding in Dannenberg.  The reason the four justice majority
26  in Dannenberg upheld the Board's standard operating procedures in the
27  face of the Court of Appeal and dissent position is because "the
28

'32'

Exhibit #18 Page 32

Case 3:08-cv-00651-JM-AJB   Document 1-3   Filed 04/09/2008   Page 105 of 114
Case 4:07-cv-06375-SBA   Document 3-2   Filed 12/17/2007   Page 37 of 38
09/12/2007  11:00   PAGE 33/34

1  Board must apply detailed standards when evaluating whether an

2  individual inmate is unsuitable for parole on public safety grounds."

3  (*Dannenberg* at p. 1096, footnote 16.  See also page 1080: "the

4  regulations do set detailed standards and criteria for determining

5  whether a murderer with an indeterminate life sentence is suitable

6  for parole.")  However, Petitioners in these cases have proven that

7  there are no "detailed standards" at all.  Instead the Board has

8  systematically reduced the "detailed standards" to empty words.  The

9  remedy this Court orders, that there truly be "detailed standards,"

10 requires the promulgation of further rules and procedures to

11 constrain and guide the Board's powers.  This remedy differs in

12 specifics, but not in kind, from what courts have previously imposed

13 and have always had the power to impose.

14     The Board must fashion a training program and further rules,

15 standards and regulations based on the opinions and decisions of the

16 state and federal court cases which provide a limiting construction

17 to the criteria which are applied.[8]  The Board must also make

18 provisions for the continuing education of its commissioners as new

19 case law is published and becomes binding authority.  This Court will

20 not, at this point, outline the requirements and lessons to be taken

21 from the above cases.  It is the Board's duty, in the first instance

22 to undertake this task.  The training program, and associated rules

23 and regulations, shall be served and submitted to this Court, in

24 _____

25 [8]While the showing and analysis in this case was limited to § 2402(c)(1), the
   conclusions that the evidence compelled, that the Board has been carelessly
   distorting and misapplying the regulations, is not so limited.  Accordingly, the

26 training program that is necessary for the Board can not reasonably be limited to
   just § 2402(c)(1).  Thus, to the extent case law recognizes, clarifies and
   establishes remedies for other due process violations they must also be

27 incorporated into the necessary rules and training the Board is required to abide
   by.

28

<div align="center">33</div>

Exhibit #18 Page 33

Case 3:08-cv-00651-JM-AJB    Document 1-2    Filed 04/09/2008    Page 106 of 114
09/12/2007  11:00
Case 4:07-cv-06375-SBA    Document 3-2    Filed 12/17/2007    Page 38 of 88    34/34

1 | writing, within 90 days.  Counsel for Petitioners, and any other
2 | interested parties, may submit briefs or comments within 30 days
3 | thereafter.  After receipt and review of the materials this Court
4 | will finalize the training program, and associated rules, and the
5 | Petitioners in these cases shall receive a new hearing before a Board
6 | that does not operate with the unfettered discretion and caprice
7 | demonstrated by the evidence here presented.

8 | <center>ORDER</center>

9 | For the above reasons the habeas corpus petition is granted and
10 | it is hereby ordered that Petitioner be provide a new hearing which
11 | shall comply with due process as outlined above.  Respondent shall
12 | provide weekly updates to this Court on the progress of its
13 | development of the new rules and regulations outlined above.

14

15

16

17 | DATED: _Aug 30_, 2007

18 | LINDA R. CONDRON
     JUDGE OF THE SUPERIOR COURT

19

20 | cc: Petitioner's Attorney (Jacob Burland)
         Attorney General (Denise Yates, Scott Mather)
21

22

23

24

25

26

27

28

<center>34</center>

Exhibit #18 Page 34

1

IN THE UNITED STATES DISTRICT COURT

2

FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    LESLIE A. BYRD,                              No. C 07-06375 SBA (PR)

6                    Petitioner,                  **ORDER OF TRANSFER**

7        v.

8    ROBERT J. HERNANDEZ, Warden,

9                    Respondent.
     _____/

10

11        Petitioner, a state prisoner, has filed a <u>pro se</u> petition for a writ of habeas corpus pursuant to

12   28 U.S.C. § 2254, challenging as a violation of his constitutional rights the denial of parole by the

13   California Board of Parole Hearings.[1]  He has paid the filing fee.

14        A petition for a writ of habeas corpus filed by a state prisoner in a State that contains two or

15   more federal judicial districts may be filed in either the district of confinement or the district of

16   conviction.  <u>See</u> 28 U.S.C. § 2241(d).  The district court where the petition is filed, however, may

17   transfer the petition to the other district in the furtherance of justice.  <u>See id.</u>  Federal courts in

18   California traditionally have chosen to hear petitions challenging a conviction or sentence in the

19   district of conviction.  <u>See</u> <u>Dannenberg v. Ingle</u>, 831 F. Supp. 767, 767 (N.D. Cal. 1993); <u>Laue v.</u>

20   <u>Nelson</u>, 279 F. Supp. 265, 266 (N.D. Cal. 1968).  But if a habeas petition is directed to the manner in

21   which a sentence is being executed, e.g., if it involves parole or time credit claims, the district of

22   confinement is the preferable forum.  <u>See</u> Habeas L.R. 2254-3(a); <u>Dunne v. Henman</u>, 875 F.2d 244,

23   249 (9th Cir. 1989).

24        Petitioner is incarcerated at the R.J. Donovan Correctional Facility, which lies within the

25   venue of the Southern District of California.  <u>See</u> 28 U.S.C. § 84.  Because Petitioner challenges the

26   execution of his sentence, the Court hereby ORDERS that pursuant to 28 U.S.C. § 1404(a) and

---

[1]  The Board of Prison Terms was abolished effective July 1, 2005, and replaced with the Board of Parole Hearings.  Cal. Penal Code § 5075(a).

**United States District Court**
For the Northern District of California

1   Habeas L.R. 2254-3(b), and in the interests of justice, this petition be TRANSFERRED to the

2   United States District Court for the Southern District of California.

3          IT IS SO ORDERED.

4

DATED:  3/13/08                                      _Saundra B Armstrong_____

5   ─                                                SAUNDRA BROWN ARMSTRONG
                                                     United States District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

P:\PRO-SE\SBA\HC.07\Byrd6375.Transfer.wpd 2

1

2   UNITED STATES DISTRICT COURT

3   FOR THE

4   NORTHERN DISTRICT OF CALIFORNIA

5

6

7   LESLIE A. BYRD,                          Case Number: CV07-06375 SBA

8            Plaintiff,                       **CERTIFICATE OF SERVICE**

9   v.

10  ROBERT J. HERNANDEZ et al,

11           Defendant.
    _____/

12

13  I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
    Court, Northern District of California.

14

15  That on March 14, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said
    copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
    envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
16  located in the Clerk's office.

17

18
    Leslie A. Byrd D-30420
19  R.J. Donovan Correctional Facility
    480 Alta Rd.
20  San Diego, CA 92179

21  Dated: March 14, 2008
                                     Richard W. Wieking, Clerk
22                                   By: LISA R CLARK, Deputy Clerk

23

24

25

26

27

28
    P:\PRO-SE\SBA\HC.07\Byrd6375.Transfer.wpd 3

*United States District Court*
*For the Northern District of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LESLIE A. BYRD,

        Petitioner,

v.

ROBERT J. HERNANDEZ, Warden,

        Respondent.

                         /

No. C 07-06375 SBA (PR)

**<u>ORDER OF TRANSFER</u>**

    Petitioner, a state prisoner, has filed a <u>pro se</u> petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging as a violation of his constitutional rights the denial of parole by the California Board of Parole Hearings.[1] He has paid the filing fee.

    A petition for a writ of habeas corpus filed by a state prisoner in a State that contains two or more federal judicial districts may be filed in either the district of confinement or the district of conviction. <u>See</u> 28 U.S.C. § 2241(d). The district court where the petition is filed, however, may transfer the petition to the other district in the furtherance of justice. <u>See id.</u> Federal courts in California traditionally have chosen to hear petitions challenging a conviction or sentence in the district of conviction. <u>See</u> <u>Dannenberg v. Ingle</u>, 831 F. Supp. 767, 767 (N.D. Cal. 1993); <u>Laue v. Nelson</u>, 279 F. Supp. 265, 266 (N.D. Cal. 1968). But if a habeas petition is directed to the manner in which a sentence is being executed, e.g., if it involves parole or time credit claims, the district of confinement is the preferable forum. <u>See</u> Habeas L.R. 2254-3(a); <u>Dunne v. Henman</u>, 875 F.2d 244, 249 (9th Cir. 1989).

    Petitioner is incarcerated at the R.J. Donovan Correctional Facility, which lies within the venue of the Southern District of California. <u>See</u> 28 U.S.C. § 84. Because Petitioner challenges the execution of his sentence, the Court hereby ORDERS that pursuant to 28 U.S.C. § 1404(a) and

---

[1] The Board of Prison Terms was abolished effective July 1, 2005, and replaced with the Board of Parole Hearings. Cal. Penal Code § 5075(a).

United States District Court
For the Northern District of California

1  Habeas L.R. 2254-3(b), and in the interests of justice, this petition be TRANSFERRED to the

2  United States District Court for the Southern District of California.

3      IT IS SO ORDERED.

4

DATED: 3/13/08

5                                          *Saundra B Armstrong*
                                           SAUNDRA BROWN ARMSTRONG
6                                          United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

P:\PRO-SE\SBA\HC.07\Byrd6375.Transfer.wpd 2

1

2    UNITED STATES DISTRICT COURT

3    FOR THE

4    NORTHERN DISTRICT OF CALIFORNIA

5

6

7    LESLIE A. BYRD,                                  Case Number: CV07-06375 SBA

8            Plaintiff,                          **CERTIFICATE OF SERVICE**

9      v.

10   ROBERT J. HERNANDEZ et al,

11           Defendant.
     _____/

12

13   I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
     Court, Northern District of California.

14

15   That on March 14, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said
     copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
     envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
16   located in the Clerk's office.

17

18
     Leslie A. Byrd D-30420
19   R.J. Donovan Correctional Facility
     480 Alta Rd.
20   San Diego, CA 92179

21   Dated: March 14, 2008
                                          Richard W. Wieking, Clerk
22                                        By: LISA R CLARK, Deputy Clerk

23

24

25

26

27

28

     P:\PRO-SE\SBA\HC.07\Byrd6375.Transfer.wpd 3

United States District Court
For the Northern District of California

**UNITED STATES DISTRICT COURT**
**Northern District of California**
1301 Clay Street
Oakland, California 94612

www.cand.uscourts.gov

Richard W. Wieking                                          General Court Number
Clerk                                                            510.637.3530

April 1, 2008

U.S. District Court, Southern District of CA
4290 Edward J. Schwartz Federal Building
880 Front Street
San Diego, CA 92101-8900

RE: CV 07-06375 SBA  LESLIE A. BYRD-v-ROBERT J. HERNANDEZ

Dear Clerk,

Pursuant to an order transferring the above captioned case to your court, transmitted herewith
are:

&#9746;        Certified copy of docket entries.

&#9746;        Certified copy of Transferral Order.

&#9746;        Original case file documents.

&#9746;        Please access the electronic case file for additional pleadings you may need.  See

        the attached instructions for details.

Please acknowledge receipt of the above documents on the attached copy of this letter.

Sincerely,
RICHARD W. WIEKING, Clerk

by: _____/s/_____
        Jessie Mosley
Case Systems Administrator

Enclosures
Copies to counsel of record

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

**FILED**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

APR 0 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ DEPUTY

**I (a) PLAINTIFFS**

Leslie A. Byrd

FILING FEE PAID
Yes ✓  No

IFP MOTION FILED
Yes  No ✓

COPIES SENT TO:
Court ✓   Pro Se

**DEFENDANTS**

Robert J. Hernandez, Warden

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**   San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Leslie A. Byrd
480 Alta Road
San Diego, CA 92179
D-30420

**ATTORNEYS (IF KNOWN)**

'08 CV 0651 JM AJB

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
(For Diversity Cases Only)   **FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)**

## 28 U.S.C. 2254

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☒ 530 General | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ Security Act | | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☐ Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☒ 5 Transferred from another district (specify) NORTHERN CA.   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   DEMAND $   Check YES only if demanded in complaint:   JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE   Docket Number

DATE   4/9/2008

SIGNATURE OF ATTORNEY OF RECORD